UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                             :

GRAMERCY HOLDINGS I, LLC d/b/a NORANDA :
ALUMINA,                                   :

                Plaintiff,        :

                                 :

        -v-                     :       20 Civ. 3937 (JPC)

                                 :

MATEC S.R.L. *et al.*,                   :

                                 :

                Defendants.     :

---------------------------------------------------------------------X
                             :

MATEC SRL *et al.*,                       :

                               :

                Plaintiffs,     :

                               :

        -v-                     :       20 Civ. 4136 (JPC)

                               :      <u>OPINION AND ORDER</u>

GRAMERCY HOLDINGS I, LLC d/b/a NORANDA :
ALUMINA,                                   :

                Defendant.     :

---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

    In 2017 and 2019, Gramercy Holdings I, LLC d/b/a Noranda Alumina ("Noranda"), which

operates an alumina refinery in Gramercy, Louisiana, entered into three contracts with Matec SRL

and Matec America, Inc. ("Matec America", and together with Matec SRL, "Matec") to purchase

five industrial filter presses to be used to process refinery waste.  In these consolidated cases,[1]

---

[1] Unless otherwise specified, citations to "Dkt." refer to the docket in *Gramercy Holdings I, LLC v. Matec S.R.L.*, No. 20 Civ. 3937 (JPC) (S.D.N.Y.).  Where clarification would be helpful,

Matec and Noranda sue each other for breach of contract.  In addition, Noranda sues Matec for breach of implied warranty, fraudulent inducement, negligent misrepresentation, and unjust enrichment, and Matec sues Noranda for breach of the implied covenant of good faith and fair dealing.[2]  Now before the Court are each party's *Daubert* motion to exclude certain opinions of the expert witness retained by its adversary, Dkts. 86, 95, and each party's motion for partial summary judgment, Dkts. 90, 98.

First, Noranda's *Daubert* motion seeks to exclude two opinions expressed by Matec's expert, Dr. Gerald Fuller: his opinion as to what caused the filter presses Noranda purchased to operate slower than expected, and his opinion as to what information Matec relied upon in designing the filter presses.  That motion is granted in part and denied in part.  Fuller may testify that the presence of entrained air in the bauxite residue actually generated at Noranda's refinery caused longer cycle times than expected based on the samples provided by Noranda prior to entering into the first contract, although Fuller may not testify that entrained air was the *only* reason for the slower-than-expected cycle times.  As to the latter opinion, Fuller may not testify to the mental states of Matec's employees, though he may opine on the sort of information a chemical engineer should rely on, or typically relies on, when designing filtration equipment.  Second, Matec's *Daubert* motion seeks the exclusion of two opinions of Noranda's expert, Dr. John Spevacek: his opinion that Matec overstated its experience and capacities in negotiating its deal

---

citations to the docket in that case will be preceded by "*Gramercy*," and citations to the docket in *Matec SRL v. Gramercy Holdings I, LLC*, No. 20 Civ. 4136 (JPC) (S.D.N.Y.) will be preceded by "*Matec*."

[2] Noranda's motion to dismiss Matec's claims against it for tortious interference and trade secret misappropriation was granted on March 31, 2021.  *Matec SLR v. Gramercy Holdings I, LLC*, No. 20 Civ. 4126 (AJN), 2021 WL 1226956, at *4-5 (S.D.N.Y. Mar. 31, 2021).  In addition, on March 8, 2021, Matec voluntarily dismissed the same two claims as pled against Luca Martinelli, a former party in No. 20 Civ. 4126.  *Matec*, Dkt. 51.

with Noranda, and his opinion that Matec was to blame for the unknown cause of the slower-than-expected operation of the filter presses.  That motion is granted, and those two opinions of Spevacek are excluded.  Third, Noranda seeks summary judgment that Matec is liable for negligent misrepresentation and breach of each of the three contracts between the parties, that Noranda is not liable for breach of any of those contracts or for breach of the implied covenant of good faith and fair dealing, and that certain categories of damages sought by Matec are unavailable.  That motion is granted in part.  Matec cannot recover certain types of damages as discussed below.  Noranda's motion for summary judgment is denied in all other respects.  Lastly, Matec seeks summary judgment dismissing Noranda's claims for negligent misrepresentation, fraudulent inducement, and unjust enrichment, and further denying certain categories of damages sought by Noranda.  That motion also is granted in part.  Noranda's claims for negligent misrepresentation and unjust enrichment are dismissed, its claim for fraudulent inducement is dismissed except with respect to two specific alleged misrepresentations, and it cannot recover punitive damages, attorneys' fees, or certain types of compensatory damages.

## I. Background

### A. Facts[3]

Noranda operates an alumina refinery.  Matec 56.1 Stmt. ¶ 1.  The process of refining alumina generates "a slurry-like residue referred to as bauxite residue," *id.* ¶ 2, and "[a]n alumina

---

[3] These facts are drawn from Noranda's statement of undisputed material facts, filed pursuant to Local Civil Rule 56.1(a) in support of its motion for partial summary judgment, Dkt. 93 ("Noranda 56.1 Stmt."); Matec's statement of undisputed material facts, filed pursuant to Rule 56.1(a) in support of its motion for partial summary judgment, Dkt. 100 ("Matec 56.1 Stmt."); Noranda's response to Matec's statement of undisputed material facts and counter-statement of additional material facts, filed pursuant to Rule 56.1(b) in opposition to Matec's motion for partial summary judgment, Dkt. 111 ("Noranda Counter 56.1 Stmt."); Matec's response to Noranda's statement of undisputed material facts and counter-statement of additional material facts, filed

refinery's life is linked to the available space to store bauxite residue," Noranda 56.1 Stmt. ¶ 1. Prior to the events giving rise to this litigation, Noranda stored the residue its refinery generated in "mud lakes." Matec Counter 56.1 Stmt. ¶ 268. But because it was running out of space to store the residue in that manner, Noranda sought a more space-efficient method of processing and storing it. Noranda 56.1 Stmt. ¶ 2. Consequently, Noranda decided to purchase filter presses that would remove water from the residue, thereby reducing its volume and permitting more space-efficient storage. *Id.*; Matec 56.1 Stmt. ¶¶ 3-4. Noranda selected Matec to provide those filter presses. Noranda 56.1 Stmt. ¶ 4. In connection with its preparation for the sale of filter presses to Noranda, Matec tested samples of bauxite residue, which were either taken by Matec during an on-site visit to Noranda's refinery or shipped by Noranda to Matec for the purpose of testing. *Id.* ¶¶ 41-42; Matec Counter 56.1 Stmt. ¶¶ 42, 273-74.

In a "Commercial Offer" labelled "20150510/2015 – Noranda Alumina" and dated May 2, 2017, Noranda agreed to purchase two filter presses and additional components (the "Initial Presses") from Matec for a total price of $2,808,175. Noranda 56.1 Stmt. ¶¶ 15, 63; Matec 56.1 Stmt. ¶ 4; *see* Dkt. 99-1 ("First Contract") at 1-3. The Initial Presses would be installed and assembled at the alumina refinery. Noranda 56.1 Stmt. ¶ 64. Certain costs of installation were included in the price for the Initial Presses, *id.* ¶ 65, and the First Contract explicitly identified the

---

pursuant to Rule 56.1(b) in opposition to Noranda's motion for partial summary judgment, Dkt. 110 ("Matec Counter 56.1 Stmt."); Noranda's reply to Matec's response and counter-statement, Dkt. 123 ("Noranda Reply 56.1 Stmt."); Matec's reply to Noranda's response and counter-statement, Dkt. 124; and the exhibits filed by the parties. (Noranda separately numbered the paragraphs in its response to Matec's statement of undisputed material facts, *see* Noranda Counter 56.1 Stmt. at 2-5, and in its counter-statement of additional material facts, *see id.* at 5-12. Citations to that document by paragraph refer to the latter portion; the former is cited by page.) Unless otherwise noted, the Court cites only to either Noranda's or Matec's statement of undisputed material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add its own "spin" on the fact or otherwise dispute the inferences drawn from it.

installation expenses that would be covered by Matec and those that would be covered by Noranda, Matec Counter 56.1 Stmt. ¶ 65; *see* First Contract at 3. The First Contract further contained technical specifications relating to the performance of the Initial Presses. Matec Counter 56.1 Stmt. ¶ 71. Those technical specifications provided that "Filtrations per hour (average)" would be "2/3 (Depending on treated material)." *Id.*; First Contract at 11.

The First Contract contemplated that delivery of the Initial Presses would take approximately four months and that installation would take six weeks, followed by six weeks of commissioning, the process of confirming that the newly installed machines were functioning properly. Noranda 56.1 Stmt. ¶ 66; First Contract at 3. However, due to delays during installation, commissioning did not begin until January 2019. Noranda 56.1 Stmt. ¶ 79; Matec Counter 56.1 Stmt. ¶ 79. And once the commissioning of the Initial Presses began, they failed to complete the two to three cycles per hour specified in the First Contract, instead completing roughly one cycle per hour. Noranda 56.1 Stmt. ¶¶ 80-81; Matec Counter 56.1 Stmt. ¶ 81. Matec claimed that the Initial Presses operated with longer-than-expected cycle times once they were installed in the refinery because the bauxite residue contained "air entrainment," Noranda 56.1 Stmt. ¶ 89; Matec Counter 56.1 Stmt. ¶ 89, a technical term for "gas bubbles in the slurry," Noranda 56.1 Stmt. ¶ 93. Matec had not previously raised air entrainment in the residue as a potential issue during its testing of the residue, during the installation of the Initial Presses, or during any other stage prior to the execution of the First Contract or the commissioning of the Initial Presses. *Id.* ¶ 98. While Noranda complained that the performance of the Initial Presses failed to comply with the requirements of the First Contract, Matec, in turn, complained that Noranda had failed to pay the full amount due under the First Contract. Matec 56.1 Stmt. ¶ 7.

In order to resolve these outstanding disputes, *see* Noranda 56.1 Stmt. ¶ 111; Matec 56.1 Stmt. ¶¶ 8-9, the parties executed two additional agreements with stated effective dates of July 22, 2019, Noranda 56.1 Stmt. ¶¶ 112, 214; *see* Dkt. 99-2 ("Punch List") at 1; Dkt. 99-3 ("Second Contract") at 1.  In the Punch List, formally titled the "Agreement on Punch List Items Regarding Commercial Offer Dated May 2, 2017," Punch List at 1, "Matec agreed to make certain repairs to the filter presses; Noranda agreed to pay a portion of its outstanding balance upon completion of those repairs; and both parties agreed to revised performance specifications and to certain liquidated damages."  Matec 56.1 Stmt. ¶ 10; *see generally* Punch List.  In the Second Contract, Noranda agreed to purchase three additional filter presses from Matec, one of the same type as the Initial Presses (the "Third Press") and two smaller, mobile presses (the "Cubes", and together with the Third Press the "Additional Presses").  Noranda 56.1 Stmt. ¶¶ 215, 218-19; Matec 56.1 Stmt. ¶ 11; *see generally* Second Contract.  Payment for the Additional Presses would be contingent on the completion of the repairs agreed to in the Punch List.  Second Contract at 36 ¶ 2; Noranda 56.1 Stmt. ¶ 222.  The Second Contract further set forth a schedule governing both when Matec would complete its installation of the Additional Presses and when Noranda would pay Matec for those Presses.  Second Contract at 38.

Shortly after the Punch List and Second Contract were signed, the parties executed amendments to both agreements, which were effective as of September 24, 2019.  Matec Counter 56.1 Stmt. ¶ 328; *see generally* Dkt. 99-2 at 20 ("Punch List Amendment"); Dkt. 99-3 at 41-42 ("Second Contract Amendment").[4]  The Punch List Amendment extended Matec's deadline to ship various components to be employed in repairing the Initial Presses.  Punch List Amendment

---

[4] Since neither Amendment is paginated using the pagination for the underlying agreements that were amended, the pincites in this citation refer to the ECF-generated page numbers for the PDF documents.  The Court will cite each Amendment by section, not by page.

§ 1.  The Second Contract Amendment also revised the timeline for Matec to ship and install the Additional Presses and for Noranda to pay for them.  Second Contract Amendment §§ 1, 4, 6-7. Matec subsequently shipped both Cubes and the Third Press to Noranda.  Matec Counter 56.1 Stmt. ¶¶ 346, 358.   However, Matec did not finish installing or commissioning any of the Additional Presses.  Noranda 56.1 Stmt. ¶ 233.  If Matec failed to perform its obligations under the Second Contract, Noranda was permitted to engage an alternative contractor to complete the remaining work instead of Matec, all at Matec's expense.  *Id.* ¶ 231.  On May 6, 2020, Noranda informed Matec that it was exercising that right and that it would therefore finish installing the machines without Matec.  Matec 56.1 Stmt. ¶ 14.  As of the parties' briefing, the Additional Presses had not been installed and were not operational.  Matec Counter 56.1 Stmt. ¶ 358.

### B.    Procedural History

On May 21, 2020, Noranda filed its Complaint against Matec, bringing one count of fraudulent inducement, *Gramercy*, Dkt. 1 ("Compl.") ¶¶ 106-15; one count of negligent misrepresentation, *id.* ¶¶ 116-20; three counts of breach of contract concerning, respectively, the First Contract, *id.* ¶¶ 121-29, the Punch List, *id.* ¶¶ 130-41, and the Second Contract, *id.* ¶¶ 142-51; one count of breach of implied warranty, *id.* ¶¶ 152-58; and one count of unjust enrichment, *id.* ¶¶ 159-164.  Shortly thereafter, on May 29, 2020, Matec initiated a separate action by filing its own Complaint against both Noranda and Luca Martinelli, *Matec*, Dkt. 1 at 1, who, allegedly, was a former employee of Matec Steelworks S.r.l., *id.* ¶ 18, and was later employed by Noranda or one of its affiliates, *id.* ¶ 9.  Against Noranda, Matec brought one count of breach of contract, *id.* ¶¶ 50-54, one count of breach of the implied covenant of good faith and fair dealing pleaded in the alternative to the breach of contract claim, *id.* ¶¶ 55-60, one count of tortious interference, *id.* ¶¶ 61-67, and one count of trade secret misappropriation, *id.* ¶¶ 68-74.  Against Martinelli, Matec

brought one count of tortious interference, *id.* ¶¶ 75-78, and one count of trade secret misappropriation, *id.* ¶¶ 68-74.

On August 11, 2020, Matec answered Noranda's Complaint, *Gramercy*, Dkt. 14, and Noranda moved to dismiss Matec's Complaint, *Matec*, Dkt. 14.  Subsequently, on December 7, 2020, Matec moved to consolidate No. 20 Civ. 4136 with No. 20 Civ. 3937, *Matec*, Dkt. 34, which Noranda subsequently opposed, *Matec*, Dkt. 39.  Then, on February 8, 2021, while Noranda's motion to dismiss was still pending, Martinelli also moved to dismiss.  *Matec*, Dkt. 40.  Rather than opposing Martinelli's motion, Matec filed a notice of voluntary dismissal as to Martinelli on March 8, 2021, *Matec*, Dkt. 51, which was so-ordered the following day by the Honorable Alison J. Nathan, *Matec*, Dkt. 52, to whom these cases were at the time assigned.  Judge Nathan then issued a Memorandum Opinion and Order on March 31, 2021, granting Noranda's motion to dismiss with respect to the claims for tortious interference and trade secret misappropriation claims, *Matec SLR*, 2021 WL 1226956, at *4-5, but denying it with respect to the claims for breach of contract and breach of the implied covenant of good faith and fair dealing, *id.* at *2-4.  Lastly, after Noranda answered Matec's Complaint on April 28, 2021, *Matec*, Dkt. 58, Judge Nathan consolidated the two cases on May 3, 2021, *Gramercy*, Dkt. 35; *Matec*, Dkt. 61.  Each was transferred to the undersigned on April 10, 2022.  *See* Notice of Case Reassignment dated Apr. 10, 2022.

Following the close of fact and expert discovery, *see* Dkt. 81, on November 18, 2022, the parties each moved to exclude certain opinions of the opposing party's expert witness, *see* Dkts. 86-87, 88 ("Noranda *Daubert* Br."), 95-96, 97 ("Matec *Daubert* Br."), and for partial summary

judgment, *see* Dkts. 90-91, 92 ("Noranda SJ Br."), 98-100, 101 ("Matec SJ Br.").[5]  On December

16, 2022, each party opposed the other party's motions.  *See* Dkts. 102 ("Noranda *Daubert* Opp."),

103, 105 ("Noranda SJ Opp."), 106-07, 108 ("Matec SJ Opp."), 109-112, 113 ("Matec *Daubert*

Opp.").  On January 6, 2023, each party replied.  *See* Dkts. 115 ("Noranda *Daubert* Reply"), 116,

118 ("Matec *Daubert* Reply"), 119, 120 ("Matec SJ Reply"), 121 ("Noranda SJ Reply"), 122-24.

## II. *Daubert* Motions

In connection with this case, Matec retained Gerald Fuller, Ph.D., a professor of chemical

engineering, Dkt. 87-1 ("Fuller Report") ¶ 3, to offer expert testimony on its behalf, *id.* ¶ 1, and

Noranda in turn retained John Spevacek, Ph.D., a chemical engineer with experience in both

industry and academia, Dkt. 87-3 ("Spevacek Report") at 1-2, to review and respond to the Fuller

Report, *id.* at 1.  Each party has moved to exclude certain opinions proffered by the other's expert

witness.  The Court must address whether the opinions proffered by the parties' experts are

admissible before ruling on their motions for summary judgment.  *See Nicosia v. Amazon.com,

Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) ("The summary judgment standard requires a court to

consider all relevant, admissible evidence . . . ." (internal quotation marks omitted)); *Colon ex rel.

Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he court must evaluate

evidence for admissibility before it considers that evidence in ruling on a summary judgment

motion." (citing Fed. R. Evid. 104(a))).  "If a proffer of expert testimony is excluded as

inadmissible pursuant to Rule 702, the court must make the summary judgment determination on

a record that does not include that evidence."  *Colon*, 199 F. Supp. 2d at 68.  The standard for

admissibility of expert testimony at the summary judgment stage is the same as it is at trial.  *See*

---

[5] Identical versions of Noranda's *Daubert* motion and Noranda's motion for partial summary judgment, along with the supporting papers, were filed in No. 20 Civ. 4136 at Docket Numbers 104 through 106 and 108 through 111, respectively.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[T]he district court functions as the gatekeeper for expert testimony.  The court performs the same role at the summary judgment phase as at trial." (internal citations omitted)).

**A.     Legal Standard**

Under the Federal Rules of Evidence,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Employing this framework, a district court's Rule 702 inquiry entails assessing three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will 'assist the trier of fact')."  *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17 Civ. 7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court set forth four non-exhaustive factors to be used in applying the second of these requirements, the reliability of the expert's reasoning or methodology:  (i) whether the theory or technique relied on has been tested; (ii) whether the theory or technique has been subjected to peer review and

publication; (iii) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation in the case of a particular scientific technique; and (iv) whether the theory or method has been generally accepted by the scientific community.  *Id.* at 593-94.  But the Supreme Court has emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *id.* at 594, and that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  In addition, as the Second Circuit has explained, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  Thus, district courts must "exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks and modification omitted).

A district court has "broad discretion to carry out this gatekeeping function" under Rule 702, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016), which "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," *Kumho Tire*, 526 U.S. at 141.  Furthermore, as the Supreme Court has made clear, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142.  "Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion." *Colon*, 199 F.

Supp. 2d at 71. But Rule 702 still requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590). Furthermore, the party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10 ("Preliminary questions concerning the qualification of a person to be a witness . . . should be established by a preponderance of proof." (internal quotation marks omitted)); *In re Pfizer*, 819 F.3d at 658 ("The proponent of the expert testimony has the burden to establish these admissibility requirements . . . .").

**B.    Gerald Fuller, Ph.D.**

Fuller is a professor of chemical engineering at Stanford University, where he studies complex liquids, including "the fluid dynamics and rheology of suspensions and foams." Fuller Report ¶ 3. His Report first discusses general principles governing the process of filtering a fluid containing suspended solid particles, such as the bauxite slurry that Noranda sought to filter using the presses it purchased from Matec. *See generally id.* ¶¶ 11-29. That discussion addresses how suspended air bubbles in a fluid affect the process of filtering it. *See id.* ¶¶ 22-29. Next, the Report applies these general principles of fluid filtration—including those related to the effect of suspended air bubbles—to analyze Noranda's use of Matec's filtration equipment. *See generally id.* ¶¶ 30-50. In particular, Fuller concludes that the samples of bauxite residue supplied to Matec for testing prior to the execution of the First Contract were denser than the residue that Noranda in fact sought to filter in its refinery, *id.* ¶ 40, that this difference in density was caused by air entrainment in the residue at the refinery, *id.* ¶ 41, that the presence of entrained air would reduce the efficiency of the pumps that transport bauxite residue to the filter presses so that they may be filtered, *id.* ¶ 46, and that because of this difference in density the cycle times at which the filter

presses actually operated on-site in the refinery were longer than the cycle times that would be expected from the samples Noranda supplied to Matec, *id.*  In addition, although the topic is not a focus of the Report, at various points Fuller asserts in passing that Matec had relied on the samples of bauxite residue or information provided by Noranda when designing the filter presses Noranda purchased.  *Id.* ¶¶ 38 ("Matec relied on this information supplied by Noranda to design the filtration system . . . ."), 40 (discussing "critical physical characteristics of the plant's bauxite slurries, upon which Matec relied in its filtration unit design," and "the density values of the samples supplied to Matec and that were relied upon in the filtration unit design"), ¶ 46 ("[T]he cause of these longer cycle times can be traced entirely back to the large amount of entrained air of which Matec was unaware during the design process *because it was not included in the specifications provided by Noranda*." (emphasis added)).

Noranda seeks to exclude two opinions of Fuller's—namely, "that (1) the slow cycle times supposedly were caused 'entirely' by the air bubbles in the bauxite residue, and (2) Matec allegedly justifiably relied on Noranda's pre-contract bauxite residue specifications (the 'specific gravity' measurement) when designing the defective filter presses."  Noranda *Daubert* Br. at 2.  Noranda argues that the first opinion must be excluded for four reasons:  because Fuller failed to consider and rule out possible causes for the slow cycles other than entrained air, *id.* at 9-10; because he did not confirm his conclusions using real-world data, *id.* at 10; because he "contradicted his own opinion in his deposition," *id.* at 10-11; and because he did not personally examine the machinery at issue in this case or review the testimony of the individuals involved, *id.* at 11.  And Noranda argues that the second opinion must be excluded because Fuller had no basis upon which to form beliefs about Matec's state of mind in designing the filter presses, *id.* at 12-13, and because in any

event expert testimony is not admissible for the purpose of proving individuals' state of mind, *id.* at 13.

### 1.   Reliance

The Court begins with the latter opinion.  As mentioned, Matec's supposed reliance on the samples or information Noranda provided is not a focus of the Fuller Report; instead, a few sentences in the Report merely mention that reliance in passing.  Fuller Report ¶¶ 38, 40, 46.  Thus, it is not entirely clear what opinion Fuller intended to express.  Noranda construes the opinion as a claim about the mental states of the Matec employees responsible for planning and executing Matec's transaction with Noranda.  Noranda *Daubert* Br. at 12 ("[I]t appears that Dr. Fuller tried to read the minds of Matec's principals . . . .  In doing so, he offered an opinion about information that Matec allegedly relied upon before entering the First Contract with Noranda . . . .").  And this interpretation is certainly supported by the text of the Fuller Report, which flatly states that "Matec relied on this information supplied by Noranda to design the filtration system."[6]  Fuller Report ¶ 38.

In opposition, Matec argues primarily that Noranda "misstates Professor Fuller's actual opinions."  Matec *Daubert* Opp. at 13.  Without any requirement for "special expertise," the conclusion that Matec relied on Noranda's samples "naturally flows from the facts" that Matec

---

[6] In its briefing, Noranda claims that Fuller opined not merely that Matec relied on Noranda's samples but further that Matec's reliance was justifiable.  Noranda *Daubert* Br. at 2 ("Dr. Fuller opined, among other things, that . . . Matec allegedly *justifiably* relied on Noranda's pre-contract bauxite residue specifications . . . ." (emphasis added)); Noranda *Daubert* Reply at 10 (describing "Dr. Fuller's opinion that Matec supposedly *justifiably* relied on Noranda's pre-contract feed specifications" (emphasis added)) & n.3 (arguing that Fuller should not be "permitted to testify about Matec's supposed *justifiable* reliance on Noranda's pre-contract representations" (emphasis added)).  The words "justified," "justifiable," and "justifiably" do not appear in the Fuller Report, however, and the Court is unaware of Noranda's basis for thinking that Fuller opined on the justifiability of Matec's reliance.

sought those samples out and tested them in the process of designing the presses and negotiating their sale to Noranda.  *Id.*  Then, "Fuller's expertise adds to this reasonable conclusion the knowledge that, in the field of chemical engineering, specifications and samples are the type of information usually relied upon in designing equipment." *Id.* at 13-14.  In its reply, Noranda reiterates its arguments for why Fuller's testimony as to Matec's state of mind would be inadmissible, but it does not dispute that Fuller could testify as to what information a chemical engineer would normally require to design filtration equipment.  Noranda *Daubert* Reply at 10.

Thus, while the parties may disagree about what opinion Fuller intended to express in his Report when discussing the samples of Noranda's bauxite residue that Matec tested, it appears that they do not disagree as to the actual admissibility of any particular opinion.  In its opposition, Matec does not argue that Fuller should be permitted to testify about the actual mental states of Matec's employees, including as to the question of what information they relied upon in designing the filter presses.  And while the Court makes no finding as to whether Fuller intended to express any such opinion in his Report, it agrees that any testimony as to the actual mental states of Matec employees would be inadmissible.  Expert testimony must involve "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), thereby "ensur[ing] that expert witnesses will not testify about 'lay matters which a jury is capable of understanding and deciding without the expert's help.'"  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541 (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).  But opinions "on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." *Id.* at 546.  Instead, such testimony addresses a paradigmatic lay matter that juries are capable of understanding without expert assistance.  *Id.*  Indeed, as Matec

itself acknowledges, inferring that Matec relied on the samples Noranda sent, given that Matec solicited and tested those samples, "requires no special expertise."  Matec *Daubert* Opp. at 13. Because inferences about individuals' actual mental states "lie outside the bounds of expert testimony," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547, any testimony Fuller might present as to what information Matec employees actually considered and relied upon when designing the filter presses is inadmissible.  However, Noranda presented no argument as to why Fuller's expertise in chemical engineering provides an inadequate basis for him to opine about what information a chemical engineer should rely upon, or typically would rely upon, when designing filtration equipment.  Fuller may testify on those topics, as they fall within his expertise.

### 2.      Causation

Next, the Court considers Fuller's opinion that air bubbles in the bauxite residue that Noranda in fact sought to filter at its refinery, which were not present in the samples Noranda previously supplied to Matec for testing, caused the pumps to operate with longer cycle times than expected.  Fuller Report ¶ 46.  Noranda describes that opinion as Fuller determining that "the slow cycle times supposedly were caused 'entirely' by the air bubbles in the bauxite residue."  Noranda *Daubert* Br. at 2.

As the Supreme Court has explained, the focus of the inquiry into the admissibility of a proffered expert's testimony "must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.  And Fuller formed his opinion about the cause of the filter presses' longer-than-expected cycle times using a methodology and principles that easily satisfy the flexible inquiry into reliability that *Daubert* envisions.  Fuller's analysis of the filtration process depends primarily "on the fundamental principle that mass is conserved," Fuller Report ¶ 12, which is one of "the fundamental governing equations of fluid

dynamics" that form the "cornerstone of computational fluid dynamics," J.D. Anderson, Jr.,

*Governing Equations of Fluid Dynamics*, *in Computational Fluid Dynamics: An Introduction* 15,

15 (J.F. Wendt ed., 3d ed. 2009).  The principle has been tested, *Daubert*, 509 U.S. at 593, has

been subjected to peer review and publication, *id.*, and is generally accepted in the relevant

scientific community, *id.* at 594.[7]  Thus, it plainly is sufficiently reliable to form the basis of

admissible testimony.  Furthermore, Fuller's methodology in forming his opinion consisted of

simple mathematics:  he applied the equations governing the fluid dynamics of filtration, *see* Fuller

Report ¶¶ 22-25, 35, to Noranda's own measurements of the density of a sample of bauxite residue

both before and after the removal of entrained air, *id.* ¶¶ 41-42, and thereby determined the extent

to which entrained air would slow the cycle time required to filter that sample of residue, *id.* ¶ 43.

No argument is necessary to establish the reliability of basic algebra and arithmetic.  The principles

and methodology Fuller employed are therefore sufficiently reliable for his testimony to be

admitted.

Nonetheless, "conclusions and methodology are not entirely distinct from one another,"

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), for the conclusion an expert offers in court

must actually draw support from the methodology and principles that the expert claims to have

employed in forming it.  To satisfy that standard, the "*ipse dixit* of the expert" does not suffice.

*Id.*  Exclusion is appropriate when the expert identifies a basis for the opinions proffered that is

"simply inadequate to support the conclusions reached," *Amorgianos*, 303 F.3d at 266, as when

---

[7] The third *Daubert* factor, which considers any known or potential error rate and standards that control the technique's operations, applies only "in the case of a particular scientific technique," 509 U.S. at 594, and thus does not bear on Fuller's purely deductive reasoning.  In any event, although the principle of conservation of mass is known to be violated in certain circumstances, *see, e.g.*, A. Einstein, *Does the Inertia of a Body Depend Upon Its Energy-Content?*, *in* H.A. Lorentz *et al*, *The Principle of Relativity* 69 (W. Perrett & G.B. Jeffery trans., 1923), it is nonetheless employed routinely in fluid dynamics, *see* Anderson, *supra*, at 23-27.

the testimony is "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," *Zerega Ave. Realty Corp.*, 571 F.3d at 214 (citation, internal quotation marks, and modification omitted). *See Gen. Elec. Co.*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). But "[o]nly serious flaws in reasoning will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 688 F. Supp. 2d 259, 267-68 (S.D.N.Y. 2010). Mere "gaps or inconsistencies in the reasoning leading to" the expert's opinion "go to the weight of the evidence, not to its admissibility." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001). "And the weight of the evidence is a matter to be argued to the trier of fact . . . ." *Id.* Noranda's four arguments for excluding Fuller's opinion as to the cause of the slow cycle times each attempt to identify such an analytical gap.

As discussed below, Noranda's argument fail in all but one respect: to the extent that Fuller seeks to testify that the presence of entrained air was the *sole* cause of the longer cycle times, rather than that the entrained air caused longer cycle times, that opinion would lack adequate support from the fundamentally reliable principles and methodology that Fuller otherwise employed. Other than in this regard, none of Noranda's four arguments show Fuller's opinion to be speculative, conjectural, in bad faith, or an apples-to-oranges comparison, *see Zerega Ave. Realty Corp.*, 571 F.3d at 214, or show that for some other reason his Report is simply inadequate to support his conclusions, *see Amorgianos*, 303 F.3d at 266. Thus, there is no analytical gap between his opinion and his basis for drawing it that is so great as to require the exclusion of his testimony, except to the extent that Matec seeks to offer testimony from Fuller that that entrained air in the bauxite residue was *the only* cause of the slow cycle times. Otherwise, to the extent that Noranda

seeks to challenge Fuller's analysis or reasoning, that is appropriate grounds for cross-examination at trial and, as appropriate, for arguments to the trier of fact.

### a. Alternative Causes

As mentioned, Noranda first argues that Fuller's causation opinion must be excluded because he failed to consider alternative possible causes for the longer cycle times. As a general matter, however, it is hardly the case that alternative causal hypotheses must always be evaluated before it is possible to reliably draw a causal conclusion. Rather, when a particular cause reliably produces a particular effect, and when the cause and effect are both present, one may reliably conclude that the cause was responsible for the effect: for example, if a person dies after being struck by a car, testing for poisoning is not ordinarily required before it is possible to reliably conclude that the car was the cause of death. Here, Fuller has offered testimony that under basic principles of fluid dynamics the presence of entrained air increases the filter press cycle time, Fuller Report ¶ 43, and that the bauxite residue generated at Noranda's refinery contained entrained air not reflected in the specifications Noranda provided to Matec, *id.* ¶¶ 35, 37, 41-42. From these two propositions, it straightforwardly follows that the cycle times required to filter the residue generated by the refinery would exceed the times expected based on Noranda's specifications.

In challenging Fuller's causation opinion, however, Noranda points to particular language in his Report that the presence of entrained air was the *only* cause of the increased cycle times. *See, e.g.*, Noranda *Daubert* Br. at 9 ("Dr. Fuller's opinion that the filter presses' slow cycle times are due '*entirely*' to the air bubbles in the bauxite residue is inherently unreliable and should be excluded for at least four reasons." (emphasis added)). As an initial matter, it is not entirely clear to the Court that Matec seeks to offer expert testimony from Fuller that the presence of entrained air was the *only* possible cause of the slower cycles. On one hand, as Noranda notes, Fuller states

at one point in his Report that the presence of entrained air "entirely" caused the longer cycle times: "However, the cause of these longer cycle times can be traced entirely back to the large amount of entrained air of which Matec was unaware during the design process because it was not included in the specifications provided by Noranda." Fuller Report ¶ 46. Yet, in the conclusion to his Report, Fuller seems to find that the presence of entrained air was *a* cause, without saying that it was the lone cause. *Id.* ¶ 51 ("The process, contracted by Noranda for Matec to provide, can only be successful if the properties of the incoming feed steam to the filter process are properly specified. Unfortunately, Noranda represented that the feed to the filtration unit would consist of two components: bauxite particles and water. Indeed, the samples Noranda sent to Matec to proceed with the design of the equipment[] did not include the presence of entrained air, nor was it disclosed in the feed specifications."). Moreover, in opposing Noranda's *Daubert* motion, it is not clear that Matec argues that Fuller should be able to testify that the presence of entrained air was the *only* cause of the longer cycle times. *See* Matec *Daubert* Opp. at 1 (referring to Fuller's "overall conclusion that [the presence of air in the slurry and the inaccurate feed specifications provided by Noranda] account for the impaired cycle times of the filter presses."); *id.* at 2 (referring to Fuller's "conclusion that entrained air interfered with the performance of the pump delivering the feed stream from Noranda into Matec filter presses"); *id.* at 7 ("Again, Noranda does not even challenge that its feed specification is accurate or that the centrifugal pump is hindered by the entrained air. [Fuller's] judgment as to their contribution to the cycle time is well within his field of expertise . . . ."). *But see id.* at 2 ("Professor Fuller examined sufficient evidence to allow him to conclude that entrained air was the cause of the slower cycle times . . . .").[8]

---

[8] Indeed, in opposing summary judgment, Matec points to other factors, which Maetc attributes to Noranda, that also slowed the cycle times. *See* Matec SJ Opp. at 6-7 (Noranda's use of improper filter cloths), 7-8 (Noranda's failure to properly maintain the presses).

Fuller's determination that entrained air caused longer cycle times, without considering whether other factors that could have also delayed the process, or otherwise explaining why no other factor could have had an impact, does not foreclose the possibility of such other contributing factors.  Fuller's Report does not compare the estimated magnitude of a slowdown resulting from the unexpected presence of entrained air, on one hand, to the difference between actual cycle times and those expected based on the provided specifications, on the other.  At one point, Fuller assesses that "aerated samples will have cycle times that are approximately 25% longer simply on the basis of decreased particle volume fraction."  Fuller Report ¶ 43.  He then further determines that, based on six samples taken on January 24, 2019, "the aerated samples would have a cycle time that is 22.6% long than the aerated samples suppled to Matec."  *Id.* ¶ 47.  But he does not then find that this delay in fact matched the delay experienced.  And otherwise, Fuller primarily concludes that the unexpected presence of entrained air would have resulted in a less efficient process than expected.  *E.g.*, Fuller Report ¶ 51 ("The pumps used to deliver the slurries will be . . . reduced in efficiency due to the presence of air.  This means that the filtration system can never produce the rate of particle capture compared to the higher volume fraction materials suggested by Noranda.").  Without an analysis of the specific expected delay compared to the actual delay, or an assessment eliminating other factors that may have also contributed to reducing the cycle speed, Fuller may not opine that the presence of entrained air was the *only* cause of the slow down.

But the mere possibility that some alternative cause might be found is not enough, on its own, to render unreliable Fuller's conclusion that entrained air, which generally increases cycle times, caused longer cycle times in the operation of Noranda's filter presses.  It is true of course that many methods of identifying causal connections *rely* on the exclusion of alternative possible causes.  When a legally significant result has many known potential causes, yet an expert singles

out only one of those many possible causes as the actual cause, one possible approach for supporting that opinion would be to explain why the alternative potential causes could not, in fact, have caused the result.  For example, "[a] differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes."  *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (internal quotation marks omitted).  The exclusion of alternative possible causes is particularly important in the absence of any direct basis for concluding that the expert's own hypothesized cause was in fact responsible for the result in question.  *Cf., e.g.*, *Tardif v. City of New York*, 344 F. Supp. 3d 579, 601-02 (S.D.N.Y. 2018) (explaining that the exclusion of alternatives is sometimes unnecessary in identifying the cause of a medical condition when adequate direct support exists for the expert's own causal hypothesis).

Noranda cites cases where adequate direct support for the expert's own causal hypothesis was not provided, and thus the expert's opinion could not be reliable unless alternative causes were excluded.  Obviously, in such circumstances a court must evaluate whether the expert's exclusion of such alternatives was adequate.  Fuller, however, has provided direct, deductive support for his causal hypothesis by applying first principles of fluid dynamics to measurements of the bauxite residue.  *See supra* II.B.2.  And because his causal hypothesis is supported directly, he need not rely on the exclusion of alternative causes to establish its reliability, as was the case in the authorities Noranda cites.  Consequently, his failure to exclude alternative causes for the longer filter cycles does not render inadmissible his opinion that the presence of entrained air delayed the cycles.

In *Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) (cited at Noranda *Daubert* Br. at 3 n.3), the plaintiff's expert opined that the plaintiff's cancer had been caused by petrochemicals

to which he was exposed while working on board the defendant's vessels. *Id.* at 38. But the expert's theory of causation "failed to satisfy any of the *Daubert* factors for reliability," and the plaintiff used cigarettes and alcohol, both of which the expert recognized as major risk factors for the cancer the plaintiff developed. *Id.* at 50. Thus, in *Wills* exclusion was appropriate because no reliable basis existed to support the expert's causal hypothesis, but a reliable basis did exist to support alternative causal hypotheses. By contrast, in this case reliable principles of fluid dynamics do support Fuller's causal hypothesis, and no reliable basis (*i.e.*, admissible as expert testimony) has been identified to support alternative causal hypotheses, though alternative causes have not been excluded. Noranda vaguely gestures at three "other, obvious alternative causes of slow cycle times—maintenance, design defects, and pump malfunction," Noranda *Daubert* Br. at 9—but fails either to describe the specific conditions that Fuller should have considered or to cite any evidence that those conditions were present. Of course, Noranda is free to present evidence of these alleged alternative causes at trial as a means of attacking Dr. Fuller's opinion.

In *DeRienzo v. Metropolitan Transportation Authority*, 694 F. Supp. 2d 229 (S.D.N.Y. 2010) (cited at Noranda *Daubert* Br. at 3 n.3), the court excluded the plaintiff's proffered experts from testifying that a surgery undergone by the plaintiff caused a tumor to hemorrhage. *Id.* at 238-41. One excluded expert, the court explained, did not "engage[] in a differential diagnosis, or any other admissible scientific process, before concluding" that the surgery caused the hemorrhage. *Id.* Rather, he noted alternative possible explanations for the hemorrhage—including "a spontaneous and unhappy coincidence," *id.* at 239—and conceded in a published case study that his proffered opinion on causation was "mere speculation[], as there are no reported cases" of the plaintiff's surgery causing the hemorrhage that occurred, *id.* at 238. As with *Wills*, then, in *DeRienzo* the expert ignored known alternative causes to opine in favor of an unsupported and

speculative cause.  Here, by contrast, Fuller has identified a cause reliably known to produce longer cycle times.

Lastly, *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3*, 313 F. Supp. 2d 213 (S.D.N.Y. 2004) (cited at Noranda *Daubert* Br. at 3 n.3) examined whether the challenged expert had adequately excluded alternative hypotheses to his opinion that the defendants had engaged in anticompetitive conduct.  *Id.* at 237-39.  That expert, however, justified the proffered opinion primarily by excluding the primary alternative hypothesis—namely, that the defendants were engaged in competition in the market.  *Id.* at 221 ("Dr. Dunbar claimed that the predictions of market equilibrium when suppliers would be competing independently on the merits are quite different from the outcomes that are observed in this market." (internal quotation marks omitted)).  Certainly, an expert must exclude alternative explanations adequately if the exclusion of those alternatives is the primary support he offers in support of his own explanation.  But because Fuller does not rely on the exclusion of other possible causes as his primary basis for opining that entrained air caused the longer filter cycles, the adequacy of that exclusion is not at issue.

### b.  Empirical Support

Although Noranda presents its second and fourth arguments as being distinct, the Court addresses them together because each appears to rely on the same essential claim—namely, that Fuller's opinion is unreliable because he did not himself conduct experiments, examine machinery, speak to witnesses, or otherwise confirm his causal opinion with real-world data.  *Compare* Noranda *Daubert* Br. at 10 ("Dr. Fuller did nothing to confirm his hypothesis with real-world data that was available to him."), *with id.* at 11 ("Dr. Fuller had a hypothesis, but he never tested it with field data.").  That claim, however, is simply incorrect.  The Fuller Report opines that bauxite

residue actually present in Noranda's refinery contained entrained air not accounted for in the specifications that Noranda provided to Matec, Fuller Report ¶ 37, and that the entrained air caused an increase in the filter press cycle time, *id.* ¶ 43.   Fuller's opinion that the bauxite residue contained entrained air was directly based on real-world data—in particular, on measurements of the residue taken by Lynn Blankenship, Sr., who appears to be a Noranda employee.   *Id.* ¶ 41.   Thus, Fuller's opinion was not "wholly divorced from the real world."   Noranda *Daubert* Br. at 11.   Furthermore, while Noranda dwells on the fact that Fuller did not himself test the residue, *id.*, it has presented no reason for thinking that the measurements from Blankenship that Fuller employed were unreliable; certainly, then, Fuller's use of those measurements as an assumption in his reasoning was not "so unrealistic and contradictory as to suggest bad faith," *Zerega Ave. Realty Corp.*, 571 F.3d at 214 (citation, internal quotation marks, and modification omitted).[9]

　　　　To be sure, while Fuller used real-world data to identify the properties of Noranda's bauxite residue, his conclusion that the entrained air in that residue would cause longer cycle times was based not on empirical experiments but rather on applying first principles of fluid dynamics to the properties of Noranda's residue, using purely deductive reasoning.   Experimentation constitutes a reliable method of investigating the world, and Noranda is free at trial to rely on expert testimony employing that methodology, *see, e.g.*, Spevacek Report at 7-8, and to argue that it is more reliable that Fuller's deductive approach.   But Noranda has identified no authority holding that deductive reasoning is so unreliable as to warrant exclusion under *Daubert*.   At best, it cites the Second Circuit's observation that "[t]he failure to test a theory of causation *can* justify a trial court's exclusion of the expert's testimony," *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir.

---

[9] Noranda also argues that the data Fuller relied on "measured the 'true density' of the bauxite," Noranda *Daubert* Reply at 4, but the Fuller Report flatly contradicts this claim, describing the measurement of apparent density that it relied on, Fuller Report ¶ 41.

2000) (emphasis added); Noranda *Daubert* Br. at 11, but the Second Circuit did not assert that experimentation is *always* required for an expert's causation opinion to be admissible. In particular, the expert in *Brooks* had presented no deductive argument in support of his conclusion. *Id.* at 90-91. And while an expert opinion supported by neither deductive argument nor experimentation may be so speculative that it is inadmissible, it hardly follows that deductive reasoning is unreliable as a matter of law unless also supported by empirical testing.

### c. Contradictory Data

Lastly, Noranda argues that the Fuller Report should be excluded because Fuller, according to Noranda, contradicted his causation opinion at his deposition and because his opinion that entrained air caused the longer cycle times is contradicted by data collected by Spevacek, Noranda's expert, which showed "no causal connection between the "specific gravity" of the bauxite residue and cycle times." Noranda *Daubert* Br. at 10-11. As a preliminary matter, the Court is unclear as to why the existence of contradictory evidence such as Spevacek's data would on its own justify the exclusion of the Fuller Report. As the Supreme Court explained in *Daubert* itself, the "presentation of contrary evidence" is a "traditional and appropriate means of attacking shaky but admissible evidence," 509 U.S. at 596; it is not a basis upon which to exclude evidence. Indeed, the fundamental role of a jury is to confront factual questions that requires it to weigh competing evidence supporting each party's position.

In any event, Noranda is simply mistaken that Spevacek's data contradicts Fuller's opinion or that Fuller contradicted his own opinion at his deposition. Spevacek empirically examined how varying the density of the bauxite residue (also called its "apparent density" or "specific gravity") affected the filter press cycle time. Spevacek Report at 7-8 & fig. 1. His data showed no correlation between density and cycle time. *Id.* This data, Noranda claims, contradicts the "alleged

connection between 'apparent density' and slow cycle times," Noranda *Daubert* Reply at 6, that

Fuller identified.  But Fuller did not opine that the filter cycle times were correlated with the

apparent density of the bauxite residue; instead, he opined that the cycle times would be "inversely

proportional to the volume fraction of the bauxite particles in the slurry."[10]  Fuller Report ¶ 43.

And the bauxite volume fraction, which represents the *volume of the bauxite* in the bauxite residue

divided by the total volume of the residue, *see id.* ¶ 15 ("The volume fraction of a component is

simply the volume occupied by that component in a suspension divided by the total volume."), is

simply not the same thing as the apparent density of the residue, which represents the *mass of the*

*bauxite residue* divided by its volume, *id.* ¶ 41 ("The 'apparent' density will be referred to as $\rho_T$ .

. . .  Measurement of $\rho_T$ simply requires measuring the mass, $W_1$, of a known volume, $V_1$, of the

original slurry so that $\rho_T = W_1/V_1$.").  Thus, Fuller opines that a correlation exists between cycle

time and one quantity, while Spevacek finds that no correlation exists between cycle time and a

*different* quantity.  Their conclusions are not contradictory.

Fuller does contend that the volume fraction of bauxite in the bauxite residue was lower

than would be expected from the specifications Matec provided because those specifications did

not indicate that entrained air would be present in the residue generated by the refinery.  *Id.* ¶ 51

("[N]ot including the presence of air immediately elevates the volume fraction of solid particles in

the suspensions to be filtered relative to the suspensions that are actually encountered in the feed

stream to the filter press.").  Because air increases the total volume of the residue without

increasing the volume occupied by bauxite, the bauxite must occupy a smaller fraction of the

---

[10] In support of its claim that "Dr. Fuller *did* equate slow cycle times with the 'apparent density' of the bauxite," Noranda *Daubert* Reply at 6, Noranda includes a footnote purporting to list statements in the Fuller Report asserting that apparent density causes longer cycle times, *id.* at 6 n.2.  Each statement, however, instead asserts that *entrained air* causes longer cycle times.  *Id.* And as explained *infra*, factors besides entrained air also affect the apparent density of the residue.

volume of the residue after air is added than it did beforehand.  And Fuller determines that entrained air was present in part using the apparent density of the residue.  *Id.* ¶¶ 22-25 (deriving five equations through which, using the densities for water, bauxite, and air, as well as the measured densities of bauxite residue both before and after air is removed, one may compute the volume fractions of the residue both with and without air).  But while Fuller used the apparent density of the residue to identify the amount of entrained air, *id.* ¶ 43, he does not claim that the apparent density of the residue and the amount of entrained air are correlated.  Rather, as he explains, "the extent of air entrainment" could be identified through "an experiment . . . to determine the differences in the 'apparent' density of a slurry obtain from a well-mixed bottle and the 'true' density of the same slurry after it had been deaerated."  *Id.* ¶ 41.  That is, the amount of entrained air can be identified from measurements of the *change in density* once the air is removed.  But because density depends on the relative amounts of air, bauxite, and water in the residue, it does not follow that a lower-density residue must have more air and less bauxite than a higher-density one; instead those differences in density might instead be caused by differences in the water content of the residue.  *See, e.g.*, Dkt. 87-2 (Fuller deposition) at 118:24-25 (explaining that "there are three things in the -- to make up the apparent density" including "the density of water").  Thus, Fuller claims that slow cycle times directly correlate with a low bauxite volume fraction, but that a low bauxite volume fraction does not directly correlate with the apparent density of the residue because of differences in the relative fractions of air and of water.  While Noranda may of course urge the jury to adopt an alternative interpretation of this data at trial, it has not identified any contradiction between Fuller's deductive analysis and Spevacek's data.

C.     John Spevacek, Ph.D.

Noranda retained Spevacek as an expert to "review and respond to the Expert Witness report of Dr. Gerald Fuller."  Spevacek Report at 1.  In that capacity, he primarily responds to Fuller's claims about the effects of entrained air, generally disputing Fuller's conclusions that entrained air was responsible for the longer cycle times of the filter presses.  Matec does not seek to exclude Spevacek's opinions concerning the role of air entrainment in cycle time.  Rather, it targets two further opinions that Spevacek expresses in his Report.  First, based on his review of the deposition testimony of Matec leadership, Spevacek opines that "Matec overstated their experience and capabilities." *Id.* at 8-9.  Matec argues that this opinion should be excluded because it is outside the scope of a rebuttal report, Matec *Daubert* Br. at 3-4, and because it is insufficiently reliable to be admissible under *Daubert*, *id.* at 4-7.  Second, after having excluded entrained air as the cause of slow cycle times, Spevacek concludes: "That the Matec filters are not performing as expected is not due to the fault of Noranda Alumina, but due to some unidentified aspect of the Matec equipment."  Spevacek Report at 12.  Because Spevacek did not identify the actual cause of the slow cycle times, *id.* ("Whether it is poor design, improperly manufactured [sic] or some other fault cannot be identified at this point . . . ."), Matec argues that this opinion must be excluded as conjectural:  merely excluding entrained air as the cause of slow cycle times provides Spevacek no basis for concluding that the actual cause—whatever it may be—was not Noranda's fault. Matec *Daubert* Br. at 7-8.  Each challenged opinion is excluded.

First, the parties no longer dispute the admissibility of Spevacek's opinion as to whether Matec overstated its qualifications.  Apparently, Noranda understood the Fuller Report to state, "at least implicitly[,] that Matec had the experience and capabilities to perform its obligations to Noranda," and Spevacek sought to rebut that opinion.  Noranda *Daubert* Opp. at 1.  Because Fuller

conceded at his deposition that he could not express any opinion on Matec's qualifications, however, *see* Dkt. 103-1 at 126:14-18, Noranda concedes that "Dr. Spevacek's rebuttal to Dr. Fuller in [the challenged opinion] is moot," Noranda *Daubert* Opp. at 2.  And since Fuller does not assert the opinion that Spevacek sought to rebut, Spevacek's opinion that Matec overstated its experience and capabilities is excluded.

Matec also seeks exclusion of Spevacek's opinion that Noranda was not responsible for the slow cycle times, in turn, essentially by arguing that "too great an analytical gap" separates "the data [from] the opinion proffered."  *Gen. Elec. Co.*, 522 U.S. at 146.  The Fuller Report concludes primarily that entrained air caused the longer cycle times, and the Spevacek Report primarily rebuts that causal hypothesis.  As Matec correctly argues, though, even were Spevacek's rebuttal arguments correct, at best they would show only that entrained air did not cause the slow cycle times.  A further question would remain as to what did cause them.  Because ruling out one cause does not rule in any other cause, Spevacek's opinions are therefore inadequate to justify any conclusion about the actual cause, including the conclusion that the actual cause was not attributable to Noranda.  *Cf., e.g.*, *Ruggiero*, 424 F.3d at 254 ("Where an expert employs differential diagnosis to rule out other potential causes for the injury at issue, he must also rule in the suspected cause, and do so using scientifically valid methodology." (internal quotation marks omitted)).  The analytical gap between the data excluding entrained air as a cause and the conclusion that the actual cause was not attributable to Noranda is "too great" for Spevacek's testimony to be admissible.

Noranda's arguments in defense of Spevacek's conclusion, furthermore, do not bridge this analytical gap.  In its briefing, Noranda baldly asserts that the conclusion follows from Spevacek's three opinions, numbered 2, 3, and 6, disputing that entrained air caused the longer cycle times.

Noranda *Daubert* Opp. at 3 ("From Opinions 2, 3, and 6, Dr. Spevacek reached his ultimate conclusion that Noranda is not to blame for the slow cycle times."); *id.* at 4 ("Dr. Spevacek's conclusion logically flows from Opinions 2, 3, and 6."). But as with the *ipse dixit* of the expert, a district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit*" of counsel. *Gen. Elec. Co.*, 522 U.S. at 146; *accord Hoffman v. Ford Motor Co.*, 493 F. App'x 962, 979 (10th Cir. 2012) (rejecting argument for admissibility of expert testimony that relied on the "'ipse dixit' of . . . counsel").

Next, Noranda argues that Matec's objections misunderstand the "function of *Daubert*," since they challenge Spevacek's conclusions rather than the methodology and principles he employed. Noranda *Daubert* Opp. at 4. But *General Electric Co.* explicitly holds that "conclusions and methodology are not entirely distinct from one another" because a methodology's reliability, on its own, does not guarantee support for the particular conclusion the expert has drawn. 522 U.S. at 146. Therefore, it is "within the District Court's discretion to conclude that the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions," *id.* at 146-47, as the Court has done here.

Lastly, Noranda appears to suggest that if Fuller testifies that the slow cycle times were Noranda's fault, any rebuttal expert must be permitted to testify that the slow cycle times were not Noranda's fault. Noranda *Daubert* Opp. at 5 ("Dr. Spevacek is thus permitted to testify that Noranda is not to blame for the filter-press slow cycle times when Dr. Fuller said . . . that Noranda was to blame."). But Noranda has not cited any authority admitting a rebuttal expert's unreliable testimony simply because it rebuts the testimony of the opposing party's expert. The admissibility of Spevacek's testimony, like Fuller's, depends on its own reliability. Whether an analytical gap separates Fuller's opinion that entrained air caused slow cycle times from his conclusion that

31

Noranda was responsible is simply a different question from whether an analytical gap separates Spevacek's opinion that entrained air was not the cause from his conclusion that Noranda was not responsible. Fuller identifies a cause, while Spevacek does not, and therefore only Fuller, but not Spevacek, may testify further about the nature of the cause that he identified.

### III.   Summary Judgment

Having decided the parties' *Daubert* motions, the Court turns to their motions for partial summary judgment, which range widely over the issues in dispute in this case. Because the two motions overlap in their content, the Court will proceed thematically, addressing claims raised by either party while moving through the surviving claims, rather than separately addressing each party's motion. First, the Court addresses a threshold question—namely, what law governs the contracts at dispute in this case. Next, the Court addresses Noranda's tort claims for negligent misrepresentation and fraudulent inducement, for which each party seeks summary judgment as to liability. The Court then moves to each party's claims for breach of contract, for which Noranda seeks summary judgment as to liability. Lastly, the Court addresses each party's arguments for summary judgment as to whether its opponent is entitled to certain categories of damages. In addition, Matec seeks dismissal of Noranda's claim for unjust enrichment as duplicative of its breach of contract claims. Matec SJ Br. at 14-15. Because Noranda concedes Matec's argument and disclaims an intention to proceed on its unjust enrichment claim, *see* Noranda SJ Opp. at 16 n.8, Matec's motion is granted with respect to that claim, and Noranda's unjust enrichment claim is dismissed.

### A.      Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *accord Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences,

or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## B.    Choice-of-Law

What law governs the contracts between Noranda and Matec?  The United Nations Convention on Contracts for the International Sale of Goods ("CISG"), Apr. 11, 1980, S. Treaty Doc. 98-9, 1489 U.N.T.S. 3, "applies to contracts of sale of goods between parties whose places of business are in different States: (a) when the States are Contracting States." *Id.* art. 1(1).  The CISG, however, permits "[t]he parties [to] exclude the application of this Convention," *id.* art. 6, and thus "the parties may by contract choose to be bound by a source of law other than the CISG," *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027 n.1 (2d Cir. 1995).  The Punch List contains no choice-of-law clause that could exclude the CISG, *see generally* Punch List, though it does contain a forum-selection clause, *id.* at 3.  The First Contract and the Second Contract, however, each contain a provision addressing choice of law:  the former provides that "[t]his contract shall be exclusively governed by New York law," First Contract at 23, while the latter provides that "[t]his contract shall be deemed to be entered into under, and shall be governed by, the substantive laws of the State of New York" and that "[t]he parties expressly agree to exclude the all [sic] revisions of the Convention on Contracts for the International Sale of Goods," Second Contract at 22.  The parties agree that the Second Contract's choice-of-law clause suffices to exclude the application of the CISG in favor of the New York U.C.C., *see* Noranda SJ Br. at 4 n.2; Matec SJ Br. at 7, and based on that agreement the Court will apply the New York U.C.C. and any relevant portions of New York common law to interpret the Second Contract.  But they disagree

as to which law governs the First Contract and the Punch List: Matec claims that each is governed by the CISG, *see* Matec SJ Br. at 6-7, while Noranda denies that the CISG applies, *see* Noranda SJ Opp. at 2-5.

As an initial matter, both the First Contract and the Punch List fall within the CISG's own provisions defining its scope. The applicability of the CISG depends on whether a contract was (1) a contract for the sale of goods (2) between parties with places of business in different Contracting States. CISG art. 1(1). As to the CISG's geographical condition, the First Contract was executed by Noranda, Matec SRL, and Matec America,[11] Noranda 56.1 Stmt. ¶¶ 59-60, whose places of business, respectively, are the United States, Italy, and the United States, Compl. ¶¶ 10-12; Dkt. 14 ¶¶ 10-12. The United States and Italy are signatories to the CISG. *See* United Nations Treaty Collection, *Multilateral Treaties Deposited with the Secretary-General: United Nations Convention on Contracts for the International Sale of Goods*, https://perma.cc/W48M-2AYA (accessed Sept. 11, 2023). The First Contract is therefore "between parties whose places of business are in different [Contracting] States." CISG art. 1(1).

---

[11] The First Contract itself is somewhat ambiguous as to the exact identities of its signatories (and about much besides). On the one hand, each page of the First Contract bears two signatures, one of which appears to represent Noranda, *see* First Contract at 23 (bearing a signature on the line for "The Buyer"); *see generally id.* (repeating that signature on every page), and the other of which was in most cases signed over a stamp reading "MATEC America inc." That the stamp reads only "MATEC America inc." and does not also refer to Matec SRL might indicate that only Matec America, not Matec SRL, entered into the First Contract. On the other hand, however, the final page of the contract (excluding the addendum), where the parties' names are ordinarily listed, was signed over both the "MATEC America inc." stamp and a printed line reading "MATEC SRL," *id.* at 23, indicating that both entities are parties to the First Contract. Furthermore, the header of each page appears to display the logos of both Matec SRL and Matec America, the footer of each page provides each entity's address, *see generally id.*, and the contract itself defines the "Seller" as both Matec entities, *id.* at 19. This ambiguity is insufficient, on its own, for the Court to disturb the parties' agreement that both Matec entities executed the First Contract. *See* Noranda 56.1 Stmt. ¶¶ 59-60; Matec Counter 56.1 Stmt. ¶¶ 59-60. (The Punch List and the Second Contract are not ambiguous in this manner, since each bears a separate signature affixed on behalf of each Matec entity. *See* Punch List at 3; Second Contract at 3.)

As to the remaining condition, the First Contract concerned the sale of goods—namely, the Initial Presses.  First Contract at 2-3 (listing items included in Noranda's order).  Filter presses, furthermore, are not among the six categories of goods that the CISG explicitly excludes from its scope.  *See* CISG art. 2.  While the First Contract does appear to contemplate that Matec would design and manufacture the Initial Presses, not merely sell them, First Contract at 5, the CISG applies to "[c]ontracts for the supply of goods to be manufactured or produced . . . unless the party who orders the goods undertakes to supply a substantial part of the materials necessary for such manufacture or production," CISG art. 3(1), and the record is devoid of any evidence indicating that Noranda provided Matec with the materials used to manufacture the Initial Presses, *cf., e.g.*, First Contract at 6 (reproducing Matec marketing materials that identify the parts, components, and brands used in Matec presses).  Lastly, while Matec did agree in the First Contract to install the Initial Presses as well as to sell them to Noranda, the CISG excludes from its scope only those "contracts in which the preponderant part of the obligations of the party who furnishes the goods consists in the supply of labour or other services," CISG art. 3(2), and only a small fraction of the contract price rather than its preponderant part—$113,000 out of $2,808,175—was billed for installation, *see* First Contract at 3.  Thus, the First Contract satisfies the CISG's own provisions governing whether it applies.

The Punch List similarly satisfies each of these two conditions.  First, because the parties to the Punch List are the same as the parties to the First Contract—Noranda, Matec SRL, and Matec America, *see* Punch List at 3—the Punch List satisfies the territorial requirements of the CISG for the same reasons that the First Contract does.  Whether the Punch List is a contract for the sale of goods presents a closer question.  The Punch List obligated Matec to perform "repairs and additional work" in order to "obtain performance levels that are agreeable to both parties."  *Id.*

36

at 1.  In general, a contract for repair and additional work might constitute a contract for services, since neither "repair" nor "work" is a good.  However, the majority of Matec's specific repair obligations under the Punch List concerned the sale of goods—specifically, parts for the Initial Presses.  *See* Punch List, Exh. A, § A.1, at 4 (replace hydraulic power unit); *id.* § A.3, at 4 (replace faulty pressure transmitter); *id.* § B.2, at 4 (replace pump); *id.* § B.3-.4 (replace sheaves on pump or drive motor); *id.* § D.1 (replace roller idler frames); *id.* § D.2 (replace broken belt cleaners); *id.* § D.3 (add low-friction surface); *id.* § D.4 (add impact idlers); *id.* § D.5 (replace conveyer belt); *id.* § D.6 (add cable guillotines); *id.* § E (replace filter cloth throat material); *id.* § F (supply safety light curtains); *id.* § G (replace pump motors).  *But see id.* § A.2 (repair rams that make noise and do not move smoothly); *id.* § B.1 (repair oil leak from pumps); *id.* § B.2 (repair pump, as alternative to replacement); *id.* § C (calibrate valves); *id.* § G (complete pump units, as alternative to replacing motors).  While Matec could discharge some of these obligations either by providing a new part or by repairing existing ones, "the preponderant part of [Matec's] obligations" does not "consist[] in the supply of labour or other services."  CISG art. 3(2).  The Punch List therefore also falls within the scope of the CISG.

The Punch List contains no choice-of-law clause through which the parties might have excluded the CISG.  *See generally* Punch List.  Thus, Noranda does not deny that the CISG applies according to the Punch List's own terms.  *See* Noranda SJ Opp. at 2-5.  It does argue, however, that the First Contract's choice-of-law clause excludes the application of the CISG.[12]  *Id.* at 2-3.

---

[12] Because the CISG is a federal treaty, the claims brought under the CISG fall within the Court's federal question jurisdiction, not only its diversity jurisdiction.  *See, e.g.*, *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l*, No. 14 Civ. 10246 (FM), 2016 WL 4532911, at *4 (S.D.N.Y. Aug. 23, 2016) (recognizing an action brought pursuant to CISG as falling within the court's federal question jurisdiction).  And while federal courts must apply state choice-of-law rules in cases that arise under diversity jurisdiction, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313

As mentioned, the parties to a contract may "choose to be bound by a source of law other than the CISG," *Delchi Carrier SpA*, 71 F.3d at 1027 n.1, but to do so the parties must "clearly indicate an intent to be bound by an alternative source of law," *Transmar Commodity Grp. Ltd. v. Cooperativa Agraria Indus. Naranjillo Ltda.*, 721 F. App'x 88, 89 (2d Cir. 2018).  And courts typically have found that parties fail to clearly indicate such an intent by "[s]tating only that a contract will be governed by a particular jurisdiction's laws," if the CISG applies in that jurisdiction.  *Microgem Corp. v. Homecast Co.*, No. 10 Civ. 3330 (RJS), 2012 WL 1608709, at *3 (S.D.N.Y. 2012) (collecting cases).  The CISG is a federal treaty, and federal treaties are "the supreme Law of the Land" throughout the United States.  U.S. Const. art. VI, cl. 2.  Thus, the CISG applies in New York.  And merely electing New York law to govern a contract does not clearly express the intent not to be bound by the federal treaty that, thanks to the Supremacy Clause, governs New York contracts for the sale of international goods.  *See Microgem Corp.*, 2012 WL 1608709, at *3.  As Matec has shown, courts rely on this reasoning to apply the CISG in analyzing contracts containing choice-of-law clauses choosing the law of particular U.S. states, Matec SJ Reply at 1 n.1 (collecting cases); by contrast, Noranda has not cited a single case excluding the CISG based on a similar choice-of-law clause, *see* Noranda SJ Opp. at 2-3.[13]

---

U.S. 487 (1941), they need not do so in cases that arise under federal question jurisdiction, *see Barkanic v. Gen. Admin. of Civil Aviation*, 923 F.2d 957, 961 (2d Cir. 1991).  Thus, the Court analyzes the First Contract's choice-of-law clause using federal rather than New York caselaw.

[13] *Multi-Juice S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635 (RPP), 2006 WL 1519981 (S.D.N.Y. June 1, 2006), did cite "counsel's admissions and a choice of law clause," Noranda SJ Opp. at 2, to justify its application of New York law, *see Multi-Juice S.A.*, 2006 WL 1519981, at *7.  But Noranda neglects to mention that the court first held the CISG inapplicable on the grounds that the contract at issue, a distributorship agreement, was not a contract for the sale of goods, and only then—after having excluded the CISG as inapplicable on its own terms—consulted counsel's admissions and the choice-of-law clause to determine which state's law would apply instead.

Instead, Noranda argues that the reasoning of *Microgem* and similar cases has since been undermined by the Second Circuit's summary order in *Rienzi & Sons, Inc. v. Puglisi*, 638 F. App'x 87 (2d Cir. 2016).  In *Microgem*, the court determined that a New York choice-of-law clause failed to exclude the CISG, explaining that "[a]s a treaty, the CISG is incorporated into federal law and, thus, is a part of New York law."  2012 WL 1608709, at *3 (citations omitted).  In *Rienzi & Sons*, by contrast, the court, in dictum, rejected the "contention that the CISG is 'incorporated into' or 'a part of' New York law."  638 F. App'x at 89 n.2.[14]  But even assuming that *Rienzi & Sons*, a summary order,[15] abrogated in dictum the reasoning of *Microgem*, the ultimate conclusion need not change.  While *Rienzi & Sons* denied that the CISG is "a part of New York law," it explained that instead "the CISG is incorporated federal law," and that "it is as federal law that the CISG preempts local contract law unless the parties agree otherwise."  638 F. App'x at 89 n.2 (quotations omitted).  Under *Microgem*, a New York choice-of-law clause could not exclude the CISG:  under that decision, the CISG is a part of New York law, which the clause chooses to govern the contract.  By contrast, under *Rienzi & Sons*, whether a New York choice-of-law clause excludes the CISG depends on the proper interpretation of the clause.  If "New York law" refers simply to the law applicable in courts in New York, then the CISG, which applies in New York, is not excluded.  By contrast, if "New York law" refers only to laws enacted under New York's sovereign authority, such as New York statutes or New York common law, then such a clause would exclude federal law, including the CISG.

---

[14] In *Rienzi & Sons*, the Second Circuit determined that the appellant, which was arguing that the CISG applied to its contract law claims, had consented to the application of New York law.  638 F. App'x at 89-90.  As such, the Second Circuit did not resolve the parties' dispute as to whether the CISG applied to the appellant's contract claims.  *Id.* at 90 n.4.

[15] Second Circuit "[r]ulings by summary order do not have precedential effect."  Second Circuit Local Rule 21.1.1(a).

In the Court's view, the former is a more plausible interpretation of the First Contract's choice-of-law clause. Certainly, a choice-of-law clause could be drafted to achieve the latter result, and under the reasoning of *Rienzi & Sons* such a clause would exclude the CISG. Similarly, the parties could exclude the CISG by choosing to be governed by a *specific* alternative source of law, "such as the Uniform Commercial Code." *Delchi Carrier*, 71 F.3d at 1027 n.1. But the First Contract contains a generic choice-of-law clause. And in Justice Brennan's words, it seems "beyond dispute that the normal purpose of such choice-of-law clauses is to determine that the law of one State rather than that of another State will be applicable; they simply do not speak to any interaction between state and federal law." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 488-89 (1989) (Brennan, J., dissenting) (addressing question not reached in majority opinion). On the basis of similar reasoning, the Supreme Court has concluded that an ordinary choice-of-law clause in an arbitration agreement does not exclude the Federal Arbitration Act ("FAA") in favor of inconsistent state laws governing arbitrators' authority: "The choice-of-law provision . . . may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship," and thus, "in the absence of contractual intent to the contrary, the FAA would pre-empt the [state] rule." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 59 (1995). In general, "[c]hoice-of-law clauses simply have never been used for the purpose of dealing with the relationship between state and federal law." *Volt Info. Scis.*, 489 U.S. at 490. Thus, "[t]here is no basis whatever for believing that the parties in this case intended their choice-of-law clause to do so." *Id.* And because there is no reason to think that the First Contract's choice-of-law clause was intended to exclude federal law generally, it fails to exclude the CISG.

Lastly, even if both the First Contract and the Punch List would ordinarily be governed by the CISG, Noranda argues that Matec has waived any claim that the CISG governs the First Contract and Punch List through its conduct in this litigation.  Noranda SJ Opp. at 3.  The Second Circuit held in *Rienzi & Sons* that a party implicitly consents to the exclusion of the CISG by failing to timely invoke it.  638 F. App'x at 90.  To show that Matec failed to timely invoke the CISG, however, Noranda cites only Matec's failure to cite the CISG in opposing Noranda's motion to dismiss.  Noranda SJ Opp. at 3.  Noranda's argument for dismissing Matec's breach of contract claim, however, pertained only to the Second Contract:  as Noranda's own heading for the relevant section argued, "Matec fails to allege that it satisfied the express conditions precedent contained in the Second Contract."  *Matec*, Dkt. 15 at 6.  And Matec agrees that the CISG does not govern the *Second* Contract.  Matec SJ Br. at 7.  Thus, Matec had no occasion to invoke the CISG in opposing Noranda's motion to dismiss.  Further, Noranda has identified no other occasion prior to summary judgment on which Matec should have invoked the CISG.  In *Rienzi & Sons*, the Second Circuit found that a party consented to the exclusion of the CISG because it took positions in litigation that were *inconsistent* with the CISG.  638 F. App'x at 90 ("Rienzi asserted a statute of frauds defense inconsistent with application of the CISG but cognizable under New York law."); *see also Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alimentari S.P.A.*, No. 08 Civ. 2540 (DLI) (JMA), 2013 WL 2154157, at *7 (E.D.N.Y. May 16, 2013) ("On several occasions, counsel for the parties framed their arguments about the merits of the case in terms of principles recognized under New York law that are not recognized under the CISG."); *see also Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, No. 07 Civ. 7483 (RJH), 2010 WL 4892646, at *2 (S.D.N.Y. Dec. 2, 2010) ("In unsuccessfully seeking a preliminary injunction, plaintiff relied exclusively on New York law.  And on appeal of this Court[']s denial of its motion for a preliminary injunction,

plaintiff again relied upon New York law.  Thereafter, plaintiff was granted leave to amend its complaint and, once again, alleged breach of contract 'under state law.'" (citations and brackets omitted)).  Because Noranda has identified no occasion on which Matec advanced positions inconsistent with its present invocation of the CISG, Noranda has not shown that Matec consented to the exclusion of the CISG.  The Court therefore will not exclude the CISG on that basis.

Accordingly, the New York U.C.C. and relevant principles of New York common law govern the Second Contract, and the CISG and federal law applying that Convention govern the First Contract and the Punch List.

## C.    Tort Claims

Following Judge Nathan's dismissal of Matec's claims for tortious interference and for trade secret misappropriation, *see Matec SLR*, 2021 WL 1226956, at *4-5, the only tort claims remaining are Noranda's claims for fraudulent inducement and negligent misrepresentation. Matec seeks summary judgment dismissing both the fraudulent inducement and negligent misrepresentation claims, Matec SJ Br. at 7-15, while Noranda seeks summary judgment in its favor as to Matec's liability for negligent misrepresentation, Noranda SJ Br. at 21-25.  With respect to these claims, Matec's motion is granted in part and denied in part and Noranda's motion is denied.  The fraudulent inducement claim is dismissed except with respect to two alleged misrepresentations identified by Noranda, and the negligent misrepresentation claim is dismissed in its entirety.

### 1.    Preemption

Matec argues that both Noranda's tort claims, for fraudulent inducement and negligent misrepresentation, are precluded entirely by the CISG.  Matec SJ Br. at 8-9.  Matec concedes that the CISG generally does not govern tort claims.  *Id.* at 8; *see, e.g.*, *Weihai Textile Grp. Imp. &*

*Exp. Co., Ltd. v. Level 8 Apparel, LLC*, No. 11 Civ. 4405 (ALC) (FM), 2014 WL 1494327, at *16 (S.D.N.Y. Mar. 28, 2014) ("[T]ort claims are generally not preempted by the CISG."). By its own terms, the CISG "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." CISG art. 4. Courts in this District have therefore commonly applied New York tort law, not the CISG, when analyzing fraudulent inducement and negligent misrepresentation claims brought in cases involving contracts governed by the CISG. *E.g.*, *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, No. 21 Civ. 859 (NRB), 2022 WL 540756, at *4-5 (S.D.N.Y. Feb. 23, 2022) (fraudulent inducement); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 286-88 (S.D.N.Y. 2002) (applying New Jersey law, rather than the CISG, to negligent misrepresentation claim), *rev'd in part on other grounds*, 386 F.3d 485 (2d Cir. 2004). To the extent Noranda's tort claims do not concern either the formation of the contracts between the parties or their obligations as buyer and seller arising from those contracts, they are governed not by the CISG but rather by New York tort law.

However, "[j]ust because a party labels a cause of action a 'tort' does not mean that it is automatically not pre-empted by the CISG. A tort that is in actuality a contract claim, or that bridges the gap between contract and tort law may very well be pre-empted." *Id.* at 286 n.30. Thus, a party cannot avoid the CISG simply by calling its breach of contract claim a claim for fraud—say, by claiming the defendant committed fraud by making contractual promises it intended to violate. *E.g.*, *Weihai Textile Grp.*, 2014 WL 1494327, at *16 ("Essentially, the gravamen of the allegations in the First Amended Complaint is Defendants entered into a contract where they promised to pay for goods produced by Plaintiff but never intended to pay. Despite the characterization of these allegations as fraudulent inducement, they are pled as an action sounding in breach of contract."). Setting aside the formation of the contracts between the parties,

which they do not dispute, by its own terms the CISG applies only to "the rights and obligations of the seller and the buyer arising from" a contract for the sale of goods.  CISG art. 4.  Thus, if Noranda's tort claims allege that Matec violated its obligations as a seller under the contracts at issue in this case, those claims are preempted by the CISG; if, instead, Noranda alleges that Matec violated a separate obligation, New York tort law governs.

### 2.     Fraudulent Inducement

In essence, Matec seeks summary judgment as to Noranda's fraudulent inducement claim by arguing that it is precluded by Noranda's breach of contract claim, either because the CISG preempts the fraudulent inducement claim or because under New York law it is duplicative of the breach of contract claim.  As a general matter, claims "sound in tort" when "the duty breached . . . is not one imposed by contract but by law as a matter of social policy," whereas they are contractual when "the duties arise solely from the parties' consensual undertaking."  *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1368 (N.Y. 1992).  In the context of false statements, "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement."[16]  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007).  Thus, "where a party is merely seeking to enforce its bargain, a tort claim will not lie."  *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 768 (N.Y. 1995).  If no tort claim exists, and thus no corresponding duty, the defendant's conduct could

---

[16] In this passage, the Second Circuit had no cause to address promissory estoppel, which, like breach of contract but unlike fraudulent inducement, does provide a cause of action for the failure to perform a promise of future conduct.  *See, e.g.*, *Allegheny Coll. v. Nat'l Chautauqua Cnty. Bank of Jamestown*, 159 N.E. 173 (N.Y. 1927) (recognizing validity of promissory estoppel in New York).  For a discussion of whether the CISG preempts claims for promissory estoppel, see *Geneva Pharmaceuticals Technology Corp.*, 201 F. Supp. 2d at 285-87.

breach only the duty that "arise[s] from the parties' consensual undertaking," *Sommer*, 593 N.E.2d at 1368, in the contract itself; any claim for the breach of such a promise would therefore concern "the rights and obligations of the seller and the buyer arising from such a contract," CISG art. 4, and would be governed by the CISG. *See Geneva Pharms. Tech. Corp.*, 210 F. Supp. 2d at 285-86 (explaining that the CISG preempts state claims for breach of contract claims).

But where it does exist, "[a] tort obligation is a duty imposed by law to avoid causing injury to others." *N.Y. Univ.*, 662 N.E.2d at 767. Thus, the existence of a distinct cause of action for fraudulent inducement reflects the existence of a separate duty imposed by law, distinct from the obligation to perform one's contractual bargain, to truthfully report present facts upon which others might rely. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151 N.E.2d 833, 836 (N.Y. 1958) ("[T]he legal relations binding the parties are created by the utterance of a falsehood [with] a fraudulent intent and by reliance thereon and the cause of action is entirely independent of contractual relations between the parties." (alteration added to correct misquotation of original source) (internal quotation marks omitted)). Consequently, if a claim for fraudulent inducement is viable under New York law—a question, of course, determined by New York tort law—it is not preempted by the CISG. *See, e.g.*, *Elara Foodservice Disposalves LLC v. Heze Ju Xin Yuan Food Co., Ltd.*, No. 21 Civ. 4523 (FB) (LGD), 2023 WL 2710880, at *3 n.4 (E.D.N.Y. Mar. 30, 2023).

Under New York law, fraud requires (1) "a misrepresentation or a material omission of fact which was false and known to be false by the defendant," (2) "made for the purpose of inducing the other party to rely upon it," (3) "justifiable reliance of the other party on the misrepresentation or material omission," and (4) "injury." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018). However, because claims for fraudulent inducement are typically closely related to claims for breach of the contracts that

plaintiffs allege they were fraudulently induced to enter, New York law imposes additional restrictions to prevent fraudulent inducement claims from duplicating claims for the breach of the underlying contracts.  Matec argues that it is entitled to summary judgment because Noranda's claim for fraudulent inducement cannot surmount multiple such restrictions.

First, "a fraudulent inducement claim can be dismissed as duplicative of a breach of contract claim if it seeks the same damages." *Ambac Assurance Corp. v. Countrywide Home Loans Inc.*, 118 N.Y.S.3d 13, 15 (1st Dep't 2020) (internal quotation marks omitted).  Matec argues that it is entitled to summary judgment on Noranda's fraudulent inducement claim because the damages Noranda seeks under that claim are identical to the damages sought under its breach of contract claim.  Matec SJ Br. at 11-12.  For Matec to succeed in this argument at summary judgment, however, the undisputed facts must "establish[], as a matter of law, that the damages sought in connection with the fraud claim are the same as those sought in connection with the contract claims." *Ambac Assurance Corp.*, 118 N.Y.S.3d at 15.  Matec has raised a number of arguments, analyzed *infra* III.E.1, purporting to show that certain categories of damages Noranda seeks cannot be recovered under the contracts at issue in this case because of contractual provisions limiting Matec's liability.  Matec SJ Br. at 16-20.  Those categories of damages, however, may be recoverable on a claim for fraudulent inducement.  *See, e.g.*, *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 648 (2d Cir. 1989) (noting that damages for fraud include the "costs incurred in making reasonable efforts to mitigate damages"); *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 793 n.6 (2d Cir. 1986) (allowing recovery on a fraud claim of costs incurred in performing under a contract); *Barrie House Coffee Co., Inc. v. Teampac, LLC*, No. 13 Civ. 8230 (VB), 2016 WL 3645199, at *11 (S.D.N.Y. June 30, 2016) (allowing for recovery of consequential damages on a fraud claim); *Orbit Holding Corp. v. Anthony Hotel Corp.*, 503

N.Y.S.2d 780, 783 (1st Dep't 1986) (allowing for recovery of consequential damages on a fraud claim). Certainly, "[w]here all of the damages are remedied through the contract claim, the fraud claim is duplicative and must be dismissed." *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, 84 N.Y.S.3d 157, 161 (1st Dep't 2018). But Matec has not shown, as a matter of law, that all damages Noranda seeks on its fraud claim would also be remedied through its contract claim. It would therefore be premature to dismiss the fraud claim as duplicative.

Next, to avoid being duplicative of a claim for breach of contract, the misrepresentation must be "a representation of present fact, not of future intent[,] collateral to, but which was the inducement for[,] the contract." *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986). If, by contrast, a "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Sommer*, 593 N.E.2d at 1369. To survive summary judgment, then, Noranda's claims for fraudulent misrepresentation must involve a false statement collateral to the contract that asserts a present fact rather than promising future performance. Matec argues that the alleged misrepresentations Noranda has identified fail to meet this requirement because they either are not collateral to the contracts or are not statements of present fact. Matec SJ Br. at 9-13. Furthermore, to the extent that any alleged misrepresentation does satisfy that requirement, Matec denies that Noranda has produced adequate evidence to show that it was actually false. Matec SJ Opp. at 18. Many, but not all, of the alleged misrepresentations that Noranda identifies fail to surmount at least one of these challenges, and Matec is granted summary judgment only with respect to those.

In its opposition brief, Noranda itemizes the alleged misrepresentations which, in its view, amount to fraudulent inducement.[17]  Noranda SJ Opp. at 6.  First, "the First Contract contained an express warranty pursuant to which Matec—specifically Matec America—*guaranteed* its products against material and manpower flaws."  *Id.* at 7.  And the First Contract indeed contains such a guarantee:  "Matec America Inc guarantees its products only for material and manpower flaws and for a maximum period of 24 months starting from the machine assembling and no later than 30 months from the delivery."  First Contract at 21.  This statement plainly is not collateral to the contract and does not assert a present fact, however.  First, it is a guarantee as to flaws for a *future* "period of 24 months" that starts after the delivery and assembly of the machines Noranda purchased, itself a promised future event.  Second, the statement is *part* of the First Contract, not collateral to it.  *See Introna v. Huntington Learning Ctrs., Inc.*, 911 N.Y.S.2d 442, 445 (2d Dep't 2010) (explaining that certain misrepresentations could be collateral to the contract only if they were not contained in the contract itself); *Del Ponte v. 1910-12 Ave. U. Realty Corp.*, 7 A.D.3d 562, 562, 775 N.Y.S.2d 905 (Mem) (2d Dep't 2004) (explaining a cause of action for fraud was duplicative "inasmuch as the alleged falsity was set forth in the contract of sale").  Thus, Matec is granted summary judgment with respect to this alleged misrepresentation.

---

[17] In addition to the misrepresentations analyzed below, Noranda claims that "Matec made specific, extra-contractual misrepresentations about its HPT [*i.e.*, high-pressure technology], fast-opening times, results of testing and calculated cycle times, and the need for flocculant."  Noranda SJ Opp. at 11 (citations omitted).  However, those claims are supported only by citation to allegations in the Complaint, not citation to evidence.  And "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (internal quotation marks omitted).  Thus, to the extent that those four alleged misrepresentations were intended to differ from the ones analyzed below, the Court does not separately consider them.

In arguing to the contrary, Noranda cites only the Second Circuit's statement, quoting the Appellate Division of the New York Supreme Court, that "[a] warranty is not a promise of performance, but a statement of present fact." *Merrill Lynch & Co.*, 500 F.3d at 184 (quoting *First Bank of the Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (1st Dep't 1999)); *see* Noranda SJ Opp. at 7. In *First Bank of the Americas*, however, the Appellate Division did not hold that *any* breach of a contractual warranty automatically constitutes fraudulent inducement. Rather, in that case the particular misrepresentations were collateral to the contract, 690 N.Y.S.2d at 19 ("In the course of offering the loans to First Bank, [Motor Care Funding] made representations . . . ."), and they concerned present statements of fact, *id.* (describing statements "about the quality of the collateral, the individual borrowers' credit history and the amount of the borrowers' down payments"). Then, only after concluding, based on the content of the representations, that they "cannot be characterized merely as an insincere promise of future performance," the Appellate Division considered whether the fraud claim was "rendered redundant by the fact that these alleged misrepresentations breached the warranties made by [Motor Car Funding] in the Agreement." *Id.* at 21. Because the warranty itself stated a present fact and did not promise future performance, the court concluded that the fraud claim was not redundant simply because the alleged misrepresentation concerned a fact warranted in the contract. Similarly, while in *Merrill Lynch* the alleged misrepresentation did concern a fact warranted in the contract, that was not the Second Circuit's reason for allowing the fraudulent inducement counterclaim. 500 F.3d at 183-84. Rather, it first held that the fraud counterclaim was not duplicative because the "[d]efendant's allegations in this case involve misstatements and omissions of present facts, not contractual promises regarding prospective performance." *Id.* at 184. Only then, after having reached that conclusion, did it further explain: "That the alleged misrepresentations would represent, if proven, a breach of

49

the contractual warranties as well does not alter the result." *Id.*  And because Matec's guarantee of its goods from manpower and material flaws was neither a statement of present fact nor collateral to the contract, it does not suffice for a claim of fraudulent inducement even though it was warranted in the contract.

Second, Noranda claims that "Matec represented that its machine applied 'high pressure'— that is, 16 to 21 bar of pressure—that pressed Noranda's bauxite residue at faster times."  Noranda SJ Opp. at 7.  And Noranda has identified statements in which Matec asserted, as a matter of present fact, that its machines operated at pressures of 16 to 21 bar.  *E.g.*, Noranda Counter 56.1 Stmt. ¶¶ 5 ("Our machines work at higher pressure than competitors'."), 6 ("MATEC PRESS WORKS AT 16-21 BAR PRESSURE.").   Noranda, however, has failed to produce any evidence showing that those assertions were false.  Interpreted as statements of present fact, these alleged statements made claims about the capacities of Matec's machines in general—namely, that Matec produces machines that operate at pressures of 16 to 21 bar, which are higher than the pressures at which its competitors' machines operate.  *Cf.*, Noranda 56.1 Stmt. ¶ 28 ("Matec represented that its HPT could achieve pressure of 16 to 21 bar."); Noranda SJ Opp. at 7 (arguing that the statements concerned "the presses and Matec's ability to perform").  But Noranda has not cited any evidence in the record showing that Matec did not produce machines operating with 16 to 21 bar of pressure, only at best evidence showing that the particular machines Noranda purchased failed to reach those pressures.  *E.g.*, Noranda 56.1 Stmt. ¶ 81.  And, obviously, the fact that a particular Matec machine failed to reach a higher pressure when operated at Noranda's facility does not show that Matec could not produce machines employing higher pressures, or that Matec did not produce such machines on other occasions.  Thus, because Noranda has not produced any evidence showing that the alleged misrepresentation about Matec's machines being able to operate at pressures of 16 to

21 bar was false, Matec is granted summary judgment with respect to this alleged misrepresentation.

Third, Noranda contends that "[w]hen the [Initial Presses] did not perform as represented, Matec falsely blamed Noranda for either poor maintenance or low 'specific gravity.'" Noranda SJ Opp. at 8. It appears that Matec did attribute the poor performance of the filter presses to both those causes. *See* Noranda 56.1 Stmt. ¶ 89 (citing emails in which Matec blamed density for poor performance); Noranda Counter 56.1 Stmt. ¶ 35 (citing documents and deposition testimony indicating that Matec blamed maintenance for poor performance). These representations are collateral to the contracts the parties signed—they do not concern Matec's promises to perform in the future but rather concern Matec's explanation for why it had failed to perform in the past. Furthermore, Noranda has produced evidence supporting its position that the representations were false, in that neither density nor maintenance caused the slow cycle times. *See, e.g.*, Spevacek Report (arguing that density was unrelated to the machines' poor performance); Noranda 56.1 Stmt. ¶ 196 (citing evidence that Noranda followed Matec's recommended maintenance procedures). Obviously, Noranda could not have initially decided to sign the First Contract based on a representation Matec made after the Initial Presses had been installed, but if Noranda can prove that it later relied on that representation, such as when it entered into the Punch List or the Second Contract, and if it can further prove that Matec's statements were false and made with fraudulent intent, Noranda could succeed on this basis for a claim of fraudulent inducement. Matec is therefore denied summary judgment with respect to this alleged misrepresentation.

Fourth, Noranda argues that Matec misrepresented the services provided by Matec America, including that its role was "supporting Matec's products with an excellent technical, and commercial organization," that it "could offer fast service, as well as delivery *and before and after*

sales assistance," and that it "can offer filtration and purification turnkey plants for the major

sectors." Noranda SJ Opp. at 8 (quoting Dkt. 91-9 (PowerPoint shown by Matec) at 16). But

Noranda has produced insufficient evidence to show that any of these claims, which all pertain to

the general capacities of Matec America, were actually false. Noranda first cites the deposition of

Darren Geesaman, an employee of Matec America, Noranda 56.1 Stmt. ¶ 128, who testified that

Matec America was "not capable of doing large installs like this." Dkt. 106-12 at 193:12-13; *see*

Noranda SJ Opp. at 8. But since none of the alleged misrepresentations involve Matec America

asserting a capability of performing "large installs," Geesaman's testimony does not show these

statements by Matec to have been false. Noranda's only other evidence that, it contends, show

these claims to have been false is the fact that Geesaman was hired after the First Contract was

executed. Noranda SJ Opp. at 8. But even if that fact is true, Noranda has not produced evidence

showing that Geesaman alone provided Matec America with the capacities it was represented to

have, and thus the fact that Geesaman was not hired until after the First Contract was executed

does not on its own show that Matec America lacked certain capacities when it made the

representations to Noranda. Thus, Matec is granted summary judgment with respect to this alleged

misrepresentation.

Fifth, Noranda claims that Douglas Strong, an alleged agent of Matec's, falsely told

Noranda that Matec had previously done work at an alumina facility in Brazil. Noranda SJ Opp.

at 9. Such a representation plainly pertains to a present fact—Matec's experience with alumina—

and was collateral to the contracts. Furthermore, it is undisputed that the misrepresentation was

made, Dkt. 91-8 (email forwarding PowerPoint presentation of Matec's global references) at 2, 10,

and that it was not true, Noranda Counter 56.1 Stmt. ¶¶ 15-16. Thus, the nature of the

misrepresentation made does not disqualify it from grounding a claim for fraudulent inducement.

Matec nonetheless argues that it is entitled to summary judgment with respect to that claim for reasons that appear to relate to the reliance element: "Noranda undisputedly knew that Matec that [sic] had little experience with bauxite residue and no experience with Jamaican bauxite." Matec SJ Reply at 3 n.6. But the mere fact that Matec had limited experience with bauxite and none with Jamaican bauxite, *see, e.g.*, Matec Counter 56.1 Stmt. ¶ 271, is insufficient, on its own, to preclude any reasonable juror from concluding that Noranda relied on Strong's representation regarding Matec's supposed work in Brazil in deciding to purchase the Initial Presses. Noranda might have believed both that Matec had little experience with bauxite and that Matec's prior work at a Brazilian alumina facility provided at least some expertise relevant to the work it would perform with respect to Noranda's facility. Consequently, Matec is denied summary judgment with respect to Strong's alleged misrepresentation.

Sixth, Noranda claims that, while prior to the execution of the First Contract, Matec had employed flocculent in conducting filtration tests of Noranda's residue, it falsely told Noranda that it had not employed flocculant in those tests. Noranda SJ Opp. at 9. Noranda's evidence consists of Matec's admission that it did add flocculant before performing tests on the residue, and the testimony of Matteo Goich, Matec's President, that flocculant was employed. Noranda 56.1 Stmt. ¶ 47; Dkt. 91-12 (Matec's responses to Noranda's first set of requests for admission) at 3-4; Dkt. 91-11 (Goich deposition) at 219:6-17. However, while Noranda has produced evidence that tests were performed with flocculant, which would show the falsity of the claim that *no tests were performed with flocculant*, that is not the misrepresentation alleged. Instead, Matec accuses Noranda of falsely representing *that tests were performed without flocculant*. *See, e.g.*, Noranda 56.1 Stmt. ¶ 48 ("Matec . . . had advised that Noranda's 'project' was 'studied and tested to work straight into the filters *without any flocc[ulant]*.'" (quoting Dkt. 91-22 (May 20, 2017 email from

Matec to Noranda) at 2)).  Those two questions are simply distinct, for Matec could have performed multiple tests on the residue, some with flocculant and some without.  Indeed, e-mails produced by each party indicate that tests both with and without flocculant were contemplated.  Dkts. 91-22 at 2; 107-1, Exh. 12 at 1.  And while Noranda easily could have asked, either in a request for admission or in Goich's deposition, whether Matec performed any tests without flocculant—the fact Matec actually asserted—it did not do so.  Consequently, Noranda has not produced sufficient evidence from which a reasonable jury could conclude that the statement that Matec tested the residue without flocculant was false.  Matec is therefore granted summary judgment with respect to this alleged misrepresentation.

Seventh, Noranda claims that Matec falsely represented the nature and results of the testing it conducted on the bauxite residue that Noranda provided.  Noranda SJ Opp. at 10.  In particular, Noranda claims, Matec represented that it had tested "total cycle time"; in fact, it had measured only the time required for filtration, not the time required for the two remaining steps in the filtration cycle, opening and closing the presses.  *Id.* ("It only measured *filtration* time, which is only one out of the three steps in a cycle.  Yet, Matec represented it had tested the 'TOTAL CYCLE TIME.'"); *see* Noranda 56.1 Stmt. ¶¶ 36-38 (explaining "*Step One – Closing Time*," "*Step Two – Filtration Time*," and "*Step Three – Opening Time*").  In support of this claim, Noranda cites two spreadsheets prepared by Matec that discuss "TOTAL CYCLE TIME," the phrase quoted by Noranda.  *See* Dkts. 91-21 at 6; 91-23 at 5-6.  Those spreadsheets, however, do not "represent [Matec] had tested the 'TOTAL CYCLE TIME,'" as Noranda claims, Noranda SJ Opp. at 10.  Instead, each spreadsheet presents a "time cycle calculation"—clearly indicating that the total cycle time was not itself tested directly but was rather extrapolated in some manner from other data—and contains no indication whatsoever that the time value given for any particular step in

the filtration cycle resulted from direct measurement.  *See* Dkts. 91-21 at 6; 91-23 at 5-6.  Indeed, while Noranda's particular complaint appears to be that Matec represented it had measured the time required for the closing and the opening of the presses, the spreadsheets do not mention closing time at all and in fact indicate that Matec had not actually measured opening time, since they employ "[e]xpected opening time and core blow" in their calculations.  *See* Dkts. 91-21 at 6; 91-23 at 5-6.  Because Matec did not represent that it had directly measured the opening and closing times, it is granted summary judgment with respect to that alleged misrepresentation.

In addition, Noranda's own motion for summary judgment identifies a number of alleged misrepresentations in the course of seeking summary judgment as to Matec's liability for negligent misrepresentation.  Noranda SJ Br. at 23-25.  Some of the alleged misrepresentations cited there are also cited in Noranda's arguments concerning fraudulent inducement, such as the statement that Matec conducted tests without flocculant and the statement that Matec had measured the speed of each step in the filtration cycle, each of which the Court has already analyzed *supra*.  Although Noranda does not cite the remaining statements specifically in connection with its fraudulent inducement claim, the Court also separately analyzes the following four statements:  (1) "Matec represented the total cycle times of its presses were two-to-three cycles per hour," (2) "Matec represented that its filter presses worked at higher pressure than those of its competitors," (3) "Matec represented . . . that Matec's filter presses could perform, notwithstanding variability in the slurry's density," and (4) "Matec also represented that just one filter press could handle Noranda's daily bauxite residue output."[18]

---

[18] Noranda's brief first lists "a number of actionable misrepresentations that damaged Noranda," Noranda SJ Br. at 22-23, without explaining why those misrepresentations are false or citing any evidence showing them to be false, then later advances a number of factual allegations, supported by citations to the record, that purportedly show Matec's representations to have been

Matec is granted summary judgment with respect to the third of these alleged misrepresentations for the simple reason that no such representation was made:  in the e-mail Noranda cites, *see* Noranda 56.1 Stmt. ¶ 90, Matec does not represent that it could perform "notwithstanding variability in the slurry's density," but rather asks a specific question about the slurry's density, "to avoid[] misunderstanding," precisely because the feed specifications would affect the "quote" Matec would provide Noranda.  Dkt. 91-32 at 3.  As to the remaining three alleged misrepresentations, Noranda's argument is caught on the horns of the same dilemma with respect to each.  In each case, Noranda cites a statement about Matec's filtration capacity which it then attempts to refute based on the actual performance of the Initial Presses.  If the statements are interpreted as claims about how the Initial Presses would perform, then the statements could be refuted by the Presses' actual performance, but the statements would then be promises of future performance, not statements of present fact.  And if the statements are instead interpreted as claims about the general capacities of the presses that Matec produces, which would be statements of present fact, then they cannot be refuted by evidence as to the future performance of the Initial Presses, as Noranda attempts to do, but rather only by evidence pertaining to the general capacities of Matec's presses, which Noranda has not adequately produced.

---

false, *id.* at 24-25.  However, not every statement included in the initial list of actionable misrepresentations has a corresponding denial as to its truth in the subsequent list of factual claims—for example, in the list of misrepresentations Noranda includes the claim that Matec had "1,800 INSTALLATIONS WORLDWIDE," but nowhere asserts that Matec had not achieved that number of installations.  *See id.* at 23-25.  Thus, the Court considers only those alleged misrepresentations that are purportedly contradicted by a specific factual denial cited to the record, and therefore ignores the following alleged misrepresentations that lack any citation to evidence demonstrating their falsity:  (1) Matec's representations concerning its specialized knowledge in filter press technology, *id.* at 23, (2) Matec's representations that its tests were successful, *id.*, (3) Matec's reassurances to Noranda leadership, paraphrased as "we can handle your slurry," *id.*, and (4) Strong's representation that "Matec's filter presses were not 'a one of [a] kind equipment in a new application,'" *id.* at 24 (alteration in original; quoting Noranda 56.1 Stmt. ¶ 23).

First, Noranda reports that "[b]ased on its alleged testing, Matec represented that a cycle time would be between 25 to 30 minutes." Noranda 56.1 Stmt. ¶ 51 (cited at Noranda SJ Opp. at 23). As stated, this claim is plainly a promise of future performance—namely, a promise as to what the cycle time of Matec presses *would be*, once Noranda purchased them—and thus is duplicative of the contract. The underlying exhibits cited do indicate that Matec's representations were phrased more ambiguously, such that they might be interpreted as representations of Matec's present projections as to the presses' future performance, not as promises that they would perform according to those projections. *See, e.g.*, Dkts. 91-10 (Rule 30(b)(6) deposition of Matec America) at 84:10-14; 91-11 (Goich deposition) at 202:7-17; 91-15 (Massimo Bertolucci deposition) at 99:24-100:9; 91-21 at 5-6, 91-23 at 5-6. However, Noranda's only proffered evidence as to falsity is that "actual closing and opening times were more than *double* what Matec promised." Noranda SJ Br. at 24. And Noranda's own phrasing admits that the evidence as to falsity shows only that Matec's alleged *promise* was violated, not that Matec falsely represented any present fact such as the content of its own projections of cycle time. Thus, Matec is granted summary judgment with respect to this alleged misrepresentation.

Second, Matec's alleged "representation that its filter presses worked at higher pressure than those of its competitors, which meant faster cycle times" does represent a present fact—namely, a fact about how capacity of Matec's presses generally compares to that of its competitors. *Id.* at 23. The only evidence cited by Noranda as to the falsity of that fact, however, is that the specific "plates and presses could not withstand a pressure of 21 bar, contrary to Matec's promises." *Id.* at 24. As Noranda's own phrasing again indicates, this evidence at most supports an argument that Matec made false promises as to how the presses would perform—a promise of future performance that cannot sustain a non-duplicative fraudulent inducement claim—and does

not show that when the statement was made, Matec lacked the capacity, in general, to produce presses with higher pressures than those of its competitors.  Nor has Noranda cited any additional evidence showing that Matec lacked the capacity to produce presses operating a higher pressure than those of its competitors.  *E.g.*, Noranda 56.1 Stmt. ¶¶ 87-88.[19]

Last is Matec's alleged misrepresentation as to the number of machines Noranda would be required to produce.  As repeated in the deposition testimony of a Noranda employee, Llaurene Craig Jackson, Matec allegedly asserted, "You only need one of our machines to service your output -- your red mud output."  Dkt. 91-2 at 27:4-5.  On its face, however, this representation appears to be promise of future performance—namely, a promise that a single Matec press would be able to process all the residue generated by Noranda.  And again, such a promise of future performance cannot sustain a claim for fraudulent inducement.   Perhaps, less naturally, the statement might be interpreted as asserting the present fact that Matec was capable of producing a machine that processed bauxite residue at a rate equal to or greater than the rate at which Noranda's refinery generated the residue.  However, the only evidence Noranda cites to show the claim false is evidence as to the actual performance of the presses that Matec sold to Noranda.  *See* Noranda SJ Br. at 24; Noranda 56.1 Stmt. ¶¶ 32 (discussing Noranda's difficulties operating the pumps it purchased), 82 (discussing "[t]he filter presses that Matec delivered to Noranda").  And such evidence cannot demonstrate the falsity of an assertion of present fact pertaining to the general capacity of the machines Matec produced.  Thus, Matec is granted summary judgment with respect to this alleged misrepresentation.

---

[19] Though not mentioned in its brief, Noranda's Rule 56.1 statement cites to one additional representation by Matec that "all the plates are 21 bars." Dkt. 91-30 at 3; *see also* Noranda 56.1 Stmt. ¶ 86.  However, even were that fact false, Noranda plainly cannot establish that it relied on the statement, since in the very same e-mail exchange Noranda's own employees discuss their belief that the representation was false and their basis for that belief. *See* Dkt. 91-30 at 2.

In sum, while Matec is granted summary judgment as to most of the supposed misrepresentations Noranda points to, Noranda has identified two representations made by Matec that were statements of present fact collateral to the contracts such that at least a genuine issue of fact exists as to their falsity—namely, the representation that Matec had worked on an alumina facility in Brazil prior to its work with Noranda, and the representation that the failure of the Initial Presses to perform was due to either the presence of entrained air or the inadequate maintenance of the Presses.  Noranda's claim for fraudulent inducement may proceed to trial as to those two alleged misrepresentations.  The claim is dismissed as to all others.

### 3.      Negligent Misrepresentation

While Matec alone sought summary judgment on Noranda's fraudulent inducement claim, each party seeks summary judgment as to Noranda's negligent misrepresentation claim.  Matec again argues that the claim is preempted by the CISG and is duplicative of Noranda's claim for breach of contract, Matec SJ Br. at 7-13, and it further claims that the special relationship between the parties required for a claim of negligent misrepresentation does not exist as a matter of law, Matec SJ Opp. at 16-18.  Noranda, by contrast, claims that it has established each element of negligent misrepresentation, including the existence of a special relationship.  Noranda SJ Br. at 21-25.

As discussed *supra*, the duty not to fraudulently induce another to enter into contracts plainly does not itself arise from any contract itself, and thus that duty is not preempted by the CISG.  Matters are more complicated as to negligent misrepresentation, however.  "New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties."  *JTRE Manhattan Ave. LLC v. Capital One, N.A.*, 585 F. Supp. 3d 474, 479 (S.D.N.Y. 2022).  As the New York Court of Appeals

has explained, the "duty to speak with care" violated by a negligent misrepresentation "exists when the relationship of the parties, arising *out of contract* or otherwise, is such that in morals and good conscience the one has the right to rely upon the other for information." *Kimmell v. Schaefer*, 675 N.E.2d 450, 263 (N.Y. 1996) (emphasis added) (internal quotation marks and brackets omitted). Obviously, the CISG does not preempt a duty to speak with care that depends on a relationship arising outside of a contract. Within certain contractual relationships that entitle one party to rely on the other, however, New York requires the party relied upon to speak with care and to compensate its counterparty for damages caused by careless speech. Because such duties are imposed by law in virtue of the relationship that arises between the parties from the contract they have signed, it is possible that the duty is among the "rights and obligations . . . arising from such a contract," which are rights and obligations governed by the CISG. CISG art. 4. New York law is hardly clear on the point. *See, e.g.*, *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922) ("Growing out of a contract, it has none the less an origin not exclusively contractual."). Thus, the CISG may preempt claims for negligent misrepresentation when the special relationship upon which the plaintiff relies depends on the parties' contract. *Cf.*, *Geneva Pharms. Tech. Corp.*, 201 F. Supp. 2d at 285-86 (explaining that the CISG's express goal of imposing uniformity on the law of sales requires it to preempt inconsistent state sales law).

The Court need determine whether the CISG would preempt a state law claim for negligent misrepresentation arising from the contracts between the parties, however, only if Noranda has a viable claim for negligent misrepresentation under New York law. As mentioned, Matec argues that as a matter of law no special relationship existed between the parties under New York law, denying in particular that an ordinary seller of goods is under a duty to speak to buyers with care that, if violated, could create liability for negligence. Matec SJ Opp. at 17-18. By contrast,

60

Noranda argues that such a duty did apply to Matec because "the undisputed evidence shows 'the plaintiff relies on information "peculiarly within the defendant's knowledge."'"  Noranda SJ Br. at 22 (quoting *McCaffrey v. Gatekeeper USA, Inc.*, No 14 Civ. 493 (VSB), 2022 WL 902423, at *7 (S.D.N.Y. Mar. 28, 2022)).  Because the Court agrees that no special relationship existed, Matec's motion for summary judgment is granted with respect to Noranda's negligent misrepresentation claim.

Noranda argues that a special relationship imposing a duty of care on Matec existed primarily in virtue of two facts:  Matec had superior expertise and knowledge concerning filter press technology, and Noranda relied on Matec's expertise and representations about that technology.  *See, e.g.*, Noranda SJ Reply at 9 ("It is undisputed that Matec claimed to be a filter press 'expert,' and that Matec knew it had superior knowledge about filter press technology.  It's also undisputed that Matec tested Noranda's bauxite, and that it reported 'successful' tests despite never actually testing or measuring Steps 1 and 3 of the pressing process.  And Noranda relied on that expertise when deciding to move forward with Matec.  That creates the 'special relationship' that New York law requires." (citations omitted)).  Furthermore, Matec does not dispute that it provided Noranda with information about its filter press technology, and that Noranda relied on at least some of that information.  In certain passages from its briefing, Noranda suggests that this reliance alone suffices to establish a special relationship.  *See, e.g.*, Noranda SJ Br. at 21-22 (arguing that "the functional equivalent of privity," required for a special relationship to exist, is established if "(1) the defendant had awareness that its work was to be used for a particular purpose, (2) there was reliance by a third party known to the defendant in furtherance of that purposes [sic]; and (3) there existed some conduct by the defendant linking it to the known third

party evincing the defendant's understanding of the third party's reliance" (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405-06 (2d Cir. 2015)).

As a threshold matter, then, the Court clarifies that reliance, on its own, does not suffice to establish a duty to speak carefully.  To be sure, individuals are not obligated to speak carefully in contexts where it is not reasonably foreseeable that others will risk loss by relying on the truthfulness of their representations.  *See, e.g.*, *Heard v. City of New York*, 623 N.E.2d 541, 546 (N.Y. 1993) ("Defendant must have imparted the information under circumstances and in such a way that it would be reasonable to believe plaintiff will rely upon it . . . .").  Thus, a speaker cannot be liable for negligent misrepresentation absent foreseeable reliance.  But the law does not guarantee individuals that any information they foreseeably rely on will be reliable.  Rather, "reliance must be justifiable" for a duty to speak carefully to exist.  *Kimmell*, 675 N.E.2d at 454.  Thus, the duty to speak carefully exists only when two distinct requirements are satisfied.  *E.g.*, *Heard*, 623 N.E.2d at 545 ("No liability arises, however, when the statements are made in circumstances where reliance is *unforeseeable* or *unjustified*." (emphasis added)).  The first pertains to the foreseeability of reliance:  "There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property."  *Int'l Prods Co. v. Erie R.R. Co.*, 155 N.E. 662, 664 (N.Y. 1927).  The second pertains to its justifiability:  "[T]he relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care."  *Id.*  Thus, even if Matec knew that Noranda would rely on its representations, no special relationship would exist unless Noranda had "the right to rely upon [Matec] for information."  *Id.*

In turn, a defendant's special expertise or special position of trust goes to the justifiability of reliance.  "[N]ot all representations made by a seller of goods or provider of services will give rise to a duty to speak with care," for "liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party *such that reliance on the negligent misrepresentation is justified*."  *Kimmell*, 675 N.E.2d at 454 (emphasis added).  New York courts find such reliance justified primarily when the party relied upon is in the business of providing specialized information for the purpose of others' reliance.[20]  Oftentimes, such defendants are members of professions employed to give specialized, technical information to clients.  *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 400 (S.D.N.Y. 2004) ("As courts have noted, such specialized knowledge usually arises due to the speaker's status as a professional, such as an accountant or an engineer, with a particular background in the subject of the alleged misrepresentation.").  Such professions include law, *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318 (N.Y. 1992), accounting, *White v. Guarante*, 372 N.E.2d 315 (N.Y. 1977), engineering, *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 539 N.E.2d 91 (N.Y. 1989), and professional weighing of commodities, *Glanzer*, 135 N.E. at 275.  *See also Int'l Prods. Co.*, 155 N.E. at 663 (citing with approval cases that imposed a duty to speak carefully on "a physician who assures a wife that she may safely treat the infected wound of her husband, or, hired by another, examines a patient, and states the result of his diagnosis").  In other cases, even when the defendant is not a member of a specific profession, a duty to speak carefully may be imposed

---

[20] In addition, the duty to speak carefully may be imposed as part of an independent fiduciary duty running from the defendant to the plaintiff. *See, e.g.*, *Gregor v. Rossi*, 992 N.Y.S.2d 17, 19 (1st Dep't 2014) (considering whether "the requisite fiduciary or special relationship between plaintiffs and defendants" existed).

when the primary purpose of the defendant's relationship with the plaintiff is to provide specialized, technical information.  *E.g.*, *Kimmel*, 675 N.E.2d at 452-53 (describing the extensive financial information about an energy generation project provided to the plaintiff by the defendant, who was a lawyer and accountant employed to solicit investors for the project).

In these cases, New York imposes a duty to speak carefully on defendants whose business is providing information on technical subjects.  "There is nothing new here in principle. . . .  One who follows a common calling may come under a duty to another whom he serves . . . .  It is the duty of every artificer to exercise his art rightly and truly as he ought."  *Glanzer*, 135 N.E. at 276 (internal quotation marks and citations omitted).  Sellers and manufacturers of goods, however, are not in the business of providing information; rather, they are in the business of providing goods. They too must "exercise [their] art rightly and truly as [they] ought," *id.*, but the duties imposed on them by law pertain to their goods, such as the implied warranties of title, *see* U.C.C. § 2-312, of merchantability, *id.* § 2-314, and of fitness for a particular purpose, *id.* § 2-315; the warranty that goods sold will conform to the seller's samples, descriptions, or affirmations, *id.* § 2-313; the duty not to sell defective products, *Micallef v. Miehle Co.*, 348 N.E.2d 571, 577 (N.Y. 1976); and the duty to warn of latent defects or of the dangers of unintended uses, *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 305 (N.Y. 1998).  Noranda has not identified any case recognizing a general duty of a seller of goods to speak carefully to buyers.  Instead, because sellers of goods are not primarily in the business of providing information to buyers, the relationship between buyer and seller does not entitle the buyer to rely generally on representations made by the seller, and thus does not create the duty to speak carefully required for a claim of negligent misrepresentation.[21]  *See, e.g.*,

---

[21] Noranda does cite certain statements in Matec's advertising materials indicating that Matec provides consulting services in addition to selling its machines.  Noranda SJ Reply at 10.

*Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 811 (1st Dep't 1976) (holding that a special relationship existed between the parties to a distributorship agreement only because "the parties' relationship was intrinsically a more intimate association, at least in terms of reliance and trustworthiness, than that of the commonly encountered buyer and seller").

To be sure, in certain circumstances the New York Court of Appeals has imposed a limited duty to speak carefully even on those not primarily engaged in the business of providing information. For example, in *International Products Company*, the defendant, which had been hired to receive, store, and ship the plaintiff's goods, incorrectly informed the plaintiff as to the specific location at which the goods were stored. 155 N.E. at 662-63. Consequently, the insurance policy the plaintiff had purchased on the goods was invalid, and the plaintiff was unable to recover under it after the goods were destroyed in a fire. *Id.* at 663. This inquiry, "expected in the usual course of business [and] made of one who alone knew the truth," gave the inquirer the right to rely on the accuracy of the answer. *Id.* at 664. And although the business relationship in *International Products Company* was between the owner and the carrier of goods, not between buyer and seller, the court's reasoning suggests that a similar duty would exist in the context of sales, as well. *Id.* ("An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another."). Thus, Noranda might claim that *International Products Company* imposed on Matec the duty to speak carefully about its presses to Noranda.

---

Had Matec provided Noranda with an engineering report upon which it relied to its detriment, as the plaintiff in *Ossining Union Free School District* relied on the engineering report produced by a defendant in that case, 539 N.E.2d at 92, then Noranda might well be able to sustain a claim for any negligent misrepresentations made in that report. However, Noranda has not identified any such report, and the record contains no indication that one was provided.

But any duty that existed in *International Products Company* could not entitle Noranda to recover in this action.  In that case, the plaintiff did not rely on the defendant's misrepresentation in deciding to enter into its business relationship with the defendant; rather, the plaintiff relied only in deciding to take the separate act of purchasing insurance for the goods that defendant stored. *Id.* at 662-63.  This distinction, the New York Court of Appeals held, was crucial:  while the duty to speak carefully is triggered by an inquiry made "of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, . . . [e]ven here the inquiry must be made *as the basis of independent action*." *Id.* at 664; *see also Gregor*, 992 N.Y.S.2d at 19 ("[T]he requisite relationship between the parties must have existed before the transaction from which the alleged wrong emanated, and not as a result of it.").  Thus, the court explicitly emphasized, any special relationship that exists between buyer and seller does not permit the buyer to recover for losses sustained by purchasing the goods themselves in reliance on the seller's representations: "We do not touch the doctrine of caveat emptor." *Id.*  And because Noranda has not identified any detrimental reliance on Matec's alleged misrepresentations other than the decision to purchase the presses from Matec, *International Products Company* does not permit Noranda to recover for negligent misrepresentation.

In sum, because Noranda and Matec were related only as a buyer and seller of goods, New York law did not impose a duty to speak carefully on Matec, and thus Matec could not have breached that duty through negligence in its representations to Noranda.  Matec therefore is granted summary judgment dismissing Noranda's claim for negligent misrepresentation.

**D.    Contract Claims**

Matec does not seek summary judgment as to any party's liability for breach of contract. Noranda, however, seeks summary judgment both as to Matec's liability for breaching each of the

three contracts and as to its own lack of liability for breaching those contracts.  Noranda SJ Br. at 4-18.  With respect to the breach of contract claims, Noranda's motion is denied.  In addition, Noranda seeks dismissal of Matec's claim for breach of the duty of good faith and fair dealing, which, it claims, is duplicative of Matec's claims for breach of contract.  Noranda SJ Br. at 10. Because Matec opposes that argument only in a footnote, Matec SJ Opp. at 23 n.20, the Court deems its argument waived, and grants Noranda's motion for summary judgment dismissing that claim.[22]  *See, e.g.*, *Harrell v. Joshi*, No. 14 Civ. 7246 (VEC), 2015 WL 9275683, at *2 n.5 (Dec. 18, 2015) ("Because Defendants have consistently raised this argument only in footnotes, the Court is not obligated to address it.").

### 1.      The First Contract

The Court first addresses Noranda's arguments for summary judgment on its claim that Matec breached the First Contract, then its argument for summary judgment dismissing Matec's claim that Noranda breached that Contract.  Noranda identifies three alleged breaches of the First Contract—first, Matec's failure to install and commission the Initial Presses by the date required in the First Contract, Noranda SJ Br. at 5; second, the failure of the Initial Presses to achieve the cycle times guaranteed in the First Contract, *id.*; and third, Matec's failure to deliver filter press plates ordered in the First Contract, *id.* at 6.  As to the first two, Matec does not dispute when the

---

[22] Matec's argument—which is unsupported by even a single citation to authority—is also unpersuasive.  The claim for breach of the duty of good faith and fair dealing, Matec argues, is not duplicative because it "concerns Noranda's efforts to frustration [sic] of Matec's performance," while the breach of contract claim "concerns Noranda's failure to pay for the goods Noranda accepted."  Matec SJ Opp. at 23 n.20.  However, "[p]revention of performance is a material breach of contract" that "consists of the violation of the implied promise of cooperation present in all contracts" and that "renders the party preventing performance liable for damages caused by the breach."  13 Richard A. Lord, Williston on Contracts § 39:12 (4th ed. 2023).  Thus, Matec's request for damages caused by Noranda's alleged prevention of its performance is cognizable under its breach of contract claim.  *See, e.g.*, *Nat. Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d. Cir 2004).

Initial Presses were installed and commissioned or what the cycle times they reached, but rather denies that those facts establish a breach.  Matec SJ Opp. at 3-9.  As to the third, Matec claims that the plates Noranda ordered were in fact delivered.  *Id.* at 9-10.

### a.     Delayed Commissioning

The First Contract, Noranda claims, "required delivery of presses within 120 days of the contract and commissioning 6 weeks later."  Noranda SJ Br. at 4 (citing Noranda 56.1 Stmt. ¶ 66).  In support of that claim, Noranda cites a provision of the First Contract reading:

> **Delivery days**: 120 calendar days; FOB Massa, Italy
> **Installation weeks**\*: 6 weeks all precabling and assembly (includes two (2) Matec Technicians for 6 weeks, 40 hours per week[)], and an additional 6 weeks of commissioning (total install including second press) (includes flights, hotels, rental car, and meals); Tools and four additional personnel to be provided by Noranda including one (1) Electrician, two (2) mechanical installers, and one (1) welder

First Contract at 3; *see also* Noranda 56.1 Stmt. ¶ 66.  However, commissioning commenced for the Initial Presses only in January 2019, Noranda 56.1 Stmt. ¶ 79, which Noranda contends was "almost a year late," Noranda SJ Br. at 5.[23]

Noranda does not provide any argument, however, in support of its contention that, in the quoted provision of the First Contract, Matec promised to commence commissioning of the Initial Presses by a specific date.  And reviewing the First Contract hardly leaves it unambiguous that the quoted provision has that effect.  The provision appears on page three of the First Contract.  First Contract at 3.  In turn, pages two and three of the First Contract together contain an itemized list, with prices, of the machinery that Noranda had ordered.  *Id.* at 2-3.  At the conclusion of that list, the First Contract sums the prices of each component of Noranda's order to yield the total price

---

[23] Because the First Contract had an effective date of May 2, 2017, allocating 120 days for delivery and six weeks for installation would leave commissioning scheduled to commence in October 2017.  Thus, commissioning would have been over a year late had it begun in January 2019, not "almost a year late."  Noranda SJ Br. at 5.  The Court cannot explain the discrepancy.

for all the machinery purchased, $2,575,555.  *Id.* at 3.  That line is labelled "Total ex works amount including second press."  *Id.*  Immediately below that line is one reading "Installation *See below" and giving a price of $113,000.  *Id.*  The provision that Noranda reads to impose a deadline for commissioning to commence appears only a few lines below.  *Id.*  Furthermore, that provision— like the line item giving a price for installation—contains an asterisk following the words "installation weeks," which is naturally interpreted as indicating that the $113,000 installation price, which also contains an asterisk, refers to the description following those words "installation weeks."  Because pages two and three of the First Contract generally set forth the contents of Noranda's order in the First Contract, one interpretation of the provision Noranda quotes—perhaps the most natural interpretation—is that it sets forth the installation services Noranda was purchasing under the Contract, much as the itemized list sets forth the machinery Noranda was purchasing under the Contract.  On that interpretation, Matec promised to provide six weeks' worth of installation under the terms listed but did not promise that installation would finish and commissioning would commence after six weeks.  Therefore, the provision of the First Contract on which Noranda relies is ambiguous.

Whether Matec breached the First Contract by delaying the commissioning date of the Initial Presses, then, depends on the proper interpretation of this ambiguous provision.  And Noranda will be entitled to summary judgment only if the Court can interpret the First Contract as a matter of law based only on the undisputed facts of this case.  Under the CISG, however, contract interpretation is sensitive to evidence as to questions of fact.  "[S]tatements made by . . . a party are to be interpreted according to his intent where the other party knew or could not have been unaware of what that intent was," CISG art. 8(1); otherwise, they "are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had

69

in the same circumstances," *id.* art. 8(2). Thus, the meaning of the First Contract must be interpreted according to Matec's intent if Noranda knew or could not have been unaware of what that intent was, and if not it must be interpreted according to the understanding a reasonable person of the same type as Noranda would have had in its circumstances. In ascertaining either "the intent of a party or the understanding a reasonable person would have had," furthermore, "due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." *Id.* art. 8(3). In addition, "parties are bound by any usage to which they have agreed and by any practices which they have established between themselves," *id.* art. 9(1), and they "are considered, unless otherwise agreed, to have impliedly made applicable to their contract . . . a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned," *id.* art. 9(2).

The proper interpretation of the First Contract therefore depends on the parties' negotiations, usages, practices, and conduct, as well as on any usages customarily employed in international trade between parties of the same type. Noranda could argue in favor of its preferred interpretation by citing facts about the parties' course of dealing to show how that interpretation is consistent either with Matec's intent, if known by Noranda, or with Noranda's reasonable understandings, if not; alternatively, Noranda could show that its interpretation follows from usages that are customary in international trade in these goods. On summary judgment, those arguments could prevail only if "no genuine dispute" exists as to the factual basis Noranda cites in favor of its interpretation. Fed. R. Civ. P. 56(a). Furthermore, as the "party asserting that a fact cannot be . . . genuinely disputed," it is Noranda's burden to "support the assertion." *Id.* 56(c)(1).

However, Noranda has not identified facts about the parties or about the customs of international trade such that the CISG would require the First Contract to be interpreted as Noranda seeks, and not having identified such facts at all, Noranda certainly has not shown that no genuine dispute exists as to them.  Thus, while Noranda may still prove at trial that it has correctly interpreted the quoted provision of the First Contract, summary judgment is not warranted on the question of whether Matec's delays in commissioning the Initial Presses breached that provision.

### b.  Excessive Cycle Times

Next, Noranda claims that Matec breached the First Contract because the Initial Presses failed to perform in accordance with their guaranteed cycle times.  In particular, the "Technical specifications" listed in the First Contract specify "Filtrations per hour (average)" of "2/3 (Depending on treated material)."  First Contract at 11.  However, while the Initial Presses could complete two or three cycles per hour only if their cycle times were thirty or twenty minutes, respectively, the Initial Presses took around an hour to complete a filtration cycle.  Noranda 56.1 Stmt. ¶ 81.  In response, Matec identifies three causes for the slow cycle times that, it argues, defeat its liability under the First Contract:  the presence of entrained air in the bauxite residue, Matec SJ Opp. at 4-6, Noranda's use of improper filter cloths (which actually filter the bauxite solids out of the slurry), *id.* at 6-7, and Noranda's failure to properly maintain the presses, *id.* at 7-8.

The contractual guarantee that Matec allegedly violated, as mentioned, is that the Initial Presses' filtrations per hour would average "2/3 (Depending on treated material)."  Noranda does not attempt to provide an explicit interpretation of this provision.  But on its face the performance guarantee clearly depends in some way on the "treated material," which would appear to refer to the bauxite residue being filtered.  The guarantee might depend on the residue in at least two obvious ways.  First, the First Contract might guarantee two cycles or three cycles per hour, full

stop, then note that the characteristics of the residue would determine whether the Initial Presses actually achieved two cycles per hour or three. Alternatively, the First Contract might impose, as a condition of its guarantee that the Initial Presses would achieve either two or three cycles per hour, the requirement that the bauxite residue have certain unspecified properties. Thus, this provision of the First Contract, too, is ambiguous, and similarly must be interpreted based on facts about the parties and about customary usages in the trade. And Noranda similarly has not adduced sufficient evidence to eliminate any genuine issue as to such facts and therefore permit the Court to interpret the contract on summary judgment. Noranda would therefore be entitled to summary judgment only if Matec breached the First Contract on any possible interpretation of the provision.

However, Matec has created a genuine issue of fact as to whether the longer cycle times were caused by differences between the bauxite residue the Initial Presses were designed to process and the residue that the presses actually encountered inside Noranda's refinery. In particular, based on tests of the bauxite residue conducted by Noranda at its refinery, Matec's expert witness, Fuller, proposes to testify that the residue the Initial Presses were required to filter contained entrained air not present in the specifications or the residue samples that Noranda provided, and that the presence of entrained air caused a considerable increase in the actual cycle times of the Initial Presses. *See generally* Fuller Report. And while Fuller certainly may be incorrect, *see generally* Spevacek Report, at the very least a genuine issue of fact exists as to whether the entrained air did cause longer cycle times. Thus, because the undisputed facts provide an inadequate basis for interpreting the First Contract's guarantee of two or three cycles per hour, genuine issues of fact prevent the Court from determining now whether that guarantee was violated if the failure to achieve two or three cycles per hour was caused by, according to the Fuller Report, the entrained air that was present in the bauxite residue at Noranda's refinery. Thus, based on the undisputed

facts alone, Noranda is not entitled to judgment as a matter of law that the cycle times of the Initial Presses constituted a breach of the First Contract.

This ambiguity in the First Contract's warranty of the Initial Presses' cycle times would alone suffice to deny Noranda's motion for summary judgment as to Matec's alleged breach of the First Contract. Matec further advances two more reasons that each independently justify the denial of that motion, which relate to Matec's claim that two additional factors contributed to the longer cycle times—namely, Noranda's use of third-party filter cloths with the Initial Presses, Matec SJ Opp. at 6-7, and its inadequate maintenance of the Initial Presses, *id.* at 7-8. Under the First Contract, "[t]he warranty is valid provide [sic] that what has been bought has been used correctly, respecting the maintenance schedule specified in the maintenance and use manual." First Contract at 21. Furthermore, "[t]he warranty does not cover defects and malfunctioning deriving from an incorrect use of the machine by [Noranda] and it decays in case of alteration/reparation and intervention carried out by [Noranda] or a third party with no written consent by Matec." *Id.* Each of these two additional factors allegedly responsible for slow cycle times, Matec claims, voided the warranties in the First Contract, such that Matec would not be liable for the Initial Presses' performing at speeds slower than those guaranteed in the First Contract. Matec SJ Opp. at 6-8.

Based on the evidence the parties have cited, genuine issues of fact preclude the Court from holding, as a matter of law, that neither the use of third-party filter cloths nor the allegedly inadequate maintenance voided the warranties in the First Contract. Noranda does not appear to dispute that it did, in fact, employ filter cloths produced by third parties, not by Matec. Noranda SJ Reply at 5. The provision that governs whether the use of those filter cloths voided the warranties is somewhat garbled: for example, the antecedent of the pronoun "it" in the phrase "it decays" is unclear, as is the intended meaning in that phrase of the word "decays." The resolution

of such ambiguities, then, must depend on extrinsic evidence, which is not presently before the Court.  But on at least one possible interpretation that cannot be excluded based on the undisputed facts, the use of non-Matec filter cloths would constitute an "alteration" or "intervention" that caused the warranty to decay with respect to the Initial Presses' cycle times.[24]  Furthermore, while the use of third-party filter clothes would not void the warranty had Matec granted "written consent," a genuine dispute of fact exists as to whether it did.  *Compare* Dkt. 107-1, Exh. 6 (Bertolucci deposition) at 156:2-4 ("Q[.]  You told Noranda they can use non-Matec cloths?  A[.] Yes, for now") *with id.* at 157:8-13 ("To install, yes, to install bigger size cloths.  Bigger permeability. . . .  But from us, not from other suppliers . . . .").[25]  These genuine issues of fact as to whether the use of third-party filter cloths voided the First Contract's cycle time guarantee constitutes a further reason why Noranda is not entitled to summary judgment on its claim that Matec breached the First Contract through the Initial Presses' failure to conform to the warranty.

As to maintenance, the First Contract provides that the warranty is valid "provide [sic] that what has been bought has been used correctly, respecting the maintenance schedule specified in the maintenance and use manual."  First Contract at 21.  Matec has presented evidence sufficient to raise a genuine issue of fact as to whether Noranda's maintenance of the Initial Presses complied

---

[24] Noranda notes that the filter cloths are clearly excluded from the warranty as "consumables."  First Contract at 22; *see* Noranda SJ Reply at 5.  The relevance of this point escapes the Court, however.  The exclusion of filter cloths from the warranty means that Matec would not be liable for defects in the filter cloths.  But that fact appears irrelevant to Matec's claim that the replacement of the filter cloths with non-Matec filter cloths caused the machine to malfunction as a whole, thereby voiding the warranty as to the machine's performance standards.

[25] To argue that the Court should disregard this testimony, Noranda cites to caselaw suggesting that a party cannot create a genuine issue of fact if, in a subsequent deposition, he or she contradicts testimony given in an earlier deposition.  *See* Noranda Reply 56.1 Stmt. ¶ 207 (citing *Rodriguez v. Cnty. of Nassau*, 830 F. App'x 335, 337-38 (2d. Cir. 2020)).  Those circumstances obviously differ, however, from a deponent clarifying his meaning moments later in the same deposition, as occurred in this case.

with the maintenance and use manual.  Matec relies on two depositions, those of Darren Geesaman,

who was employed by Matec America as a service manager and assigned to Noranda's facility,

Noranda 56.1 Stmt. ¶¶ 129-130, and of Stu Gamble, Matec America's principal, *id.* ¶ 127.  Each

testified that Noranda's maintenance of the Initial Presses was inadequate in a number of respects.

*See, e.g.*, Dkt. 107-2, Exh. 39 (Geesaman deposition) at 46:5-47:13 (describing Noranda's failure

to wash the Initial Presses due to a broken pressure washer and failure to lubricate parts); *id.* at

51:14-16 (describing unwashed filter cloths); *id.* at 54:25-55:6 (indicating that the Initial Presses

were poorly maintained by Noranda); Dkt. 107-2, Exh. 30 (Gamble deposition) at 130:17-131:25

(describing maintenance failures including the failure to change filters, the failure to replace worn

parts, and the failure to take oil samples).[26]  This testimony creates a genuine issue of fact as to

whether the Initial Presses were "used correctly, respecting the maintenance schedule specified in

the maintenance and use manual."  First Contract at 21.  And because the warranty is void if that

---

[26] Noranda's arguments for why this testimony is inadmissible are unavailing.  Noranda argues that Geesaman's testimony is inadmissible because it is conflicting and because it lacks foundation.  However, the only evidence cited as to the lack of foundation is Geesaman's lack of "first-hand knowledge of Noranda's maintenance schedule."  Noranda Reply 56.1 Stmt. ¶ 311. And Geesaman's testimony concerns not Noranda's scheduled maintenance but rather whether it actually performed maintenance, and the foundation for his testimony on the latter point consists of his observations at the refinery.  *See, e.g.*, Dkt. 107-2, Exh. 39 at 46:15-19 (describing "[t]he lack of maintenance I observed").   Furthermore, while the conflict Noranda identifies in Geesaman's testimony is that he supposedly "testified that he did not see the plates being power-washed, but there was 'no telling' whether Noranda actually power-washed the machines," Noranda Reply 56.1 Stmt. ¶ 311, Noranda mischaracterizes his testimony.  Geesaman in fact testified that there was "no telling" whether Noranda *would* have washed the presses "[i]f their pressure washer was operational," Dkt. 107-2, Exh. 39 at 50:6-7, which it was not, *id.* at 49:20-21. Given that the power-washer was not operational, there is no contradiction.  Lastly, Noranda attacks Gamble's testimony as being hearsay, since Gamble testified as to statements made by Noranda's employee, Martinelli.  However, Gamble mentioned those statements not in order to prove their truth but rather in order to prove facts about Martinelli's state of mind.  *See, e.g.*, Dkt. 107-2, Exh. 30 at 130:25-131:1 (explaining, in apparent reference to the filter in the hydraulic system, that Martinelli "didn't even know where it was").  Such testimony is not excluded as hearsay.  *See* Fed. R. Evid. 803(3).

condition is breached, the genuine issue of fact as to the maintenance of the Initial Presses further precludes the Court from holding, on summary judgment, that Matec is liable for the Initial Presses' failure to meet their guaranteed cycle times.

### c. Inadequate Pressure

Lastly, Noranda claims that Matec breached a provision of the First Contract providing an "UPGRADE to 2x2 200 plates with 4 rms and HPT 21 BAR," First Contract at 2, because Matec "did not provide the plates called out (and paid for) in the First Contract," Noranda SJ Br. at 6. However, a genuine dispute of fact exists as to whether Matec did, in fact, provide those plates. In his deposition, Goich testified that the plates were delivered.  Dkt. 107-1, Exh. 4 at 258:2-10. Furthermore, while Noranda has cited evidence indicating that Matec provided plates with a "working pressure" of only 16 bar, not 21 bar, *see, e.g.*, Dkt. 91-7 (Martinelli deposition) at 113:19-24; Dkt. 91-30 at 2, that same evidence indicates that those plates were for the Additional Presses, not the Initial Presses, *see* Dkt. 91-30 at 3.  And because a genuine issue of fact exists as to whether Matec did deliver the plates that, Noranda claims, were not delivered, Noranda is not entitled to summary judgment on the claim that Matec breached the First Contract by failing to deliver those plates.

### d. Noranda's Liability

As mentioned, Noranda claims that it is entitled to summary judgment on Matec's claim for breach of contract.  While Noranda argues more extensively that it is not liable for breaching the Punch List and the Second Contract, it mentions the First Contract only in claiming that "[i]f Matec did not comply with its obligations under the Punch List, Matec was entitled to nothing and would be liable for damages under the First Contract:  'Unless and until Matec fully and timely completes all of its obligations hereunder, this [Punch List] shall not supersede any provisions of

the [First Contract].'"  Noranda SJ Br. at 11 (emphasis added) (quoting Punch List at 2).  This citation, however, plainly fails to show that Matec cannot bring a claim under the First Contract: if Matec failed to complete its obligations under the Punch List, as Noranda claims, *id.* at 7-9, then the Punch List would not supersede any provisions of the First Contract.  Furthermore, in addition to providing generally that all provisions of the First Contract would remain in effect until Matec completed its obligations under the Punch List, the Punch List provides that Matec would release its claims against Noranda under the First Contract only after Noranda paid the amount due under the Punch List.  Punch List at 3.  And Noranda has not claimed or presented evidence to show that it made that payment.  Thus, Noranda plainly has not shown that Matec's release in the Punch List of claims under the First Contract went into effect.  The Punch List thus does not prevent Matec from recovering for any damages due under the First Contract.[27]

* * *

Noranda seeks summary judgment holding both that it is not liable for breaching the First Contract and that Matec is.  However, the undisputed facts do not establish, as a matter of law, that Matec breached the First Contract.  Nor has Noranda shown that the Punch List precludes Matec from recovering under the First Contract for Noranda's alleged breaches.  Consequently, Noranda's motion for summary judgment is denied with respect to the First Contract.

---

[27] In its reply brief, Noranda advances the new argument that it is entitled to summary judgment on Matec's claim for breach of the First Contract because Matec failed to issue the appropriate invoices for damages suffered for breach of the First Contract.  But the Court "need not consider a new argument raised for the first time in a reply brief, as arguments presented in this fashion deny the opposing party a fair opportunity to respond."  *Snyder v. Graham*, No. 09 Civ. 10307 (RJS) (KNF), 2012 WL 983536, at *5 (Mar. 22, 2012).

2.      **The Punch List**

With respect to the Punch List, too, Noranda argues that it is entitled to summary judgment regarding both its own claims for breach of contract against Matec and Matec's claims for breach of contract against it.  The Court once again begins with the former.  The Punch List primarily imposed two obligations on Matec.  First, it required Matec to repair each item on a list of broken or missing components of the Initial Presses (the "Punch List Items").  Punch List at 1 ("Matec agrees to perform the Punch List Items set forth in the attached **Exhibit A** . . . ."); *see id.* at 4-5 (Exhibit A).  Second, Matec guaranteed that following the completion of the Punch List Items, the Initial Presses would perform for thirty days according to certain specifications (the "Revised Specifications").  *Id.* at 2 ("Commencing on the 51st day and for the ensuing consecutive thirty (30) calendar days thereafter, each Press shall perform in accordance with the newly agreed upon specifications . . . (collectively, 'Specifications' – see **Exhibit B**) . . . ."); *see id.* at 7-18 (Exhibit B).  Noranda argues that Matec breached the Punch List with respect to both obligations.  Noranda SJ Br. at 7-9.  First, Noranda claims that Matec failed to complete five specific items:  increasing the hydraulic speed of the filter presses, completing the TT bar coupling (a component of the system controlling the opening and closing of the presses), installing a second conveyor belt scraper, preventing mud cakes from clogging under the presses, and installing filter press safety curtains.  *Id.* at 8.  Second, it denies that the Initial Presses "m[e]t the performance requirements contained in the Punch List for 30 consecutive days."  *Id.* at 9.

Matec advances three arguments in response.  First, it argues that the Punch List is merely a "contingent settlement amendment to the First Contract" that does not supersede the First Contract unless it is performed; thus, it claims, to the extent that the Punch List was not performed, Noranda's only remedy is to sue under the First Contract.  Matec SJ Opp. at 10-11.  Second, as to

the first breach of the Punch List alleged by Noranda—the non-completion of the five specific items listed—Matec argues that those items were in fact completed. *Id.* at 11. Lastly, as to both alleged breaches of the Punch List, Matec argues that any breaches were caused by Noranda, which prevented Matec from completing the repairs required by the Punch List. *Id.* at 12-14. The Court addresses each of these arguments in turn; then, it addresses Noranda's arguments for dismissing Matec's claim that Noranda is liable for breaching the Punch List.

> ### a. Remedies for Breaching the Punch List

According to Matec, "[t]he express terms of the Punch List preclude any separate claim for breach of the Punch List." Matec SJ Opp. at 10. Matec's only citations in support of this claim, however, are to provisions of the Punch List specifying that it would not supersede the First Contract until Matec discharged all the obligations it imposed. *Id.* Those provisions do establish that merely executing the Punch List did not extinguish already available remedies under the First Contract, at least not until the parties discharged their obligations under the Punch List. However, even if the Punch List did not extinguish remedies available under the First Contract, it might have created additional remedies, available for breaching the Punch List, that apply alongside remedies for breaching the First Contract. Matec advances no compelling argument to support its position that Noranda cannot bring a separate claim for Matec's alleged breach of the Punch List.

Furthermore, Matec's claim that no independent remedies are available under the Punch List is undermined by the fact that, on its face, the Punch List plainly does create such remedies. As mentioned, the Punch List imposed two primary obligations on Matec—the obligation to repair or install certain broken or missing parts of the Initial Presses, Punch List at 1, and the obligation to perform pursuant to the Revised Specifications, certain performance standards for the Initial Presses, *id.* at 1-2. In addition to creating those obligations, though, the Punch List further created

remedies for their violation in the form of liquidated damages, set at $1,500 per day for delays in shipping the replacement parts, *id.* at 1, and at $3,000 per day for delays in achieving the Revised Specifications, *id.* at 2.  It is unclear why the Punch List would create such remedies if it did not allow the parties to seek them, as on Matec's interpretation of the Punch List.  Indeed, on that interpretation it would be logically impossible for liquidated damages under the Punch List to be awarded:  either Matec would perform its obligations, in which case no damages would be available because no breach had occurred, or Matec would not perform them, in which case the First Contract would not have been superseded, and, on Matec's view, thus no claim could be brought under the Punch List.  Given the CISG's emphasis on the role of extrinsic evidence in interpreting contracts, *see* CISG art. 8(3), Matec could conceivably have presented evidence sufficient to raise a genuine question of fact as to whether the parties did, in fact, intend the Punch List to create remedies that could never be awarded.  But because Matec has not presented any such evidence, and because parties ordinarily intend the remedies created by their contracts to be available if those contracts are breached, the Court does not adopt Matec's interpretation of the Punch List.

### b.  The Punch List Items

As mentioned, the Punch List primarily imposed two obligations on Matec—it was required to resolve the Punch List Items, *see* Punch List at 4-5, by replacing or installing new parts, *see id.* at 1, and it was required to guarantee the subsequent operation of the Initial Presses in accordance with the Revised Specifications, *see id.* at 6-18.  Noranda divides its opening brief into two sections, each of which addresses one of those two obligations.  *See* Noranda SJ Br. at 7 (defining the "Punch List Items"); *id.* at 8 (identifying the obligation to ensure that the Initial Presses would operate for thirty days in accordance with the specifications listed in Exhibit B).  As

80

to the former, Noranda identifies five specific Punch List Items that, it claims, Matec failed to complete.  Noranda Reply 56.1 Stmt. ¶ 343.  With respect to the Punch List Items, the Punch List imposes liquidated damages on Matec only for the failure to timely ship the parts required to complete repairs:

> The specified replacement parts and equipment . . . shall be shipped within ten (10) days after the Effective Date of this Agreement, except that parts related to the belt modifications required by Noranda shall be shipped within 40 days . . . .  Matec will pay Noranda liquidated damages . . . per day for each day any of the replacement parts have not been shipped.

Punch List at 1.  Thus, to prove its entitlement to liquidated damages, Noranda must prove that Matec failed to ship the parts required to fix the Punch List Items.[28]

First, Punch List Item A.1 reads, "Hydraulic Power Unit (HPU) for Both FPs – This unit is too small for the service.  Movement of hydraulic rams and TT release systems are slow.  HPU needs to be replaced with a larger unit."  Punch List at 4.  This is the only mention of either hydraulic speed or the "TT" system in Exhibit A, and Noranda claims that Item A.1 was violated by the following two "items [that] were among those left unfinished:  (i) hydraulic speed of the filter presses was still not to Noranda's requirements; (ii) work on the TT bar (which governed opening and closing time) coupling was not completed."  Noranda SJ Br. at 8; *see also* Noranda

---

[28] The Court notes that the Punch List also requires Matec to complete the Punch List Items within thirty-five days from the effective date of the Punch List.  Punch List at 1-2.  Thus, even if Matec is correct that it did eventually complete all the Punch List Items, it still might have breached the Punch List if more than thirty-five days had passed before those Items were completed.  However, because Noranda has argued only that Matec failed to complete the Punch List Items, not that it completed them after the Punch List's deadlines had passed, the Court does not separately consider whether the evidence shows that Matec failed to complete the Punch List Items in accordance with those deadlines.  In any event, because the Punch List liquidates damages "for Matec's failure to timely complete the work specified in the" Punch List, *id.* at 2, and because no liquidated damages are due upon failure to comply with the deadline for completing the Punch List Items, only for (1) delays in shipping the parts used to complete the Punch List items and for (2) failure to comply with the Revised Specifications, it is unclear whether Noranda can recover more than nominal damages for any delays in completing the Punch List Items.

Reply 56.1 Stmt. ¶ 343.  As to the former, Noranda produces evidence that, following the repairs Matec performed, the "[h]ydraulic speed of the filter presses was still not to Noranda's specification."  Noranda 56.1 Stmt. ¶ 154(a).  And Noranda is correct that Exhibit B of the Punch List requires that the hydraulic power units achieve a specific time for opening and closing.  Punch List at 17.  However, as mentioned, Exhibit B pertains to the second of the two obligations imposed on Matec by the Punch List—namely, the guarantee that the Initial Presses would operate in accordance with the Revised Specifications—not the first of the two obligations—namely, the obligation to resolve the Punch List Items.  *See* Punch List at 1-2.  The Punch List Item imposes only the obligation for the "HPU . . . to be replaced with a larger unit."  Punch List at 4.  And because the failure of the hydraulic power unit to achieve a particular opening and closing speed is not evidence that Matec failed to provide a larger replacement unit, Noranda has not shown that no genuine issue of fact exists as to whether Matec completed the required replacement.

As mentioned, Exhibit A of the Punch List refers to the TT system only in connection with the hydraulic power units of the filter presses, Punch List at 4-5, and Noranda claims that Item A.1 was also violated with respect to the "TT bar," Noranda SJ Br. at 8.  Item A.1 does report that the hydraulic rams and TT system were operating too slowly.  Punch List at 4.  However, it further explains that the cause of those failures was that the power unit was too small, and it therefore imposes on Matec the specific obligation only for the "HPU . . . to be replaced with a larger unit."  *Id.*  Thus, to show that Matec failed to complete Item A.1, Noranda must show that the hydraulic power unit was not replaced with a larger unit.  However, the evidence Matec cites to prove that "work on the TT bar . . . coupling was not completed," Noranda SJ Br. at 8, does not show any failure to replace the hydraulic power unit.  First, Noranda produces a slide reporting that "[d]ue the extreme solicitation the joint of TT pump of machine 1 broken.  The broken joint are always

symptomatic of pump overload and when this happen the pump will die soon.  We receive the 2 coupling.  The SW modification to don't stop the motor is still not done."  Dkt. 91-52 at 8 (grammatical errors in original).  Though this exhibit is so ungrammatical that the Court cannot confidently interpret it at all, it appears to describe only damage to the TT pump joints, not a failure to install a new power unit.  Similarly, Noranda cites Martinelli's testimony that "[i]n the modification of the hydraulic system, they expected to use the TT bar motor, also to speed up the opening.  But this did not work and they had many joint failures," Dkt. 91-7 at 138:20-23, which shows only that the TT system malfunctioned, not that the power unit was not replaced.  Certain of the Revised Specifications pertain to the TT system.  *See* Punch List at 16-17.  Thus, Noranda's evidence may show that the Initial Presses failed to perform in accordance with the Revised Specifications.  But that evidence does not establish, as a matter of undisputed fact, that by failing to complete work on the TT system Matec failed to complete any Punch List Item.

Next, Punch List Item D.2 reads, "Belt Cleaning System – Belt cleaners supplied do not work.  Housekeeping under the press is a mess."  Punch List at 4.  In turn, conveyor belt cleanliness appears to be the subject of the next "item[] . . . among those left unfinished: . . . (iii) a second conveyor belt scraper was never installed," Noranda SJ Br. at 8, and Noranda claims that the failure to complete this item violated Item B.2, Noranda Reply 56.1 Stmt. ¶ 343.  As an initial matter, the Court notes that Item B.2 is plainly ambiguous as to this point.  It merely specifies the existing problem—namely, that the belt cleaning system was not functioning effectively—without obligating Matec to take any particular steps to fix it.  Thus, extrinsic evidence—which Noranda has not cited—would be required to show that Item B.2 in fact required Matec to provide *two* belt scrapers, rather than only one.  Nonetheless, even assuming *arguendo* that two belt scrapers were required, Noranda has not shown that Matec failed to provide them.  While Noranda does cite an

undated slideshow reporting that a second belt scraper had not been installed, *see* Dkt. 91-52 at 10, it also cites Martinelli's deposition testimony that a second belt was installed but then later broke down, Dkt. 91-7 at 140:11-12 ("They went ahead with it but after a few days it broke down."). Certainly, the subsequent breakdown of the second belt scraper might give rise either to a claim for the replacement of that belt scraper under the warranty provided in the Punch List, *see* Punch List at 5, or a claim that the Initial Presses failed to perform in accordance with the Revised Specifications.  However, Martinelli's testimony indicates that Matec in fact did complete the installation of two belt scrapers.  Thus, even assuming that the Punch List required Matec to install two belt scrapers, a genuine issue of fact exists as to whether it discharged that obligation.

Noranda next identifies "the following item[] . . . among those left unfinished: . . . (iv) bauxite mud cakes continued to clog under the filter press."  Noranda SJ Br. at 8.  Noranda claims that this failure breached Punch List Item D.3, Noranda Reply 56.1 Stmt. ¶ 343, which reads, "The mud cake slides – Angle of the slides need to be steeper and possible friction reduction surface material (e.g. Tyvar) added to help prevent the cakes from 'hanging up' on the slides," Punch List at 4.  However, the plain language of this provision required Matec to take two specific steps— namely, to increase the angle of the slides and to add a friction reduction material.  It did not further obligate Matec to eliminate any and all mud cake clogging in the Initial Presses.  Thus, even if Noranda's evidence did show, as a matter of undisputed fact, that Matec failed to eliminate mud cake clogging, that evidence would not show a breach of the Punch List unless it further showed that Matec failed to increase the angle of the slides or to add a friction reduction surface material.  And the evidence Noranda cites to establish the existence of mud cake clogging does not establish

that Matec failed to discharge either of those specific obligations.[29]   While continued mud cake clogging might show that the Initial Presses did not perform in accordance with the Revised Specifications, it does not show that Matec failed to complete the Punch List Items.

Lastly, Punch List Item F reads, "**Safety Light Curtains –** Matec is yet to supply this item. Item called out on the P.O."  This Item was violated, Noranda claims, Noranda Reply 56.1 Stmt. ¶ 343, by "the following item[] . . . among those left unfinished: . . . (v) the 'safety curtains' for the filter presses were never installed."  Noranda SJ Br. at 8.  However, Noranda's own evidence is inconsistent as to whether they were.  In his deposition, Martinelli denies that the safety curtains were installed.  Dkt. 91-7 at 141:1-5.  But Noranda also cites to a slide that explains, "Has we say when you propose the safety curtains you don't consider the steam, during the night the steam is very dense and the curtains stop the cycle (see Video).  When the wind is from the North at 30-35 mph the structure below the machine move and the curtains lost the laser."  Dkt. 91-52 at 13 (grammatical errors in original).  Because it escapes the Court how the "curtains" could "stop the cycle" or "los[e] the laser" if they had not been installed, this slide would seem to indicate that the curtains were installed.  Thus, a genuine issue of fact exists as to whether the curtains were installed, and the Court cannot hold as a matter of law that Matec breached the Punch List by failing to install them.

Noranda refers to one additional alleged failure to complete the Punch List Items:  "Matec never resolved problems with the filter presses' cylinder alignment because it refused to affix

---

[29] Noranda does cite a slide that reads, "[w]aiting for the material, for the second machine." Dkt. 91-52 at 11.  On its own, this text is unclear as to whether the "material" discussed is the required friction reduction surface material or is instead some other substance.  However, even were the Court to credit the slide as evidence that the material required by Item D.3 was not installed when the slide was prepared, Geesaman testified that the material was subsequently installed, Dkt. 91-18 at 159:21-22.

security cables to those cylinders, falsely claiming there was no danger to Noranda or its employees." Noranda SJ Br. at 8. However, Noranda does not tie this alleged breach to any specific Punch List Item, and the Court has been unable to identify any reference either to cylinders or to security cables within Exhibit A to the Punch List. *See generally* Punch List at 4-5. Therefore, Matec's failure to affix security cables to the cylinders, even if proven, would not show that Matec had failed to complete any Punch List Item.

In sum, the first of the two obligations imposed on Matec by the Punch List was to complete the specific Punch List Items listed in Exhibit A of the Punch List. But while Noranda has produced evidence showing that the Initial Presses did not perform to Noranda's expectations after the Punch List was executed, which might suffice to show that the performance of the Presses failed to confirm with the Revised Specifications, that evidence does not suffice to eliminate any genuine issue of fact as to whether Noranda breached the distinct obligation to complete the Punch List Items. Noranda is therefore denied summary judgment on its claim that Matec breached the Punch List with respect to its obligation to complete the Punch List Items.

### c. The Revised Specifications

In addition to promising to complete the Punch List Items, Matec guaranteed in the Punch List that the Initial Presses' performance would comply with the Revised Specifications for a thirty-day period, starting fifty-one days after the effective date of the Punch List. Punch List at 2. Noranda argues that Matec breached this provision because the Initial Presses "did not meet the performance requirements contained in the Punch List for 30 consecutive days." Noranda SJ Br. at 9. In reply, Matec argues primarily that it is not liable for the Initial Presses' failure to operate in accordance with the Revised Specifications because Noranda was itself responsible for that failure, first through delays it caused in the completion of the Punch List Items and in the

subsequent commencement of the thirty-day test, Matec SJ Opp. at 12-13, and then by instructing Matec to cease work on the project, *id.* at 13-14.

The CISG provides that "[a] party may not rely on a failure of the other party to perform, to the extent that such failure was caused by the first party's act or omission." CISG art. 80. Thus, even if Matec failed to perform by not ensuring that the Initial Presses operated in accordance with the Revised Specifications, Noranda would not be "entitled to rely" on that failure to the extent that Noranda caused it. In other words, if Noranda's act or omission prevented Matec from bringing the performance of the Initial Presses in accordance with the Revised Specifications, the CISG would prevent Noranda from seeking damages by relying on the Initial Presses' failure to perform in accordance with those Specifications. But because the results caused by Noranda's acts and omissions obviously could have occurred only after the acts and omissions themselves, whether Noranda's conduct was the cause of Matec's failure to ensure that the Initial Presses performed in accordance with the Revised Specifications depends on when, exactly, Matec was required to ensure that the Initial Presses performed in accordance with those Specifications.

In its briefing, Noranda does not identify when, in its view, the performance guarantee took effect. Because the Punch List requires the Initial Presses to perform in accordance with the Revised Specifications "[c]ommencing on the 51st day" following the Punch List's effective date, Punch List at 2, and because the Punch List was effective as of July 22, 2019, *id.* at 1, the original terms of the Punch List guaranteed performance according to the Revised Specifications as of September 11, 2019. The Punch List was amended, however. Matec 56.1 Stmt. ¶ 13.[30] That amendment provided that "[b]oth filter presses shall be fully operational in accordance with the

---

[30] Noranda claims that the Punch List was "supplemented" rather than amended, Noranda Counter 56.1 Stmt. at 4, but the document is titled "Amendment." *See* Punch List Amendment.

newly agreed upon specifications by November 18, 2019." Punch List Amendment.  Furthermore,

the parties agree that that date was extended at least until February 26, 2020.  Matec Counter 56.1

Stmt. ¶¶ 327-30; Noranda Reply 56.1 Stmt. ¶¶ 327-30.  And the record suggests that the date was

further extended.  *See* Dkt. 107-2, Exh. 38 at 2 (explaining, in an e-mail dated February 20, 2020,

that "[w]e need to agree on an official start date for the 30 Consecutive Run time to start"); Noranda

Reply 56.1 Stmt. ¶ 345 ("Unless the original machines are tested and meet the 30-day performance

criteria by June 15, 2020, Noranda will formally declare Matec to have defaulted on the

contracts . . . ." (quoting *Matec*, Dkt. 16-5 (April 3, 2020 email to Goich))).  Given the CISG's

liberal policy of permitting contracts to "be modified . . . by the mere agreement of the parties,"

CISG art. 29(1), and given that the record does not clearly establish the date on which the parties

agreed that the thirty-day test period would begin, the Court cannot identify as a matter of law

when the Initial Presses were guaranteed to perform according to the Revised Specifications.

And because the Court cannot identify as a matter of law when that guarantee went into

effect, a genuine issue of fact exists as to whether Noranda prevented Matec from ensuring that

the guarantee was met and, consequently, caused the failure to perform that it relies upon in seeking

damages from Matec.  It is undisputed, at the very least, that on May 6, 2020, Noranda stopped

Matec from completing further work on the Initial Presses.  Matec 56.1 Stmt. ¶ 14; Matec Counter

56.1 Stmt. ¶ 344.  Obviously, Noranda's termination of Matec's work prevented Matec from taking

any further steps to ensure that the Initial Presses performed in compliance with the Revised

Specifications.  Furthermore, a genuine issue of fact exists as to whether Noranda prevented the

installation of software updates required for certain newly installed or repaired components of the

Initial Presses to function properly.  The parties do not dispute that Noranda blocked Matec's

remote access to the Initial Presses, thereby preventing it from installing software on the Initial

Presses itself.  Matec Counter 56.1 Stmt. ¶ 337.  And a genuine issue of fact exists in the record as to whether Noranda refused to install software updates that were provided by Matec.[31]  Thus, a genuine issue of fact exists as to whether the failure of the Initial Presses ultimately to perform in accordance with the Revised Specifications was caused by Noranda's failure to upgrade the Initial Presses' software and its termination of Matec's work on the Presses.[32]  And because the CISG does not permit a party to "rely on a failure of the other party to perform, to the extent that such failure was caused by the first party's act or omission," CISG art. 80, a genuine issue of fact exists as to whether Noranda can recover for Matec's breach of contract in reliance on the Initial Presses' failure to conform to the Revised Specifications.[33]

---

[31] While Noranda claims that "Matec was never prevented from installing filter press software," Noranda SJ Br. at 17, Matec's claim that Noranda refused to install requested software updates is supported by testimony from its leadership and contemporaneous e-mails, *see* Dkt. 107-1, Exh. 4 (Goich deposition) at 361:7-20, 362:15-21; *id.*, Exh. 6 (Bertolucci deposition) at 160:22-162:8; Dkt. 107-3, Exh. 46 at 1.  While a reasonable jury could side with Noranda on this issue, this evidence suffices to create a genuine dispute of fact.

[32] In their briefing, the parties extensively dispute whether various other actions taken by Noranda caused delays both in Matec's completion of the Punch List Items and in the Initial Presses' ability to perform in accordance with the Revised Specifications.  Noranda SJ Br. at 12-18; Matec SJ Opp. at 12-13; Noranda SJ Reply at 7-8.  The evidence presented by the parties creates genuine issues of fact as to whether the actions Noranda took did, in fact, cause any such delays.  Resolving such disputes may be necessary at trial, depending on whether the jury finds that certain Punch List Items were not completed and when it finds that the guarantee of performance according to the Revised Specifications went into effect.  For clarity, though, the Court reiterates that Noranda is not entitled to summary judgment even independent of those disputes:  Matec has created a genuine issue of fact as to whether the Punch List Items were completed, and, given that a genuine issue of fact exists as to when the guarantee of performance according to the Revised Specifications went into effect, Matec has created a genuine issue of fact as to whether Noranda caused the Initial Presses not to conform to that guarantee either by failing to install software updates or by terminating Matec's work on the Initial Presses.

[33] Arguably, Matec could not appeal to this provision of the CISG if the Punch List had explicitly permitted Noranda to prevent Matec from performing further work on the Initial Presses.  *Cf., e.g.*, Lord, *supra* n. 22, at § 39:11 (4th ed. 2023) (explaining that, in American common law, the analogous "doctrine of prevention as an excuse for nonperformance of a contractual duty is inapplicable when the conduct alleged to have prevented performance was permissible under the

To be sure, a reasonable jury might conclude that the Initial Presses would not have conformed fully to the Revised Specifications even had Noranda installed the software upgrades and permitted Matec to continue working on the project.  In that case, Noranda would not have been the cause of Matec's failure to perform, and article 80 of the CISG would not prevent Noranda from recovering for Matec's alleged breach of the Punch List.  Similarly, even if a reasonable jury did conclude that Matec ultimately would have successfully brought the Initial Presses' performance in line with the requirements of the Revised Specifications, Matec still might have breached its obligations under the Punch List if the performance guarantees went into effect before Noranda took any steps to prevent the Initial Presses from performing in accordance with those requirements.  In that case as well, Noranda would not have been the cause of Matec's failure to perform, which would have occurred *before* any steps taken by Noranda that could have prevented performance.  Nonetheless, genuine issues of fact preclude the Court from deciding either question as a matter of law.  Consequently, Noranda is denied summary judgment with respect to its claim that Matec breached the Punch List because the Initial Presses failed to perform in accordance with the Revised Specifications.

### d.  Noranda's Liability

In addition to seeking summary judgment on its own claim that Matec breached the Punch List, Noranda seeks summary judgment dismissing Matec's claim that Noranda breached the Punch List.  Noranda's primary argument for why Matec cannot recover under the Punch List is

---

express . . . terms of the contract").  But while the Second Contract explicitly permitted Noranda to "take the Work remaining to be completed . . . out of the hands of [Matec]," Second Contract at 21, that provision of the Second Contract pertained only to the Additional Presses, not to the Initial Presses or Punch List Items, *id.* at 24 (defining the "Scope of Work" to include only the Additional Presses), nor has Matec identified any provision of the Punch List that would authorize Noranda to terminate Matec's work on the Punch List Items.

that "it is indisputable that Matec failed to fulfill its obligations and, therefore, cannot recover for any alleged breach by Noranda."[34]   Noranda SJ Br. at 11.   Genuine issues of fact, however, preclude dismissal of Matec's claims under the Punch List on that basis.   First, as the Court has held *supra*, genuine issues of fact exist as to whether Matec completed the Punch List Items.   Thus, the Court cannot dismiss Matec's claims under the Punch List, as a matter of law, on the grounds that Matec breached the Punch List by failing to complete the Punch List Items.   Furthermore, while Matec does not appear to claim that the Initial Presses ever performed for thirty days in accordance with the Revised Specifications, a genuine issue of fact exists as to whether Noranda caused that failure of performance.[35]   And because Noranda may not "rely on the failure of the other party to perform, to the extent that such failure was caused by [Noranda's] act or omission," a genuine issue of fact exists as to whether Noranda may seek dismissal of Matec's claims for breach of the Punch List by relying on the Initial Presses' failure to perform in accordance with

---

[34] In its briefing, Noranda cites the New York doctrine of material breach to argue that Matec's breaches of the Punch List preclude it from recovering under the Punch List.   As the Court has held, however, *see supra* III.B, the Punch List is governed by the CISG, not by New York common law.   Thus, if Noranda does establish at trial that Matec breached the Punch List and that Noranda did not itself cause those breaches, Noranda must rely on the CISG to establish that for that reason Matec would not be entitled to recover for Noranda's own breach of the Punch List, should any such breach be proven.   Absent briefing from the parties, however, it would be premature for the Court to decide how the CISG resolves that question.

[35] As discussed, *see supra* note 32, the jury's finding as to when the Initial Presses were guaranteed to perform according to the Revised Specifications will determine which issues of fact are material as to whether Noranda caused that failure of performance.

the Revised Specifications.  Thus, Noranda's motion for summary judgment is denied with respect to the dismissal of Matec's claim that Noranda is liable for breaching the Punch List.

### 3.  The Second Contract

As with the First Contract and the Punch List, Noranda argues that it is entitled to summary judgment both holding Matec liable for breach of the Second Contract and dismissing Matec's claim for breach of the Second Contract for Noranda's failure to pay for the Additional Presses. As to the former, Noranda argues that Matec failed to install and commission the Additional Presses, as required by the Second Contract.  Noranda SJ Br. at 9-10.  In response, Matec argues primarily that it is not liable for its failure to perform because Noranda prevented its performance. Matec SJ Opp. at 14-16.  As to the latter, Noranda does not deny that it failed to pay the price for the Additional Presses; rather, it argues that under an explicit condition precedent in the Second Contract that no payment would be due until Matec had "completed the Punch List," which it failed to do.  Noranda SJ Br. at 11-12.  In response, Matec presents a number of distinct arguments for why that condition precedent does not preclude it from recovering for Noranda's failure to pay for the Additional Presses.

### a.  Matec's Liability

In its opening brief, Noranda is clear as to the nature of Matec's alleged breach: "Matec America has admitted that Matec did not fully install or commission the [Additional Presses], and thus, it is undisputed that Matec breached the Second Contract."  Noranda SJ Br. at 10; *see also id.* at 9 ("Matec never installed or commissioned the [Additional Presses]."). The Second Contract plainly required Matec to provide and fully install the Additional Presses, Second Contract at 24, and Matec does not dispute that the Additional Presses were not and have not been fully installed, *e.g.*, Matec 56.1 Stmt. ¶¶ 15-16.  However, New York recognizes "the general rule that a party

who causes or sanctions the breach of an agreement is thereby precluded from recovering damages for its nonperformance or from interposing it as a defense to an action upon the contract."[36] *Patterson v. Meyerhofer*, 97 N.E. 472, 473 (N.Y. 1912); *see also Wieder v. Skala*, 609 N.E.2d 105, 109 (N.Y. 1992) ("The idea is simply that when A and B agree that B will do something it is understood that A will not prevent B from doing it."); *Chemical Bank v. Stahl*, 712 N.Y.S.2d 452, 462 (1st Dep't 2000) ("The landlord's obstructive conduct, then, would excuse the tenant's performance of its lease obligation, and a continuing refusal by the landlord would ultimately discharge the tenant's obligation."). The parties do not dispute that on May 6, 2020, Noranda terminated Matec's work under the Second Contract. Matec 56.1 Stmt. ¶ 14. Obviously, Matec could not complete the installation of the Additional Presses after Noranda had removed it from the project. And because the undisputed facts do not establish whether Matec would have completed the installation of the Additional Presses had Noranda not removed Matec from the project, a genuine issue of fact exists as to whether Noranda caused Matec not to complete the installation of the Additional Presses. Thus, because "a party who causes or sanctions the breach of an agreement is thereby precluded from recovering damages for its nonperformance," *Patterson*, 97 N.E. at 473, a genuine issue of fact exists as to whether Noranda can recover for Matec's failure to install the Additional Presses.

In preventing Matec from completing the installation of the Additional Presses, Noranda claimed to be exercising authority granted under article XXVII(A) of the Second Contract, which empowered Noranda "to take the Work remaining to be completed . . . out of the hands of [Matec]." Second Contract at 21. And "[t]he doctrine of prevention as an excuse for nonperformance of a

---

[36] As discussed, the New York U.C.C. and relevant provisions of New York common law govern the Second Contract. *See supra* III.B.

contractual duty is inapplicable when the conduct alleged to have prevented performance was permissible under the express . . . terms of the contract."  Lord, *supra* n. 22, at § 39:11 (4th ed. 2023).  Thus, Noranda might argue that if it was entitled to invoke article XXVII(A)—a claim it does not defend in its briefing—then its prevention of Matec's performance would not excuse Matec's nonperformance of its duty to complete installation of the Additional Presses.  But had Noranda validly invoked article XXVII(A), that invocation would in itself excuse Matec's obligation under the Second Contract to complete installation of the Additional Presses.

On the most natural reading of article XXVII(A), once Noranda took "the Work remaining to be completed . . . out of the hands of [Matec]," Matec was no longer obligated to perform that work.  Indeed, it is unclear what meaning the phrase could have if, as Noranda's arguments suggest, Matec were still obligated to complete work that had been "take[n] . . . out of [its] hands" through Noranda's invocation of article XXVII(A).  Furthermore, were Noranda to rely on article XXVII(A) and prevent Matec from completing installation of the Additional Presses, article XXVII(B) explicitly provides that Noranda might still owe further payments to Matec.[37]  Second Contract at 21-22.  And, obviously, the existence of a contractual requirement for Noranda to make additional payments to Matec despite Matec's failure to complete the installation of the Additional Presses is flatly inconsistent with Noranda's present position that Matec cannot recover anything under the Second Contract without completing that installation.  To be sure, if Noranda did validly invoke article XXVII(A), its termination of Matec's work on the project would not have breached the Second Contract, and it would be entitled to the remedies granted under article XXVII(B),

---

[37] Whether payments would be due depended on whether the unpaid portion of the price for the Additional Presses exceeded the cost of completing their installation.  Second Contract at 21-22.  If the cost of completion exceeded the unpaid portion of the contract price, then Matec would owe the difference to Noranda.  *Id.*

including the right to complete the installation of the Additional Presses at Matec's expense.  *See* Second Contract at 21-22.  But Noranda cannot claim that Matec breached the Second Contract by failing to finish installing the Additional Presses when, following Noranda's invocation of article XXVII(B), the Second Contract itself required Matec to cease installing them.  Consequently, Noranda is denied summary judgment on its claim that Matec breached the Second Contract by failing to install the Additional Presses.[38]

### b.  Noranda's Liability

Noranda argues that it is not liable for failing to pay the contract price under the Second Contract because an express condition precedent to its obligation to pay was not met.  In particular, "[p]ayment for the new filter presses under [the Second] Contract shall be contingent on the completion of repairs of the [Initial Presses], provided under the [First Contract], as set forth more particularly in the [Punch List] entered into contemporaneously herewith."  Second Contract at 36. And, therefore, because "Matec failed to satisfy that condition because it never completed the

---

[38] In addition to requiring Matec to install the Additional Presses, the Second Contract imposed liquidated damages on Matec for failing to ship and install each of the Additional Presses by specified deadlines.  Second Contract at 36-37.  Certain of those deadlines were extended when the Second Contract was amended.  Second Contract Amendment §§ 5, 7(c).  Because Noranda's briefing argues that Matec breached the Second Contract only by virtue of its complete failure to install and commission the Additional Presses, not by virtue of its having missed any deadline set forth in the Second Contract, and because Noranda's briefing does not even identify any such deadline as having been breached, *see* Noranda SJ Br. at 9-10; Noranda SJ Reply at 9, the Court has not considered whether the undisputed facts establish, as a matter of law, that Matec missed any such deadline.  Nonetheless, Noranda may argue at trial that Matec owes Noranda liquidated damages under the Second Contract for failing to comply with the deadlines for the Additional Presses to be shipped and installed.  Matec, in turn, may defend against that claim by arguing that Noranda caused any delays in the installation of the Additional Presses.  *See generally* Matec SJ Opp. at 14-16.  Thus, it will remain for the jury to resolve the parties' disagreement as to whether any such delays were caused by Matec or Noranda, *see generally* Matec Counter 56.1 Stmt. ¶¶ 346-56; Noranda Reply 56.1 Stmt. ¶¶ 346-56, and whether Matec provided notice to Noranda, as required by article XIV of the Second Contract, that its conduct had caused a delay in the timeline for completing the installation of the Additional Presses, *see* Second Contract at 14.

Punch List," Noranda SJ Br. at 12, it cannot recover under the Second Contract.  In response, Matec advances four separate arguments for why the condition precedent does not preclude it from recovering under the Second Contract.  Matec SJ Opp. at 19-23.

### i.    Amendment

As mentioned, both the Second Contract and the Punch List were amended on September 24, 2019.  Matec Counter 56.1 Stmt. ¶ 328; *see* Second Contract Amendment.  The Second Contract Amendment primarily affected the schedule governing when Matec would ship, deliver, and install the Additional Presses and when Noranda would pay for them.  Under the Second Contract, and prior to the Amendment, Noranda would not be obligated to pay for the Additional Presses until Matec achieved certain milestones with respect to each:  Noranda would pay 30% of the cost of each Press upon its delivery to Noranda, 40% of the cost upon its installation, and the remaining 30% of the cost once it had operated for thirty days in accordance with performance specifications set forth in the Second Contract.  *See* Second Contract at 36-37.  The Second Contract further imposed a schedule for the delivery and installation of the Additional Presses, according to which Matec would first deliver and install one Cube, then deliver and install the next Cube, and then deliver and install the Third Press.  *Id.* at 38.  To enforce that schedule, the Second Contract provided that Noranda would not be obligated to make the second payment for the first Cube, otherwise due upon installation, unless Matec had by that point shipped the second Cube, or the corresponding payment due upon installation of the Second Cube unless Matec had by that point shipped the Third Press.  *Id.* at 36.  Lastly, the Second Contract set dates by which each of the Additional Presses would be shipped, delivered, and installed, *id.* at 38, and imposed liquidated damages for delays either in shipping or in installing them, *id.* at 36-37.

The Second Contract Amendment altered the schedule for Matec to ship, deliver, and install the Additional Presses and for Noranda to pay for them. In particular, it extended the deadlines for Matec to ship each of the Additional Presses, Second Contract Amendment §§ 1, 7(a), and correspondingly extended all other deadlines related to the second of the two Cubes and the Third Press, *id.* § 7(c), though not the first of the two Cubes, *id.* § 5. The deadlines to complete installation of the first Cube and to complete its thirty-day run test thus remained October 1, 2019 and October 31, 2019, as provided in the Second Contract. Second Contract at 38. In the Amendment, Matec represented that it was ready to ship the first Cube as of September 20, 2019, and it committed to be ready to ship the second Cube and the Third Press as of October 9, 2019 and November 9, 2019, respectively. Second Contract Amendment at 1. The Second Contract had provided that the second Cube and the Third Press would be shipped by September 20, 2019, and October 30, 2019, Second Contract at 38, nineteen days and ten days earlier than the revised deadlines imposed in the Second Contract Amendment. Thus, the deadlines to deliver and to complete installation of the second Cube, originally October 11 and October 31, 2019, *id.*, were correspondingly extended by nineteen days to October 30 and November 19, 2019, and the deadlines to deliver and to complete installation of the Third Press, originally November 20 and December 25, 2019, *id.*, were correspondingly extended by ten days to November 30, 2019 and January 4, 2020.

The Second Contract Amendment also altered the schedule governing Noranda's payments to Matec. First, "[o]nce the last of the COMPLETE inventory list of items pertaining to CUBE PRESS #1 is loaded and shipping containers have been locked, sealed and dispatched, Noranda will effect a wire transfer of the 1st 30% payment for CUBE PRESS #1." Second Contract Amendment § 4. And "Noranda will make further payments in respect of CUBE PRESS #1 in

accordance with the Original Agreement TIME FRAMES as they apply to CUBE PRESS # 1 installation and start up and the 30 consecutive day run time at the completion of installation." *Id.* § 6.  Next, "[t]he second (40%) installment of the agreed price for CUBE PRESS #1 to be paid upon installation . . . but only if CUBE FILTER PRESS # 2 has been shipped." *Id.* § 7(b)(1). Similarly, "[t]he second (40%) installment of the agreed price for CUBE PRESS #2 to be paid upon installation . . . but only if FILTER PRESS # 3 has been shipped." *Id.* § 7(b)(2).  Lastly, as with "[t]he scheduled milestone dates in the [Second Contract] for each of CUBE PRESS #2 and the 3rd Full Press," "all associated . . . payment schedules . . . with respect to each, will be adjourned by the same amount of days as the adjournment in the respective ship dates of CUBE PRESS #2 and the 3rd Full Press." *Id.* at 2.

None of these provisions explicitly amended the condition precedent set forth in the Second Contract.  And the Second Contract Amendment further provided that "[a]ll other provisions in the [Second Contract] shall remain unchanged and in full force and effect." *Id.*  Thus, Noranda argues that the Second Contract Amendment left the Second Contract's condition precedent unchanged.  Noranda SJ Reply at 2-3.  Matec, however, argues that the Second Contract Amendment's explicit changes to the payment schedule implicitly waived the requirement that the Punch List Items be completed before payment would be due under the Second Contract.  Matec SJ Opp. at 19-21.  In particular, Matec argues, the Second Contract Amendment "provided that amounts would 'be paid upon' certain events, with no mention of a condition precedent related to the Punch List." *Id.* at 21.  Because this language *mandates* payment once certain milestones are met, without mentioning a contingency under which payment would not be required, Matec reasons that the Second Contract Amendment removed the condition precedent from the Second Contract. *Id.* at 19-21.

In addition to the Second Contract Amendment, on September 24, 2019, the parties also executed the Punch List Amendment, Matec Counter 56.1 Stmt. ¶ 328, which extended the deadline for Matec to ship certain parts required to repair the Initial Presses until October 18, 2019, and extended the deadline for the Initial Presses to be "fully operational in accordance with the newly agreed upon specifications" until November 18, 2019, Punch List Amendment § 1.  Thus, Noranda agreed to make payments for the Additional Presses immediately (first Cube shipment), on October 1, 2019 (first Cube installation), on October 30, 2019 (second Cube delivery), and on October 31, 2019 (first Cube thirty-day test), all through the Second Contract Amendment, on the very same day that it recognized, through the Punch List Amendment, that the Punch List Items would not be completed until November 18, 2019.  Of course, November 18, 2019 is after October 31, 2019, and thus after the first four payments for the Additional Presses were scheduled to be made.  Because the two Amendments were executed together, they must be interpreted together. *See Davimos v. Halle*, 877 N.Y.S.2d 20, 21 (1st Dep't 2009) ("It is a well-established principle of contract law that all contemporaneous instruments between the same parties relating to the same subject matter are to be read together and interpreted as forming part of one and the same transaction." (brackets and internal quotation marks omitted)); Restatement (Second) of Contracts § 202(2) (Am. L. Inst. 1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").  And Noranda's agreement to make payments upon milestones scheduled to occur before the Punch List Items were completed most plausibly reflects its intent for those payments not to be contingent on the completion of the Punch List Items.  Thus, the Second Contract Amendment removed the condition precedent with respect to those payments scheduled to occur before November 18, 2019.

The Court interprets the Second Contract Amendment to remove the condition precedent with respect to payments due before the scheduled completion of the Punch List Items because it would have been impossible for Noranda to make those payments as scheduled had they been contingent on the completion of the Punch List Items.  The remaining payments, however, were scheduled for after the scheduled completion of the Punch List Items.  Thus, while Noranda might have intended to eliminate the condition precedent entirely by agreeing in the Second Contract Amendment to make certain payments inconsistent with it, Noranda also could coherently have intended to retain the condition precedent as to any payments scheduled for after the completion of the Punch List Items.  Because the Second Contract Amendment does not clearly elect either of these approaches through its text, it is ambiguous as a matter of law.  Consequently, the jury must determine at trial whether the Second Contract Amendment removed the condition precedent with respect to all payments for the Additional Presses, or only with respect to those payments scheduled for dates incompatible with the enforcement of the condition precedent.  *See, e.g.*, *Pellot v. Pellot*, 759 N.Y.S.2d 494, 497 (2d Dep't 2003) ("It is well settled that whether or not a writing is ambiguous is a question of law to be resolved by the courts.  Where the language of a contract is susceptible to varying but reasonable interpretations . . . the resolution of the ambiguity is for the trier of fact." (citations omitted)).  Thus, because the Second Contract Amendment eliminated the condition precedent with respect to some payments under the Second Contract, and because a genuine issue of fact exists as to whether the Amendment eliminated the condition precedent with respect to the remaining payments, Noranda is denied summary judgment as to the dismissal of Matec's claim for breach of the Second Contract.

ii.     **Wavier**

Although Matec's argument that the Second Contract Amendment eliminated the Second Contract's condition precedent would on its own enable Matec to proceed to trial on its claim that Noranda breached the Second Contract, Matec also advances multiple independent arguments that would also require the denial of Noranda's motion for summary judgment with respect to that claim.   First, Matec argues that Noranda is precluded from enforcing the condition precedent because it accepted Matec's performance—namely, the delivery and installation of the Additional Presses—despite knowing that the condition precedent had not been satisfied.   Matec SJ Opp. at 21-23.   A condition precedent "must occur before a duty to perform a promise in the agreement arises," and an express condition precedent, such as the one found in the Second Contract "must be literally performed."   *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995).   However, even express conditions precedent are not absolute, for "the nonoccurrence of the condition may yet be excused by waiver."   *Id.*

Under New York law, "a party that continues to . . . accept performance despite the failure of a condition precedent established for its benefit may be said—provided that such party's intent is clearly expressed—either to have *elected* to affirm the contract despite the failure of the condition, or to have *waived* the satisfaction of the condition."   *Kamco Supply Corp. v. On the Right Track, LLC*, 49 N.Y.S.3d 721, 728 (2d Dep't 2017); *see also* Lord, *supra* n. 22, at § 39:17 (4th ed. 2023) ("It is well established that a party to a contract may waive a condition precedent to its own performance of a contractual duty . . . .").   Such principles, furthermore, apply to contracts governed by the U.C.C., including the contract at issue in *Kamco Supply Corp*, *see* 49 N.Y.S.3d at 727, and the Second Contract.   While the U.C.C. restricts the form of acceptable contract modifications, it provides that "an attempt at modification or rescission" that does not meet those

formal requirements "can operate as a waiver."[39]  N.Y. U.C.C. § 2-209(4).  And it further provides

that the "course of performance shall be relevant to show a waiver . . . of any term inconsistent

with such course of performance."  *Id.* § 2-208(3).  The foundations of this principle "lie firmly in

equity, and are 'designed to prevent the waiving party from lulling the other party into a belief that

strict compliance with a contractual duty will not be required and then . . . demanding compliance."

*Kamco Supply Corp.*, 49 N.Y.S.3d at 727 (quoting Lord, *supra* n. 22, § 39:15 (4th ed. 2013)).

By accepting delivery of the Additional Presses despite knowing that the condition

precedent had not been met, Matec argues, Noranda waived the condition precedent.[40]  A waiver

"is essentially a matter of intention" that requires "the intentional abandonment or relinquishment

of a known right."  *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 118 N.E. 210,

210 (N.Y. 1917).  Consequently, to prevail on the claim that a contractual right was waived, the

"intention to relinquish the right . . . must be proved."  *Id.*  Thus, when a waiver is "not express"

but rather "found in the acts, conduct, or language of a party," it "is rarely established as a matter

of law rather than as a matter of fact."  *Id.*; *see also* Lord, *supra* n. 22, at § 39:17 (4th ed. 2023)

---

[39] In particular, a "signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded," N.Y. U.C.C. § 2-209(2), and the requirements of the statute of frauds must be met by any modification or rescission if the contract to be modified or rescinded was itself governed by the statute of frauds, *id.* § 2-209(3).

[40] In addition to arguing that the acceptance of Matec's continued performance constituted a waiver of the condition precedent, Matec argues that the U.C.C. requires a buyer to "pay at the contract rate for any goods accepted."  Matec SJ Opp. at 21 (quoting N.Y. U.C.C. § 2-607).  However, as Noranda argues, Noranda SJ Reply at 3, the terms of the U.C.C. may be modified by contract, N.Y. U.C.C. § 1-302.  Thus, to the extent that the express condition precedent is inconsistent with the statutory remedies allowed by the U.C.C., Matec has not presented any compelling argument for why the U.C.C. should govern rather than the terms of the contract.  However, Noranda does not address the argument that, although the condition precedent in the Second Contract did vary the terms of the U.C.C., Noranda waived that condition precedent through its conduct in accepting Matec's performance under the contract.  *See* Noranda SJ Reply at 2-4.

("[T]here is no rigid requirement that the waiver of conditions be expressly made, either orally or in writing, since conditions may be waived either expressly or impliedly, and by acts or other conduct, by the party in whose favor they are made.").

Of course, a right may be waived as a matter of law if it can be "proved by the express declaration of the party, or by his undisputed acts or language so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary." *Alsens Am. Portland Cement Works*, 118 N.E. at 210. But Noranda's acceptance of Matec's performance was not obviously inconsistent with its purpose to stand upon its rights. Noranda might have intended to waive the condition precedent to induce Matec to deliver and install the Additional Presses before completing the Punch List Items, rather than completing the Punch List Items first as contemplated in the Second Contract. Second Contract at 38. Alternatively, though, Noranda might have intended for work on the Punch List Items to proceed concurrently with the installation of the Additional Presses and for payment to be made only once both were completed. Thus, whether Noranda waived the condition precedent through its conduct must "be proved by various species of proofs and evidence, by declarations, by acts, and by nonfeasance, permitting different inferences." *Id.* And "it is for the jury to determine from the facts as proved or found by them whether or not the intention [to waive the condition] existed." *Alsens Am. Portland Cement Works*, 118 N.E. at 210-11. This genuine issue of fact precludes dismissal of Matec's claim for breach of the Second Contract as a matter of law.

### iii.    Compliance

Having first provided two different reasons why the satisfaction of the condition precedent in the Second Contract is no longer required before Noranda must pay for the Additional Presses, Matec next argues that it can still recover under the Second Contract even if the condition

precedent must be satisfied because it has been satisfied.  Matec SJ Opp. at 24.  Whether Matec fulfilled that condition depends on what, exactly, it required.  By its terms, the condition made "[p]ayment for the new filter presses under this Contract . . . contingent on the completion of repairs of the existing two Matec presses . . . as set forth more particularly in the [Punch List] entered into contemporaneously herewith."  Second Contract at 36.  As mentioned, Matec made two primary commitments in the Punch List:  it agreed to complete the Punch List Items, and it guaranteed that the Initial Presses would perform in accordance with the Revised Specifications once the Punch List Items were complete.  Because the Punch List involved two primary obligations, the condition that payment for the Additional Presses would be "contingent on the completion of repairs of the existing two Matec presses . . . as set forth more particularly in the [Punch List]" might initially appear ambiguous as to which of the two Punch List obligations it designated:  payment might be contingent either on Matec's completion of the Punch List Items or on the Initial Presses' having run for thirty days in accordance with the Revised Specifications.

But while the text of the condition precedent itself may not clearly identify which obligation under the Punch List it referred to, other parts of the Second Contract eliminate any ambiguity.  As mentioned, the Second Contract contained a schedule governing both Matec's obligations to perform and Noranda's obligations to pay.  Second Contract at 38.  That schedule established that the Punch List Items would be completed by August 23, 2019 and that the Initial Presses would run in accordance with the Revised Specifications from August 23, 2019 to September 22, 2019.  *Id.*  It also provided, however, that the first payment for the Additional Presses would be due on September 11, 2019—after the Punch List Items were expected to be completed, but before the Initial Presses were expected to run for thirty days in accordance with the Revised Specifications.  *Id.*  If the condition precedent required the Initial Presses to satisfy the

thirty-day guarantee before any payments would be made for the Additional Presses, then it would directly contradict the schedule of payments included in the Second Contract, which required Noranda to make its initial payment for the Additional Presses before the Initial Presses could satisfy the thirty-day performance guarantee.   Noranda's promise to begin paying for the Additional Presses before the thirty-day test period had run indicates that the test period did not need to be completed before Noranda would be obligated to make payments for the Additional Presses; instead, the condition precedent merely required Matec to complete the Punch List Items before Noranda would be obligated to begin payments.

On that interpretation, however, genuine issues of fact plainly exist as to whether the condition precedent was satisfied:  the condition precedent would be satisfied if Matec completed each of the Punch List items, and, as the Court has discussed, a genuine issue of fact exists as to whether Matec completed each of the five Punch List Items that Noranda claims were left unfinished.  *See supra* III.D.2.b.  And because the undisputed evidence does not establish that the condition precedent was not satisfied, Noranda is not entitled to judgment dismissing Matec's claim for breach of the Second Contract as a matter of law.

### iv.    Prevention

Lastly, Matec argues that even if Noranda neither amended nor waived the condition precedent, and even if it was not in fact satisfied, Noranda cannot enforce it because Noranda itself caused its non-occurrence.  Under New York law, "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."  *Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 268 N.E.2d 782, 784 (N.Y. 1971).  This rule is based both on "the long-established principle of law that a party should not be able to take advantage of its own wrongful act" and on the parties' implied obligation "to

105

proceed in good faith and cooperate in performing the contract . . . and, therefore, to refrain from committing any intentional act or omission that would interfere with the other party or prevent or make it impossible for the other party to perform."  Lord, *supra* n. 22, at § 39:6 (4th ed. 2023). The Court has already held that a genuine issue of fact exists as to whether Noranda's decision to terminate Matec's work on the Initial Presses caused their failure to achieve the Revised Specifications.  *See supra* III.D.2.c.  For similar reasons, if Matec failed to complete the Punch List Items, a genuine issue of fact would exist as to whether Noranda's termination of Matec's work on the project caused that failure, since Matec plainly could not complete the Punch List once Noranda had stopped it from doing so.  *See id.*  Furthermore, additional genuine issues of fact exist as to whether, prior to its termination of Matec's work on the Punch List Items, Noranda took other steps that delayed or prevented Matec's completion of those Items.  *See* Matec Counter 56.1 Stmt. ¶¶ 336-45; Noranda Reply 56.1 Stmt. ¶¶ 336-45.  If Noranda caused Matec not to perform the condition requiring completion of the Punch List items, in turn, then Noranda could not rely on that failure.  *Kooleraire Serv. & Installation Corp.*, 268 N.E.2d at 784 ("[O]ne may not take advantage of a condition precedent, the performance of which he himself has rendered impossible." (citation omitted)).  Thus, even assuming the condition precedent both remained valid and failed to occur, a genuine issue of fact would still exist as to whether Noranda could rely on Matec's failure to perform the condition precedent to defend against Matec's claim that Noranda breached the Second Contract.

In response, Noranda notes that the "prevention doctrine . . . excuses a condition precedent only when a 'party *wrongfully* prevents that condition from occurring.'"  Noranda SJ Br. at 12 (quoting *In re Gulf Oil/Cities Service Tender Offer Litig.*, 725 F. Supp. 712, 737 n.9 (S.D.N.Y. 1989)).  And, certainly, in some instances "frustration is justified by the conduct of the other party."

*Koolerairse Serv. & Installation Corp.*, 268 N.E.2d at 784.  Any of its actions that may have prevented Matec from completing the Punch List Items, Noranda argues, were justified, not wrongful, and therefore do not excuse the non-occurrence of the condition precedent.[41]  But because genuine issues of fact exist as to exactly what caused delays in the completion of the Punch List Items and as to what role each party played in causing those delays, the Court cannot hold as a matter of law that Noranda was justified in terminating Matec's work on the Punch List Items or in otherwise taking steps that may have prevented Matec's performance.  Instead, should the jury find at trial that Noranda did prevent Matec from completing the Punch List Items, therefore causing the nonoccurrence of the condition precedent in the Second Contract, it would remain for the jury to determine whether Noranda's conduct breached its implied obligation "to cooperate in performing the contract in accordance with its expressed intent" or whether, instead, Noranda's actions were justifiable attempts to protect its own interests in light of Matec's conduct. *Cf.*, *Kooleraire Serv. & Installation Corp.*, 268 N.E.2d at 784 (explaining that the question of whether "this kind of frustration is justified by the conduct of the other party . . . ought to be litigated").  Due to those genuine issues of fact, in turn, the Court cannot as a matter of law reject

---

[41] In general, "[t]he doctrine of prevention as an excuse for nonperformance of a contractual duty is inapplicable when the conduct alleged to have prevented performance was permissible under the express . . . terms of the contract."  Lord, *supra* n. 22, § 39:11 (4th ed. 2023).  Thus, because the Second Contract explicitly permitted Noranda to terminate Matec's work on the Additional Presses, Noranda's exercise of that right would not operate to excuse the nonoccurrence of the condition precedent contained in the Second Contract.  However, that provision of the Second Contract, which authorizes Noranda to "take the Work remaining to be completed . . . out of the hands of [Matec]," Second Contract at 21, does not authorize Noranda to terminate Matec's work on the Punch List Items, *id.* at 24 (defining the "Scope of Work" to exclude the Punch List Items).  And Noranda has not identified, nor has the Court uncovered, any provision of the Punch List that would authorize Noranda to terminate Matec's work on the Punch List Items.  Thus, to the extent that Noranda prevented the occurrence of the condition precedent in the Second Contract by terminating Matec's work on the Punch List Items, Noranda cannot argue that such prevention was expressly permitted and thus could not excuse the nonoccurrence of the condition precedent.

Matec's argument that the nonoccurrence of the condition precedent in the Second Contract was excused because Noranda prevented its occurrence.  Thus, on that basis too, Noranda is denied summary judgment dismissing Matec's claim for breach of the Second Contract.

## E.    Damages

Lastly, each party moves for summary judgment denying certain types of damages sought by the other party.

### 1.    Damages Sought by Noranda

Matec seeks to preclude four categories of damages sought by Noranda:  the costs of expanding Mud Lake 4, which was used to contain bauxite residue in the form of slurry and which Noranda expanded once it became clear that the Initial Presses were operating too slowly to handle the volume of residue generated by the refinery, Matec SJ Br. at 15-20, labor costs, *id.* at 20, punitive damages, *id.* at 20-22, and attorneys' fees, *id.* at 22-23.  In opposition, Noranda defends its requests for punitive damages and compensatory damages, but not its request for attorneys' fees.  The Court thereby deems Noranda to have abandoned its request for attorneys' fees, and it consequently grants Matec summary judgment denying that request.  *See, e.g.*, *Banyan v. Sikorski*, No. 17 Civ. 4942 (LJL), 2021 WL 2156226, at *2 (May 27, 2021) ("[A] failure to respond to arguments set forth in a moving party's brief is an adequate ground for a Court to deem the claim abandoned.").

#### a.    Mud Lake 4

Most of the damages claimed by Noranda consist of the cost of expanding Mud Lake 4 so that it could hold excess bauxite residue that the Initial Presses could not process given their longer-than-expected cycle times.  *See* Dkt. 99-5.  Matec argues that Noranda cannot recover those costs

for two reasons:  the First Contract precludes such damages,[42] Matec SJ Br. at 16-19, and Matec failed to mitigate damages, *id.* at 19-20.  As to the former, the section of the First Contract governing damages provides that "Matec is neither responsible for the possible damage or loss suffered by [Noranda] and caused by the stoppage or reduction of the production, related to damages, defects, malfunctions of what has been sold."  First Contract at 22.  This provision, Matec argues, limits its liability for any damages caused by a reduction in the Initial Presses' rate of producing dry mud cakes from bauxite residue.  Matec SJ Br. at 16-17.  In response, Noranda claims that the provision is ambiguous, because "it is impossible to determine whether this clause would apply to the stoppage or reduction of producing mud cakes or producing alumina generally." Noranda SJ Opp. at 17.

The Court agrees with Noranda.  While the First Contract limits Matec's liability for damages caused by a reduction in "production," it does not clarify *what* must be reduced in production for Matec not to be liable.  And at least two possibilities exist:  the First Contract might have disclaimed Matec's liability for any damages caused by a reduction in the Initial Presses' rate of producing mud cakes, or it might have disclaimed liability only for damages sustained if the performance of the Initial Presses caused Noranda's refinery as a whole to reduce its rate of producing alumina.  Because the First Contract could plausibly be interpreted to limit damages in either respect, it is ambiguous, and the jury must determine its meaning at trial.  *See, e.g.*, *Pellot*,

---

[42] While Matec further argues that the Punch List and the Second Contract also preclude Noranda from recovering the costs of expanding Mud Lake 4, Matec SJ Br. at 17-19, even if correct those arguments could not entitle Matec to summary judgment given its concession that "these damages purportedly flow from Matec's alleged breach of the First Contract," *id.* at 17, and the Court's conclusion *infra* that the First Contract does not as a matter of law bar such damages.

759 N.Y.S.2d at 497.[43]  Thus, a genuine issue of fact precludes the Court from granting Matec judgment as a matter of law that Noranda cannot recover the costs of expanding Mud Lake 4 because the First Contract limits Matec's liability for such damages.[44]

Next, Matec argues that the costs of raising Mud Lake 4 cannot be recovered because they were caused by Noranda's failure to mitigate damages, not by Matec's breach of the First Contract. Matec SJ Br. at 19-20.  In particular, Matec argues that if the Initial Presses operated too slowly to adequately process all Noranda's bauxite residue, Noranda should have completed the installation of the Additional Presses so they could process the additional residue rather than expanding Mud Lake 4 to store it.  Matec is certainly correct that "a party subject to injury from the breach of a contract [is under] the active duty to make reasonable efforts to render the injury as light as possible." *Losei Realty Corp. v. City of New York*, 171 N.E.899, 902 (N.Y. 1930).  "The question of reasonable conduct as affecting the measure of damages," however, is "a question of fact." *Id.* And while conceivably the evidence as to the reasonableness of a party's mitigation might be so one-sided such that any reasonable jury could reach only one conclusion as to reasonableness, no such evidence exists here:  for example, Matec has not established the expected cost of completing the installation of the Additional Presses, the expected time required to complete that installation,

---

[43] Noranda also argues that the First Contract's limitation of liability should be construed against Matec because Matec was the party that drafted it.  Noranda SJ Opp. at 17.  And in New York "[i]t has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it." *151 W. Assocs. v. Printsiples Fabric Corp.*, 460 N.E.2d 1344, 1345 (N.Y. 1984). However, "[t]hat doctrine may only be applied as a last resort, if the extrinsic evidence is inconclusive," and "it cannot be assumed that all relevant extrinsic evidence has been presented at this stage of the proceedings." *Perella Weinberg Partners LLC v. Kramer*, 58 N.Y.S.3d 384, 390 (1st Dep't 2017).

[44] Because it is ambiguous whether the First Contract limits Matec's liability for the costs of raising Mud Lake 4, the Court does not address Noranda's argument that Matec would be liable despite the contractual limitation because its conduct was reckless or grossly negligent.  *See* Noranda SJ Opp. at 17-20.

the expected time remaining before existing space for storing bauxite residue would be exhausted, the risk that installation of the Additional Presses would not be completed, or the relative benefits of enlarging Mud Lake 4 and of completing the Additional Presses.  Because all those facts might affect the reasonableness of Noranda's decision to enlarge Mud Lake 4 rather than to complete the Additional Presses, the Court cannot hold as a matter of law that Noranda's decision was unreasonable.  Thus, Matec is denied summary judgment as to its argument that Noranda cannot recover the costs of enlarging Mud Lake 4 because it failed to reasonably mitigate those damages. Instead, if the jury finds Matec liable, it must decide based on the facts proved at trial whether Noranda reasonably enlarged Mud Lake 4 rather than completing the Additional Presses.

> **b.    Labor Costs**

Next, Matec argues that Noranda cannot "recover[] labor costs allegedly incurred in connection with replacing purportedly defective parts," because the warranty under the First Contract "covers 'only the supply of the **particular component damaged or with defect/s**.'" Matec SJ Br. at 20 (quoting First Contract at 22).  The Court agrees that this term, on its face, does not entitle Noranda to recover labor costs associated with the repair of parts covered under the First Contract, since it covers the "supply" of the part, not the labor associated with installing it. Furthermore, Noranda's argument that Matec implicitly waived this provision through its course of conduct is unpersuasive.  *See* Noranda SJ Opp. at 22-23.  As discussed, *see supra* III.D.3.b.ii, a party can waive a contractual right through "acts or language . . . inconsistent with his purpose to stand upon his rights."  *Alsens Am. Portland Cement Works*, 118 N.E. at 210.  And Noranda claims that Matec implicitly waived this right because "Matec sent its technicians *to Noranda* to repair or replace defective filter presses [sic] parts and components."  Noranda SJ Opp. at 22-23.  But Matec's provision of technicians at its own expense is consistent with a purpose not to reimburse

Noranda for the labor expenses *Noranda* incurred in installing the replacement parts.  Thus, no reasonable jury could conclude, simply from the fact that Matec provided technicians for installing replacement parts, that Matec had agreed to reimburse Noranda for its own labor costs.  The Court therefore holds that Noranda cannot recover the labor costs associated with installing replacement parts as damages for any breach it proves of the First Contract's warranty.

Nonetheless, in its briefing Matec does not specifically identify which of Noranda's requested damages, in its view, would be precluded by this provision of the First Contract.  Matec SJ Br. at 20; Matec SJ Reply at 9.  Noranda, in turn, disputes whether it seeks various specific labor costs as damages for breach of the First Contract's warranties or as damages under some other legal theory.  Noranda SJ Opp. at 22-23.  And Matec has not shown that no issue of fact exists as to whether any particular category of labor cost sought as damages could only have been caused by Matec's alleged breach of the First Contract's warranties rather than being caused by a breach of the Punch List, the Second Contract, or some other provision of the First Contract.  Thus, while the Court agrees with Matec that Noranda cannot recover the labor costs it incurred in installing parts that were replaced pursuant to the First Contract's warranty, the Court cannot hold as a matter of law that any specific damages sought are unrecoverable as a result.  Instead, while the Court will instruct the jury at trial on the legal effect of Noranda's limitation of liability, the jury must determine based on the facts proven which specific costs are unrecoverable due to that provision.

### c.    Punitive Damages

While punitive damages are generally unavailable for breach of contract, they may be available for independent torts that accompany a breach of contract.  *See, e.g.*, *Rocanova v. Equitable Life Assurance Soc. of the U.S.*, 634 N.E.2d 940, 943-44 (N.Y. 1994).  "[A] private party

seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *Id.* at 944. Noranda seeks punitive damages in connection with its fraudulent inducement claim. Compl. ¶ 115. Matec argues that Noranda's request for punitive damages must be denied as a matter of law because Noranda has produced insufficient evidence to show either that Matec's conduct was sufficiently egregious to merit punitive damages or that it formed part of a pattern directed at the public generally. Matec SJ Br. at 20-22.

Whether the tort claims Noranda presents at trial might entitle it to punitive damages depends, of course, on which tort claims survive for trial. In this Opinion and Order, the Court grants Matec's motion for summary judgment dismissing Noranda's claim for fraudulent inducement except with respect to two particular alleged misrepresentations—namely, Matec's statement that the Initial Presses operated at cycle times longer than expected because of entrained air in the residue, and its statement that it had previously worked at an alumina facility in Brazil. Noranda would be entitled to punitive damages for these allegedly fraudulent misrepresentations only if either constituted "egregious tortious conduct," where "such conduct was part of a pattern of similar conduct directed at the public generally." *Rocanova*, 634 N.E.2d at 944. Even if these allegedly fraudulent misrepresentations did constitute "egregious tortious conduct," however, Matec has not shown that the misrepresentations were "part of a pattern of similar conduct directed at the public generally." *Id.*

Because each was made privately, in private communications between Matec's and Noranda's employees, not generally to the public, *see* Noranda 56.1 Stmt. ¶ 89; Noranda Counter 56.1 Stmt. ¶ 35; Dkt. 91-8 at 2, the individual statements do not plausibly constitute "conduct directed at the public generally" on their own. Thus, Noranda would be entitled to punitive

damages only if it could identify other, similar statements that together constituted a pattern, directed to the public generally, of making private misrepresentations about Matec's experience or about why Matec's equipment failed to work as expected.  Punitive damages would be appropriate, for example, were the evidence to show that using such misrepresentations to "defraud[] the general public into entering . . . contracts, such as the one involved in the present case, was the very basis of [Matec's] business."  *Walker v. Sheldon*, 179 N.E.2d 497, 500 (N.Y. 1961).

Noranda has produced insufficient evidence to make that showing, however.  At best, its evidence shows that "it has happened in the past" that Matec falsely blamed customers for failing to maintain their presses appropriately, Dkt. 106-6 (Martinelli deposition) at 190:15-191:1, and that on one occasion Matec disseminated advertising misrepresenting the nature of its past work (in that case, with Noranda), *see* Dkt. 106-17.  But while this evidence might prove that Matec engaged in "isolated" misrepresentations "incident to an otherwise legitimate business," it does not prove that fraud was "the very basis of [Matec's] business," *Walker*, 179 N.E.2d at 500.  Thus, Matec is granted summary judgment denying Noranda's request for punitive damages.

### 2.     Damages Sought by Matec

First, Noranda asks the Court to deny Matec SRL any recovery for breach of the contracts between the parties, arguing that such damages can be recovered only by Matec America because only Matec America issued invoices pursuant to those contracts.  Noranda SJ Br. at 18; *see* Dkts. 91-70 to 91-74.  However, Noranda cites no authority, whether a provision of the CISG or New York law or a provision of any of the contracts at issue, for the proposition that a party to a contract

cannot recover payments due under the contract unless invoices were issued under its letterhead.[45]

And in the absence of any legal or contractual rule that would condition Noranda's liability to

Matec SRL on the issuance of an invoice under Matec SRL's letterhead, Noranda is denied

summary judgment on its claim that Matec SRL cannot recover damages absent such an invoice.

Next, Noranda cites provisions of the Punch List and Second Contract that, it argues,

preclude Matec from recovering specific categories of damages.  The Second Contract provides

that, if Noranda were to cause "delay to [Matec]" (referred to as "Owner-Caused Delays") such

that Matec "believes and can document [resulting] cost increases," Matec may request "a proposed

increase in compensation, which the parties shall use good faith efforts to resolve."  Second

Contract at 14.  In addition, however, "[n]otwithstanding the foregoing provisions, [Matec] hereby

waives any and all claim to any other damages damages [sic], including consequential damages of

whatever kind, which it may suffer from any such delay or similar causes."  *Id.*  Citing only the

language in which Matec waived "any other damages . . . which it may suffer from any such delay,"

Noranda claims that this provision bars the damages Matec seeks as reimbursement for labor and

other costs that it allegedly incurred because of delays Noranda caused.  Noranda SJ Br. at 19-21.

---

[45] The issuance of appropriate invoices could conceivably be a condition precedent to Noranda's obligation to make payment.  *See, e.g.*, *Town of Mexico v. Cnty. of Oswego*, 107 N.Y.S.3d 221, 224 (4th Dep't 2019) (finding that the plaintiff's submission of invoices within thirty days of performing work was a condition precedent to its right to payment).  However, New York courts interpret contracts to establish a condition precedent only when they "employ[] the unmistakable language of condition ('if,' 'unless and until')."  *Oppenheimer & Co.*, 660 N.E.2d at 418.  And while the First Contract may require Matec to issue invoices, First Contract at 19 ("[A]ny delay caused by buyer will be invoiced for the additional days as time and material."), its language does not make Matec's obligation to pay contingent on the issuance of those invoices, and therefore it does not create a condition precedent, *see, e.g.*, *Tecchia v. Bellati*, 165 N.Y.S.3d 32, 35 (1st Dep't 2022) ("The contract language . . . does not contain unambiguous conditional language such as 'if' and 'unless and until,' and therefore cannot be interpreted as an express condition rather than a promise."); *Town of Mexico*, 107 N.Y.S.3d at 223 (quoting contractual language, found to create a condition precedent, that "[a]ny compensation for the work and services performed and submitted after the [30-day] billing deadline shall be deemed to be forfeited by [plaintiff]").

The portion of the provision Noranda cites, however, is not the portion relevant to the damages Matec seeks.  The Second Contract both (1) provides a method by which Matec could seek compensation for any increases in the cost of performance attributable to delays caused by Noranda and (2) precludes Matec from seeking any other sort of damages as a result of such delays.  Certainly, that provision does preclude Matec from recovering certain types of damages, such as consequential damages, that resulted from delays Noranda caused.  However, additional labor costs incurred because of Noranda-caused delays are plainly a "cost increase[] resulting from Owner-Caused Delays."  Second Contract at 14.  Thus, the Second Contract explicitly authorizes Matec to seek such costs.  Furthermore, the language in which Matec waived claims to "other damages," which immediately follows the language authorizing it to seek compensation for "cost increases resulting from Owner-Caused Delays," applies only to categories of damages other than the one just mentioned—namely, the increased costs due to Noranda-caused delays.  Thus, that waiver of damages does not preclude Matec from seeking reimbursement for costs in incurred due to such delays.

Nonetheless, the Second Contract does establish a specific procedure that Matec must employ to seek such costs.  In particular, Matec must provide Noranda with notice that its conduct would cause a delay, and that notice must propose an increase in compensation based on the additional costs incurred as a result of that delay.  Second Contract at 14.  Genuine issues of fact exist as to whether Matec complied with that procedure with respect to all the additional labor costs that it seeks to recover as damages.  Thus, while Noranda is denied summary judgment excluding Matec from recovering costs due to Noranda-caused delays as damages, it may still argue at trial that Matec cannot recover such costs because it failed to comply with the procedures

116

required by the Second Contract.[46]   However, as Matec notes in its briefing, such arguments could

show at most that such costs cannot be recovered as damages for breach of the Second Contract.

*See* Matec SJ Opp. at 24-25.  Matec would remain free to seek reimbursement for such costs if it

could prove it was entitled to recover those costs as damages under the First Contract.[47]

Next Noranda argues that certain labor costs for Matec America technicians are barred

because under the Punch List "Matec agreed to repair and address the Punch List items '*at no*

*charge to Noranda.*'"   Noranda SJ Br. at 20 (quoting Noranda 56.1 Stmt. ¶ 117).  Matec does not

appear to argue that the Punch List obligated Noranda to pay Matec for the labor costs it incurred

in completing the Punch List Items, and the Court agrees that the plain text of the Punch List does

---

[46] Matec further argues that this provision is inapplicable because "delay damages are recoverable 'even with such a clause,' for uncontemplated delays or delays attributable to Noranda."  Matec SJ Opp. at 25 (quoting *Corinno Civetta Constr. Corp. v. City of New York*, 493 N.E.2d 905, 910 (N.Y. 1986)).  Matec is correct that such a clause does not preclude damages due to delays that (1) are "caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct," (2) are "uncontemplated," (3) are "so unreasonable that they constitute an intentional abandonment of the contract by the contractee," or (4) "result[]from the contractee's breach of a fundamental obligation of the contract."  *Corinno Civetta Constr. Corp.*, 493 N.E.2d at 910.  The second category of damages recoverable despite such a clause—uncontemplated delays—does not encompass delays "mentioned in the contract."  *Id.*  And the provision of the Second Contract authorizing Matec to seek compensation for cost increases explicitly mentions three types of delays.  Second Contract at 14.  Thus, Matec could not recover increased labor costs resulting from such delays on the grounds that they were uncontemplated.  Similarly, while Matec claims that certain delays were caused by Noranda, Matec SJ Opp. at 25, New York does not permit delay damages to be recovered despite such a clause simply because they were caused by the defendant.  Rather, damages are barred by the clause unless the delays were caused in bad faith or maliciously, constituted an abandonment of the contract, or resulted from the breach of a fundamental obligation under the contract.  *Corinno Civetta Constr. Corp.*, 493 N.E.2d at 910.

[47] Under the First Contract, in the event of "any delay caused by [Noranda]," Matec must "invoice[] for the additional days as time and material."  First Contract at 19.  Noranda argues that this provision prevents Matec from recovering labor costs under the First Contract, because it has not produced evidence that it issued any such invoices.  Noranda SJ Br. at 20.  This argument would succeed, however, only if the invoicing provision established a condition precedent to Noranda's payment.  And, as discussed, *see supra* note 45, under the First Contract Matec's issuance of invoices is not a condition precedent to Noranda's obligation to pay.

not obligate Noranda to pay such costs.  However, the record does not clearly identify any category

of damages that Matec seeks solely based on the theory that Noranda was obligated to pay Matec

for the costs of completing the Punch List Items, *see* Noranda 56.1 Stmt. ¶ 253 ("Matec America

claimed that labor costs ($25,186) and expenses ($9,600) related to all three contracts . . . ."), and

Matec's briefing indicates that it relies primarily on the First Contract in seeking its costs for labor

performed on the Initial Presses, Matec SJ Opp. at 24 ("[T]he vast majority of the labor costs relate

to Filter Presses 1 and 2 and are therefore sought under the First Contract . . . .").  Thus, while the

Court agrees that Matec is not entitled to recover its labor costs for completing the Punch List

Items, the Court cannot deny on the current record any specific damages sought on that basis.

Lastly, Noranda argues, because Matec "admitted that damages in connection with extra

'TT plastics' and the mobile plate wheels were 'spare parts' that had nothing to do with the

Contracts," those damages are barred.  Noranda SJ Br. at 21.  Because Matec did not provide an

argument in its opposition brief as to why a claim for breach of any of the three contracts at issue

could entitle it to those damages, the Court deems Matec to have abandoned its request for those

damages, which is therefore denied.  *See, e.g.*, *Banyan*, 2021 WL 2156226, at *2.

## IV.  Conclusion

For the foregoing reasons, Noranda's motion to exclude certain of Fuller's opinions is

granted in part and denied in part, Matec's motion to exclude certain of Spevacek's opinions is

granted, Noranda's motion for summary judgment is granted in part and denied in part, and

Matec's motion for summary judgment is granted in part and denied in part.  Any opinion by Fuller

that Matec relied upon Noranda's specifications in designing the Initial Presses is excluded, and

Fuller may testify that the presence of entrained air caused the delay in cycle times, but not that it

was the only cause of the delay.  Spevacek's opinions that Matec exaggerated its experience and

118

capabilities and that Matec was at fault for the unknown cause of the Initial Presses' slow cycle times are excluded.  Noranda's claims for negligent misrepresentation and for unjust enrichment are dismissed, as is Matec's claim for breach of the duty of good faith and fair dealing.  Noranda's claim for fraudulent misrepresentation is dismissed except with respect to two alleged misrepresentations—the statement that Matec had worked on an alumina facility in Brazil prior to selling Noranda the Initial Presses, and the statement that the Initial Presses' slow cycle times were caused by entrained air and poor maintenance.  Noranda's requests for punitive damages and attorneys' fees are denied, as is Matec's request for damages for "TTA plastics" and mobile plate wheels.  The parties are ordered to appear for a status conference on October 11, 2023, at 11:30 a.m. to discuss a trial date.  That conference shall be held in Courtroom 12D of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007.  The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 86, 90, 95, and 98 in No. 20 Civ. 3937, as well as the motions pending in No. 20 Civ. 4136 at Docket Numbers 104 and 108.

SO ORDERED.

Dated: September 11, 2023
    New York, New York

_____
JOHN P. CRONAN
United States District Judge